UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNION CAPITAL LLC, a New York Limited Liability Company, | ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-1343 (RJS) |
| - against - | ) ) | |
| | ) | **DECLARATION OF** |
| VAPE HOLDINGS INC., a Delaware | ) | **JUSTIN BRAUNE** |
| corporation, and ISLAND CAPITAL | ) | |
| MANAGEMENT LLC, d/b/a ISLAND | ) | |
| STOCK TRANSFER, a Florida Limited | ) | |
| Liability Company | ) | |
| | ) | |
| Defendants. | ) | |

JUSTIN BRAUNE being duly sworn, does hereby affirm under penalty of perjury pursuant to 28 U.S.C. §1746, as follows:

1.      I am the Chief Executive Officer and a member of the board of directors of Vape Holdings, Inc. ("VHI").  I submit this Declaration in opposition to Plaintiff Union Capital LLC's ("Plaintiff") Motion for Preliminary Injunction (the "Motion").

2.      I was appointed as Chief Executive Officer and member of the board of directors of VHI on December 10, 2015 after the convertible note (the "Note") was entered into by and between VHI and Plaintiff.

3.      In January 2016, the VHI board, including myself, began to discuss potential solutions to the impending conversions of up to eight noteholders totaling an aggregate of approximately $1 million in convertible debt.  The debt itself was not due to be re-paid for several months, but the conversions had the potential to severely depress the market price of VHI

shares.   I was approached by Plaintiff with an offer to purchase all of the $1milliion in convertible debt at a 25% discount to face value of these notes. They did not want a bidding war and specifically requested we would not "shop" the deal.  The proposed deal would require that each of the noteholders assign their convertible debt to Plaintiff which represented that it would then reasonably sell in the market to avoid the "death spiral" of numerous noteholders converting at prices well below market which in turn resulted in severe selling pressure on the market and a downward drop of the market price of VHI.  Based on the assurances of Plaintiff, VHI began discussions with all noteholders regarding Plaintiff's offer.  The other noteholders, however, rejected Plaintiff's offer.

4.      In the first week of February 2016, we were approached by a third party investor willing to financing a buy-out of the $1 million in convertible debt at the full value of principal and interest on the notes.  Based on my discussions with the other noteholders, I believed this offer was much more likely to be accepted by the noteholders and represented a complete elimination of the risk of loss by the noteholders while also avoiding the death spiral of the market price of VHI stock.

5.      VHI is currently not seeking new financing monies as part of this debt restructuring but rather is doing so solely to buy-out the convertible debt, including Plaintiff's Note.  VHI has sufficient capital at this time to sustain its operations and revenue growth.

6.      On February 10, 2016, the board of directors of VHI authorized me as CEO to enter into the term sheet with the third party financing party (the "$1 Million Term Sheet").  The $1 Million Term Sheet provided that the third party would purchase up to $1,000,000 of the notes at face value of principal and interest.  I was also provided assurances that this third party financing party would convert responsibly into the market thereby avoiding the death spiral and

toxic natures of the notes, including that of Plaintiff. The $1 Million Term Sheet is attached hereto as Exhibit A.

7.      Each of the noteholders was provided the offer set forth in the $1 Million Term Sheet. On February 11, 2016, I received notice of a conversion by Union.  This was just one day after they were informed that VHI chose a better buy-out offer to resolve VHI's toxic debt issues.  I originally believed that Plaintiff would surely accept a full buy-out offer considering they believed that a buy-out offer of 25% discount to face value was a reasonable offer on the value of these notes. However, it became clear that Plaintiff was upset its offer was not chosen as evidenced by the conversion and the fact they cut-off all communications with VHI.

8.      After discussion with other noteholders, we had tentative agreements with 5 of the 8 parties totaling roughly $700,000 of the $1 million. VHI began to work on drafting definitive documentation to close the transaction.  In addition, the board of directors of VHI, including myself, reviewed the validity of the notice of conversion sent in by Plaintiff with corporate counsel.

9.      On February 17, 2016, we authorized our corporate counsel to send notice to our transfer agent, Island Stock Transfer ("Island") that a legal basis existed to deny the notice of conversion of Plaintiff.  VHI promptly provided Island with a letter from its counsel addressing some of the legal bases for these conclusions.  See Vail Decl, Ex. F.

10.     On February 22, 2016, VHI filed its Quarterly Report on Form 10-Q for the quarter-ended December 31, 2015 in which VHI had $688,929 in current assets, revenue of $246,828 for the quarter and gross profit of $41,419.  Due to certain non-cash, line item expenses, including certain adjustments to interest expenses, VHI ended the quarter with a net loss which is not uncommon for an emerging growth company. See Vail Suppl. Decl, Ex. H.

11.     VHI has been an operating its current business model since March 2014 and has generated annual revenues of $841,724 for 2014 and $1,277,657 for 2015 for over $2,000,000 in revenues in less than two years of operation.  Due to the launch of new products beginning in January 2016 and certain adjustments to VHI's manufacturing costs, VHI anticipates that it will continue to grow revenues and progress towards achieving profitability.  VHI is certainly not insolvent and has financing necessary to re-pay its outstanding loan obligations, including Plaintiff's.  VHI's main concern, instead, is that toxic conversions do not so severely depress the market for VHI stock that the company cannot maintain liquidity and shareholder value. See VHI's Annual Reports for the fiscal year-ended September 30, 2014 and 2015 attached hereto as Exhibits B and C, respectively.

12.     Despite assertions to the contrary, VHI's market has been relatively stable over the past 90 days, generally hovering between $0.01 and $0.005 per share with an average daily volume of 7,500,000 shares traded.  VHI has substantial liquidity in its market and a large shareholder base.  Further, due to the toxic structure of Plaintiff's note, as well as the multi-week lookback, fluctuations in stock price have little to no impact on the ability to calculate damages that would be owed to Plaintiff.  A true and correct copy of Yahoo! Finance market report for VHI the last 90 days is attached hereto as Exhibit D.

13.     The Court should not reward Plaintiff for its usurious, invalid contract and bad faith, retaliatory conduct by allowing it to receive shares that it immediately plans to sell in the market and convert into cash.  Plaintiff should not be permitted to take advantage of small, emerging growth companies with capital needs at the expense of the company's shareholders and to continue its toxic, predatory conduct.

4

14.    VHI intends to fully re-pay Plaintiff for the monies loaned to VHI in good faith and has offered as much to Plaintiff which has instead filed suit to seek many, many times the amount its loaned as return.

Executed: March 1, 2016

JUSTIN BRAUNE

# EXHIBIT "A"



**Proposed Term Sheet**

## VAPE HOLDINGS, INC. (OTCQB: VAPE)

*This term sheet (the "Term Sheet") is an indication of terms pursuant to which GHS Investments LLC or its designee (the "Investor") would purchase certain securities of Vape Holdings, Inc. (the "Company"), and the Company would issue such securities to the Investor (the "Transaction"). This Term Sheet is an indication of interest only, not an offer to purchase or sell securities in the United States or any other jurisdiction, and is non-binding on the parties pending execution of a definitive agreement. The information contained herein is confidential and intended only for the person to whom this memorandum is furnished.*

### SECURITIES PURCHASE PROPOSAL

**Date:** February 10, 2016

**Issuer:** Vape Holdings, Inc. (the "Company")

**Securities Seller:** Redwood, Typenex, JSJ, JMJ, Union, Adars Bay, LG and Darling, collectively (the "SELLER'S")

**Purchaser:** GHS Investments LLC ("GHS")

**Proposed Transaction:** GHS will purchase convertible securities issued to SELLER'S by the Company (the "Securities"). GHS will initially purchase $335,000 from Redwood and Typenex. Starting 30 days from initial purchase, GHS will begin to purchase $695,000, plus additional accrued interest, from the other sellers in monthly tranches pro-rata to their holdings. Repayment in full of each SELLER'S note will be made in full by their respective maturity dates in their notes. The parties will mutually agree on a repayment schedule for each SELLER's note.

**Purchase Amount:** GHS will purchase up to $1,000,000 of the Securities from SELLER'S.

**Interest Rate:** 10% per annum

**Maturity Date:** November 30, 2016

**Conversion Provisions:**  The Note may be converted, in whole or in part, into shares of the Company's common stock. The Conversion Price will be the equal to 55%, equivalent to a 45% discount off of the lowest trading price of the Company's common stock during the 20 trading days prior to conversion. A letter of instruction with the Transfer Agent reserving 816,000,000 shares for the conversion of the Securities purchased by GHS shall be provided.

**Selling Restrictions:**  GHS shall be restricted to converting no more than 25% of the outstanding balance of the Note per month.  GHS will only be entitled to convert if they are not in default on the repayment of the SELLERS notes.

**Closing:**  The closing of this transaction shall be deemed to have occurred upon the execution of all documents required by the parties to facilitate the transaction.

**Securities Exchanges:**  The Company shall not enter into, or facilitate, any securities exchanges between the Company and any other party besides GHS as long as this transaction and its agreements are in effect.  This includes any securities exchanges pursuant to Section 3(a)9 or 3(a)10 of the Securities Act.

**Shorting:**  Neither GHS nor its affiliates shall engage in any short sales of the Company's common stock.

**Conditions to Closing:**
1.  Mutual agreement and execution of all definitive documentation.
2.  Satisfactory due diligence and background checks completed by GHS.
3.  No material adverse change in the circumstances of the Company prior to closing.

*Execution of a definitive agreement will be subject to the satisfactory completion of the Purchaser's due diligence.*

**Signature Page**

**Vape Holdings, Inc.**

By: _____*Justin Braune*_____
                  Justin Braune

Title: _____CEO_____

Date: _____2/10/2016_____


**GHS Investments, LLC**

By: _____

Title: _Member_____

Date: __2/11/2016_____

# EXHIBIT "B"

---

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 30, 2015**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from _____ to _____.**

**Commission File Number 333-163290**

# VAPE HOLDINGS, INC.
**(Exact name of registrant as specified in its charter)**

| Delaware | 90-0436540 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**5304 Derry Avenue, Suite C, Agoura Hills, CA 91301**
(Address of principal executive offices) (Zip Code)

**(877) 827-3959**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, par value $0.00001**
(Title of class)

Indicate by check mark if the Registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Website, if any,

every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

At January 11, 2016, the aggregate market value of shares held by non-affiliates of the Registrant (based upon the closing sale price of such shares on OTCQB on January 11, 2016 of $0.005) was $789,135.

At January 11, 2016, there were 163,026,935 shares of the Registrant's common stock outstanding.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain information included in this Annual Report on Form 10-K and other filings of the Registrant under the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as well as information communicated orally or in writing between the dates of such filings, contains or may contain "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act.  Forward-looking statements in this Annual Report on Form 10-K, including without limitation, statements related to our plans, strategies, objectives, expectations, intentions and adequacy of resources, are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements are subject to certain risks, trends and uncertainties that could cause actual results to differ materially from expected results.  Among these risks, trends and uncertainties are the availability of working capital to fund our operations, the competitive market in which we operate, the efficient and uninterrupted operation of our computer and communications systems, our ability to generate a profit and execute our business plan, the retention of key personnel, our ability to protect and defend our intellectual property, the effects of governmental regulation and other risks identified in the Registrant's filings with the Securities and Exchange Commission from time to time.

In some cases, forward-looking statements can be identified by terminology such as "may," "will," "should," "could," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of such terms or other comparable terminology.  Although the Registrant believes that the expectations reflected in the forward-looking statements contained herein are reasonable, the Registrant cannot guarantee future results, levels of activity, performance or achievements.  Moreover, neither the Registrant, nor any other person, assumes responsibility for the accuracy and completeness of such statements.  The Registrant is under no duty to update any of the forward-looking statements contained herein after the date of this Annual Report on Form 10-K.

2

# VAPE HOLDINGS INC.

## **INDEX TO FORM 10-K**

**PART I**                                                                                                                                                                                                                                                                      PAGE

Item 1.     Business                                                                                                                          4
Item 1A.   Risk Factors                                                                                                                      7
Item 1B.   Unresolved Staff Comments                                                                                         7
Item 2.     Properties                                                                                                                         7
Item 3.     Legal Proceedings                                                                                                         7
Item 4.     Mine Safety Disclosure                                                                                                 7

**PART II**

Item 5.     Market for Registrant's Common Equity, Related Stockholder Matters and Small Business Issuer Purchases
            of Equity Securities                                                                                                            8
Item 6.     Selected Financial Data                                                                                             12
Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operation                 12
Item 7A.   Quantitative and Qualitative Disclosures About Market Risk                                            21
Item 8.     Financial Statements and Supplementary Data                                                            21
Item 9.     Changes in and Disagreements With Accountants on Accounting and Financial Disclosure                21
Item 9A.   Controls and Procedures                                                                                         21
Item 9B.   Other Information                                                                                                  22

**PART III**

Item 10.   Directors, Executive Officers and Corporate Governance                                                22
Item 11.   Executive Compensation                                                                                          27
Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters        29
Item 13.   Certain Relationships and Related Transactions and Director Independence                              30
Item 14.   Principal Accountant Fees and Services                                                                   32
Item 15.   Exhibits, Financial Statement Schedules                                                                  33
            Index to Consolidated Financial Statements                                                              F-1
            Index of Exhibits

Signatures                                                                                                                                    34

3

## PART I

ITEM 1.  BUSINESS

**Background**

On August 9, 2013, PeopleString Corporation, and its wholly-owned subsidiary, RewardString Corporation ("RewardString"), and Vape Holdings, Inc., a Nevada corporation (the "Private Company"), entered into a Merger and Reorganization Agreement (the "Agreement") whereby the Private Company merged with RewardString, with the Private Company being the surviving entity (the "Merger"). In consideration for the merger, the shareholders of the Private Company received a total of approximately 4,684,538  shares of common stock of the merged company on a pro rata basis in exchange for 8,875 shares of the Private Company's common stock, representing 100% of the outstanding common stock of the Private Company. The total shares of the merged company issued on a pro rata basis to the Private Company shareholders represented approximately 74.95% of the total issued and outstanding common stock of the merged company.

The merger among PeopleString, RewardString and the Private Company was accounted for as a reverse acquisition and change in reporting entity, whereby the Private Company was the accounting acquirer.  The Merger was accounted for using the purchase method of accounting in accordance with ASC 805 "Business Combinations", whereby the estimated purchase was allocated to tangible net assets acquired based upon preliminary fair values at the date of acquisition.  Accordingly, the assets and liabilities of PeopleString and RewardString were recorded at fair value; the assets of PeopleString Corporation were not significant.  The historical results of operations and cash flows of the Private Company are being reported beginning in the quarter ended December 31, 2013 in this Quarterly Report.  The Merger closed on September 30, 2013.  On September 30, 2013, the Company approved a change in fiscal year end of the Company from December 31st to September 30th.  The Company's decision to change the fiscal year end was related to the Merger.  Following such change, the date of the Company's next fiscal year end is September 30, 2014.

On March 27, 2014, the Company formally closed its asset purchase of the HIVE Ceramics LLC ("HIVE") vaporization product and related intellectual property and has begun distributing the HIVE products through various wholesale distribution channels.  HIVE had been in development of a ceramic product for use in the vaporization market.  The development for one product line was completed in 2014.  No sales of this product line were made prior to Vape's acquisition of the HIVE ceramic product line on March 27, 2014.  We determined that HIVE's assets acquired were not deemed a business prior to being acquired by the Company under Rule 11-01(d) of Regulation S-X since there were no significant revenue activities, physical assets, employees or customers.

**Overview**

*General*

Vape Holdings, Inc. ("Vape," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company has designed, and recently began marketing, and distributing ceramic vaporization products under a unique brand. The Company has also introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products

through business alliances and acquisitions, as well as developing its branded retail business expansion.

Vape is organized and directed to operate strictly in accordance with all applicable state and federal laws.

4

*HIVE Ceramics*

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, the HIVE x D-Nail 16mm and 20mm attachments and the highly anticipated Brothership Ceramic Honey Bucket developed on collaboration with Mothership Glass.

*Revival*

On December 28, 2015, the Company created a new wholly-owned subsidiary, Revival Products, LLC ("Revival"), which is in the business of portable vaporization devices. Revival will complement HIVE Ceramics' product lines utilizing its sales and distribution channels.

*Distribution Channels*

HIVECERAMICS.COM is the Company's e-commerce site for its premier HIVE Ceramics product line. The website will also be used in connection with the Company's new HIVE Glass product line. A beta version of the e-commerce site was successfully launched in April 2014 with a limited product line and no paid or formal advertising. The e-commerce site has since become fully operational since July 1, 2014 with a full product line and is taking orders daily with same or next day shipping available direct to the consumer on all orders.

The Company's AUTHORIZED DEALER NETWORK has grown to over 1,100 authorized shops for the Company's wholesale distribution platform. The Company and its principals have relied on their industry reputation and contacts to rapidly expand this vast wholesale distribution network in a matter of months. The Company has already funneled the HIVE Ceramics product line through these channels and anticipates parlaying this expansive network into the success of future product lines and related ventures, including the HIVE Glass line.

5

GOTVAPE.COM is an Orange County, California based online distributor that boasts the top online vaporizer retail site in the world and sells a full range of vaporization products for shipment nationwide. The Company has partnered with GotVape.com for the U.S. distribution of its HIVE product lines through its expansive nationwide distribution chain.

DNA GENETICS is a world-renowned name in cannabis genetics with a global reach and trusted brand poised to assist the Company with its expansion into the emerging European markets. DNA Genetics will serve as the Company's European distributor assisting the Company in reaching the European market from its base in Amsterdam.

PURE DNA is DNA Genetics' South American distributor based in Chile which will partner with the Company to distribute HIVE products throughout the South American Market. Pure DNA is backed by DNA Genetics' brand which can be found throughout the world.

PUFF PIPES is a Vancouver, B.C. Canada based distributor and one of two Canadian distributors partnering with the Company to blanket the Canadian market. Puff Pipes is one of Canada's leading suppliers of high quality glass works for over 20 years and a trusted name in the vaporizer industry.

WEST COAST GIFTS is also based in Vancouver, B.C. Canada and is known for having an excellent reputation as one of the longest-running distributors of nationally recognized brands of vaporizers and related accessories in Canada.

Subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue.

*Competition*

Vape's brands and retail and online distributions channels compete for customers and sales with many different companies and products that are competitive today and likely to be even more competitive in the future. Accordingly, it is essential that Vape and its HIVE brand product lines continue to innovate, expand, develop and refine its product and the underlying value offered to consumers. Competition in the retail and wholesale vaporizer and e-cigarette industries is significant as competing shops, manufacturers and distributors continually open.

The competition for the Company's premier HIVE Ceramics product line, which offers a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element that can be used for a range of applications exists in the form of traditional quartz and titanium vaporization products and other lesser grade ceramic vaporizers.

With regard to our company's size relative to its competition, that is difficult to gauge as most of our competition is privately held and does not publicly report their earnings. We do know of several competitors who own and operate larger online retail vaporizer and e-cigarette stores than we currently do, but, like our Company, many are in their initial stages of development and are focusing on different areas of this industry.

While our management believes that we have the opportunity to be an innovative group of industry professionals focused on providing the most relevant and effective products to our consumers, there can be no assurance that we will be successful in accomplishing our business initiatives, or that we will be able to maintain significant levels of revenues, or recognize net income, from the sale of our products and services.

*Intellectual Property and Proprietary Rights*

Our intellectual property consists of our brands and their related trademarks and websites, expansive customer lists and affiliations, product know-how and technology and related marketing intangibles plus our pending patent applications

on our ceramic vaporizer line of products.

The Company intends to prosecute all of its pending patent applications to completions as well as its current and planned brand names for which the Company has applied for federal trademark protection.

6

We have a policy of entering into confidentiality and non-disclosure agreements with our employees and some of our vendors and customers as we deem necessary. These agreements and policies are intended to protect our intellectual property, but we cannot ensure that these agreements or the other steps we have taken to protect our intellectual property will be sufficient to prevent theft, unauthorized use or adverse infringement claims. We cannot prevent piracy of our methods and features, and we cannot fully determine the extent to which our methods and features are being pirated.

*Employees*

As of September 30, 2015, we had 8 employees. Since inception, we have never had a work stoppage, and our employees are not represented by a labor union. We consider our relationship with our employees to be positive.

### ITEM 1A. RISK FACTORS

Vape is a smaller reporting company and is therefore not required to provide this information.

### ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

### ITEM 2. PROPERTIES

As of September 30, 2015, the Company leases a 5,000 square foot office in Chatsworth, California.

### ITEM 3. LEGAL PROCEEDINGS

Vape is not currently a party to, and none of its property is the subject of, any pending legal proceedings. To Vape's knowledge, no governmental authority is contemplating any such proceedings.

### ITEM 4. MINE SAFETY DISCLOSURE

Not applicable.

7

# PART II

ITEM 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

     Our common stock commenced quotation on the OTCQB under the trading symbol "VAPE" on January 8, 2014. Our common stock is currently quoted on OTCQB. The closing price of our common stock on September 30, 2015 was $0.04 per share. The following table sets forth, for the periods indicated, the high and low sales prices for our common stock as reported on the OTCQB. This information reflects inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions.

| From the Year Ended September 30, 2015 | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 1.92 | $ | 0.52 |
| Second Quarter | $ | 0.92 | $ | 0.51 |
| Third Quarter | $ | 0.60 | $ | 0.26 |
| Fourth Quarter | $ | 0.43 | $ | 0.03 |

     The OTCQB is generally considered to be a less active and efficient market than the NASDAQ Global Market, the NASDAQ Capital Market or any national exchange and will not provide investors with the liquidity that the NASDAQ Global Market, the NASDAQ Capital Market or a national exchange would offer.

**Holders**

     As of September 30, 2015, the approximate number of registered holders of our common stock was 71. As of September 30, 2015, the number of outstanding shares of our common stock was 19,455,896; there were 1,184,727 shares of common stock subject to outstanding warrants, and there were no shares of common stock subject to outstanding stock options.

**Dividends**

     No dividends were declared on Vape's common stock in the year ended September 30, 2015 and 2014, and it is anticipated that cash dividends will not be declared on Vape's common stock in the foreseeable future. Our dividend policy is subject to the discretion of our board of directors and depends upon a number of factors, including operating results, financial condition and general business conditions. Holders of common stock are entitled to receive dividends as, if and when declared by our board of directors out of funds legally available therefor. We may pay cash dividends if net income available to stockholders fully funds the proposed dividends, and the expected rate of earnings retention is consistent with capital needs, asset quality and overall financial condition.

**Details of Issuance of Shares of Our Common Stock in Connection with Investor Relation Services**

     On January 31, 2014, the Company entered into an agreement to issue a 10% convertible promissory note to a consultant as compensation for investor relations services for a period of up to one (1) year. The agreement was terminated after five (5) months. On July 10, 2014, the holder converted principal of $41,667 and outstanding accrued and unpaid interest of $345 into 21,006 shares of the Company's common stock at a per share conversion price of $2.00, which is in accordance with the terms of the convertible note payable. The conversion of the 10% Note was in full satisfaction of the note payable. See Note 4 for terms of the 10% Note.

     On June 6, 2014, the Company entered into an agreement to issue 20,000 shares of its common stock to a consultant as compensation for investor relations services for a period of six (6) months valued at $29,600 at the date of issuance and $41,600 as of September 30, 2014. Per the terms of the agreement, 10,000 shares vest immediately, 5,000 shares vest after ninety (90) days, and 5,000 shares vest after one hundred days. The 20,000 shares were formally issued on August 4, 2014. The fair value of the stock vested and recorded during the year ended September 30, 2014 was $31,200.

**Securities Authorized for Issuance under Equity Compensation Plans**

As of September 30, 2015, there were no options issued and outstanding under the 2014 Plan and 2009 Plan as all options were forfeited and cancelled as of September 30, 2015.

8

**Recent Sales of Unregistered Securities**

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. See Note 5 for more details regarding the Securities Purchase Agreement and Note.

Between June 2015 and September 2015, the Company issued the following conversions for repayment of the Note by Investor:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| June 4, 2015 | $ | 46,667 | $ | 28,871 | $ | 75,538 | $ | 0.342 | 220,949 |
| July 3, 2015 | | 46,667 | | 4,295 | | 50,962 | $ | 0.194 | 263,141 |
| August 11, 2015 | | 25,000 | | - | | 25,000 | $ | 0.138 | 181,818 |
| September 3, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 445,196 |
| September 23, 2015 | | 25,000 | | - | | 25,000 | $ | 0.041 | 606,061 |
| September 29, 2015 | | 23,000 | | - | | 23,000 | $ | 0.015 | 1,548,822 |
| | $ | 191,334 | $ | 33,166 | $ | 224,500 | | | 3,265,987 |

Subsequent to year end, the Company issued the following conversions:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| October 8, 2015 | $ | 21,000 | $ | - | $ | 21,000 | $ | 0.012 | 1,818,182 |
| October 16, 2015 | | 18,900 | | - | | 18,900 | $ | 0.012 | 1,636,364 |
| October 22, 2015 | | 25,800 | | - | | 25,800 | $ | 0.011 | 2,333,786 |
| October 29, 2015 | | 22,460 | | - | | 22,460 | $ | 0.011 | 2,031,660 |
| November 11, 2015 | | 33,500 | | - | | 33,500 | $ | 0.007 | 4,649,549 |
| November 18, 2015 | | 24,000 | | - | | 24,000 | $ | 0.006 | 4,195,804 |
| November 30, 2015 | | 30,000 | | - | | 30,000 | $ | 0.005 | 5,741,627 |
| December 11, 2015 | | 22,000 | | - | | 22,000 | $ | 0.002 | 9,090,909 |
| December 28, 2015 | | 22,500 | | - | | 22,500 | $ | 0.002 | 9,297,521 |
| January 7, 2016 | | 20,000 | | - | | 20,000 | $ | 0.002 | 10,101,010 |
| | $ | 240,160 | $ | - | $ | 240,160 | | | 50,896,412 |

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an original issue discount ("OID") of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015. The accredited investor only funded a total of $800,000 in principal under the $2M Note. See Note 5 for more details regarding $2M Securities Purchase Agreement and $2M Note.

9

The following is summary of conversions by the $2M Note holder and its assignees during the year ended September 30, 2015:

| Conversion Date | Principal Converted | Accrued Interest Converted | Total Converted | Conversion Rate | Common Shares Issued |
|---|---|---|---|---|---|
| August 13, 2015 | $ 50,000 | $ - | $ 50,000 | $ 0.127 | 393,701 |
| August 26, 2015 | 25,000 | - | 25,000 | $ 0.056 | 446,428 |
| September 8, 2015 | 25,000 | - | 25,000 | $ 0.056 | 446,428 |
| September 14, 2015 | 25,000 | - | 25,000 | $ 0.053 | 469,925 |
| September 16, 2015 | 10,000 | - | 10,000 | $ 0.053 | 188,679 |
| September 17, 2015 | 25,000 | - | 25,000 | $ 0.053 | 469,925 |
| September 22, 2015 | 10,000 | - | 10,000 | $ 0.043 | 232,558 |
| September 24, 2015 | 10,000 | - | 10,000 | $ 0.026 | 390,625 |
| September 25, 2015 | 10,000 | - | 10,000 | $ 0.019 | 518,135 |
| September 29, 2015 | 13,410 | - | 13,410 | $ 0.015 | 900,000 |
| | $ 203,410 | $ - | $ 203,410 | | 4,456,404 |

Subsequent to year end, the $2M Note holder and its assignees also enacted the following conversions:

| Conversion Date | Principal Converted | Accrued Interest Converted | Total Converted | Conversion Rate | Common Shares Issued |
|---|---|---|---|---|---|
| October 1, 2015 | $ 10,000 | $ - | $ 10,000 | $ 0.0148 | 675,676 |
| October 5, 2015 | 10,000 | - | 10,000 | $ 0.0148 | 675,676 |
| October 6, 2015 | 13,262 | - | 13,262 | $ 0.0138 | 961,000 |
| October 7, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 9, 2015 | 11,728 | - | 11,728 | $ 0.0116 | 1,011,000 |
| October 9, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 12, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 13, 2015 | 11,601 | - | 11,601 | $ 0.0116 | 1,000,052 |
| October 15, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 19, 2015 | 17,400 | - | 17,400 | $ 0.0116 | 1,500,000 |
| October 19, 2015 | 15,000 | - | 15,000 | $ 0.0116 | 1,298,701 |
| October 20, 2015 | 16,650 | - | 16,650 | $ 0.0111 | 1,500,000 |
| October 21, 2015 | 17,500 | - | 17,500 | $ 0.0115 | 1,515,152 |
| October 23, 2015 | 20,000 | - | 20,000 | $ 0.0115 | 1,731,602 |
| October 26, 2015 | 24,420 | - | 24,420 | $ 0.0111 | 2,200,000 |
| October 29, 2015 | 26,640 | - | 26,640 | $ 0.0111 | 2,400,000 |
| November 2, 2015 | 29,970 | - | 29,970 | $ 0.0111 | 2,700,000 |
| November 2, 2015 | 20,000 | - | 20,000 | $ 0.0111 | 1,809,136 |
| November 5, 2015 | 32,190 | - | 32,190 | $ 0.0111 | 2,900,000 |
| November 10, 2015 | 28,800 | - | 28,800 | $ 0.0096 | 3,000,000 |
| November 12, 2015 | 23,930 | - | 23,930 | $ 0.0072 | 3,323,611 |
| November 17, 2015 | 16,500 | - | 16,500 | $ 0.0060 | 2,727,273 |
| November 19, 2015 | 1,640 | 11,225 | 12,865 | $ 0.0056 | 2,316,013 |
| November 23, 2015 | 23,111 | - | 23,111 | $ 0.0056 | 4,127,000 |
| November 27, 2015 | 24,750 | - | 24,750 | $ 0.0055 | 4,500,000 |
| December 2, 2015 | 18,450 | - | 18,450 | $ 0.0041 | 4,500,000 |
| December 8, 2015 | 18,000 | - | 18,000 | $ 0.0036 | 5,000,000 |
| December 11, 2015 | 13,368 | - | 13,368 | $ 0.0024 | 5,570,000 |
| December 16, 2015 | 14,181 | - | 14,181 | $ 0.0024 | 5,860,000 |
| December 22, 2015 | 15,488 | - | 15,488 | $ 0.0024 | 6,400,000 |

| December 29, 2015 | 17,666 | - | 17,666 | $ | 0.0024 | 7,300,000 |
|---|---|---|---|---|---|---|
| | $   541,604 | $   11,225 | $   552,830 | | | 82,775,494 |

10

On March 12, 2015, the Board issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Allan Viernes. An additional 100,000 shares of restricted common stock each were granted to Kyle Tracey and Joseph Andreae for serving on the Board. In addition, a total of 60,000 shares were granted to three (3) employees. These immediately vested issuances resulted in $9,150, $9,150, and $195,200 being charged to cost of revenue, sales and marketing, and general and administrative expense during the three and six months ended March 31, 2015, respectively.

On March 12, 2015, the Board issued a bonus stock grant of 60,277 shares of restricted common stock to an outside sales consultant for services performed. This immediately vested issuance resulted in $36,769 being charged to sales and marketing expense during the three and six months ended March 31, 2015.

On March 12, 2015, Kyle Tracey converted $59,718 of accrued wages into 97,898 shares of immediately vested restricted common stock.

On March 12, 2015, Michael Cook converted $36,769 of accrued wages into 60,277 shares of immediately vested restricted common stock.

On March 12, 2015, the Company offered to pay accrued interest and modify the terms of the six (6) Holders' outstanding 6% Notes, decreasing the conversion floor from $1.00 to $0.50 in order to entice the noteholders to convert their promissory notes. The Company recorded a loss on debt extinguishment of $23,443 as a result of the fair value in excess of the modified conversion floor. In March 2015, the Company paid all accrued interest on the 6% notes of $17,200. Five (5) of the six (6) holders converted in full a total of $80,000 of 6% Notes into 160,000 shares of common stock. The remaining note holder partially converted $20,000 of 6% Notes into 40,000 of common shares and extended the terms on the remaining $30,000 for six (6) months. See Note 5 regarding Convertible Notes Payable.

On June 1, 2015, the Board issued 100,000 shares of restricted common stock at $0.50 per share for payment of $82,648 of accrued legal services.

On July 1, 2015, the Company issued 250,000 shares of common stock to its Chief Science Officer Dr. Mark Scialdone in exchange for 80% of the outstanding common stock of BetterChem Consulting, Inc. See Note 1 regarding the acquisition of 80% of BetterChem.

11

On August 5, 2015, and August 12, 2015, the Company issued convertible notes totaling an aggregate of $622,000 pursuant to a series of convertible note financings with several accredited investors. None of these convertible notes have been converted in whole or in part to date. See Note 5 regarding convertible note financings.

In connection with the above stock sales, we did not pay any underwriting discounts or commissions. None of the sales of securities described or referred to above was registered under the Securities Act of 1933, as amended (the "Securities Act"). We had or one of our affiliates had a prior business relationship with each of the purchasers, and no general solicitation or advertising was used in connection with the sales. In making the sales without registration under the Securities Act, we relied upon the exemption from registration contained in Section 4(a)(2) of the Securities Act.

## ITEM 6.    SELECTED FINANCIAL DATA

Vape is a smaller reporting company and is therefore not required to provide this information.

## ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION

The following discussion and analysis is intended to provide information about Vape's financial condition and results of operations for the year ended September 30, 2015 and 2014. This information should be read in conjunction with Vape's audited consolidated financial statements for the year ended September 30, 2015 and 2014, which begin on page F-2 of this report. Some of the information contained in this Management's Discussion and Analysis of Financial Condition and Results of Operations, and elsewhere in this report, includes forward-looking statements based on our current management's expectations. There can be no assurance that actual results, outcomes, or business conditions will not differ materially from those projected or suggested in such forward-looking statements. Some of the factors that may cause results to differ are described in the forward-looking statements cautionary language on page two of this report.

**Background**

On August 9, 2013, PeopleString Corporation, and its wholly-owned subsidiary, RewardString Corporation ("RewardString"), and Vape Holdings, Inc., a Nevada corporation (the "Private Company"), entered into a Merger and Reorganization Agreement (the "Agreement") whereby the Private Company merged with RewardString, with the Private Company being the surviving entity (the "Merger"). In consideration for the merger, the shareholders of the Private Company received a total of approximately 4,684,538 shares of common stock of the merged company on a pro rata basis in exchange for 8,875 shares of the Private Company's common stock, representing 100% of the outstanding common stock of the Private Company. The total shares of the merged company issued on a pro rata basis to the Private Company shareholders represented approximately 74.95% of the total issued and outstanding common stock of the merged company.

12

The merger among PeopleString, RewardString and the Private Company was accounted for as a reverse acquisition and change in reporting entity, whereby the Private Company was the accounting acquirer. The Merger was accounted for using the purchase method of accounting in accordance with ASC 805 "Business Combinations", whereby the estimated purchase was allocated to tangible net assets acquired based upon preliminary fair values at the date of acquisition. Accordingly, the assets and liabilities of PeopleString and RewardString were recorded at fair value; the assets of PeopleString Corporation were not significant. The historical results of operations and cash flows of the Private Company are being reported beginning in the quarter ended December 31, 2013 in this Quarterly Report. The Merger closed on September 30, 2013. On September 30, 2013, the Company approved a change in fiscal year end of the Company from December 31st to September 30th. The Company's decision to change the fiscal year end was related to the Merger.

On March 27, 2014, the Company formally closed its asset purchase of the HIVE Ceramics LLC ("HIVE") vaporization product and related intellectual property and has begun distributing the HIVE products through various wholesale distribution channels. HIVE had been in development of a ceramic product for use in the vaporization market. The development for one product line was completed in 2014. No sales of this product line were made prior to Vape's acquisition of the HIVE ceramic product line on March 27, 2014. We determined that HIVE's assets acquired were not deemed a business prior to being acquired by the Company under Rule 11-01(d) of Regulation S-X since there were no significant revenue activities.

## Overview

*General*

Vape Holdings, Inc. (formerly PeopleString Corporation) ("Vape," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company has designed, and recently began marketing, and distributing ceramic vaporization products under a unique brand. The Company has also introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, and the HIVE x D-Nail 16mm and 20mm attachments.

The Company has also launched 'HIVE Glass.' HIVE Glass is VAPE's newest line of products under the HIVE brand name. The HIVE GLASS line is precision made using state of the art manufacturing processes and techniques, and exclusively uses German Schott glass caliber and fittings through all production phases. The aim with HIVE Glass is to create an affordable, high quality glass product that is both aesthetically pleasing and a highly functional vaporization product. VAPE's existing customer base and distribution network will be the catalyst for expansion of this new HIVE product line. Under HIVE Glass, the Company also buys and sells high-end collector pieces. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

13

VAPE has also recently launched 'HIVE Supply.' HIVE Supply is a packaging and sourcing division of VAPE designed to serve as a competitively priced, comprehensive "one-stop shop" for all medical and recreational marijuana packaging needs. As with all of VAPE's products, HIVE Supply will operate in full compliance with all federal laws and the laws of each individual state in which it does business. HIVE Supply will focus on providing much-needed support to cannabis businesses in regards to sourcing consumer products, brand management and marketing services. HIVE Supply is currently operated out of three (3) locations: HIVE Supply in Southern California, HIVE Supply Washington in Spokane and HIVE Supply Oregon in Portland. Under HIVE Supply, the Company also buys and sells high-end manufacturing machines. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

In connection with its launch of HIVE Supply and HIVE Glass, the Company opened 'THE HIVE' retail store and gallery in Los Angeles, an end-user experience to showcase the complete line of HIVE Ceramics and HIVE Glass products, while introducing HIVE Supply and all the new products being tested and developed through each vertical. Subsequent to year end, the Company curtailed its retail store in order to reduce overhead costs and focus on HIVE Ceramics.

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products through business alliances and acquisitions, as well as developing its branded retail business expansion. VAPE and its business units are organized and directed to operate strictly in accordance with all applicable state and federal laws.

**Critical Accounting Policies**

Vape's discussion and analysis of financial condition and results of operations are based upon Vape's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these unaudited consolidated financial statements requires Vape to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities. Vape evaluated its estimates, including but not limited to those related to such items as costs to complete performance contracts, accruals, depreciable/useful lives, revenue recognition and valuation allowances for deferred tax assets. Vape based its estimates on historical experience and on various other assumptions that were believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that were not readily apparent from other sources. Actual results could differ from those estimates.

CONVERTIBLE DEBT

Convertible debt is accounted for under the guidelines established by Accounting Standards Codification ("ASC") 470-20 "Debt with Conversion and Other Options". ASC 470-20 governs the calculation of an embedded beneficial conversion, which is treated as an additional discount to the instruments where derivative accounting (explained below) does not apply. The amount of the value of warrants and beneficial conversion feature may reduce the carrying value of the instrument to zero, but no further. The discounts relating to the initial recording of the derivatives or beneficial conversion features are accreted over the term of the debt. Many of the conversion features embedded in the Company's convertible notes are variable and are adjusted based on a discount to market prices which could cause an unlimited number of common stock to be issued. The management and board of directors currently have the ability to authorize additional shares of common stock through their voting power in the Series A Preferred Stock.

When applicable, the Company calculates the fair value of warrants and conversion features issued with the convertible instruments using the Black-Scholes valuation method, in lieu of a lattice model for simplicity, using the same assumptions used for valuing employee options for purposes of ASC 718 "Compensation – Stock Compensation", except that the contractual life of the warrant or conversion feature is used. Under these guidelines, the Company allocates the value of the proceeds received from a convertible debt transaction between the conversion feature and any other detachable instruments (such as warrants) on a relative fair value basis. The allocated fair value is recorded as a debt discount or premium and is amortized over the expected term of the convertible debt to interest expense. If the fair value exceeds the carrying value of the debt, an immediate charge to operations is recorded by management.

14

The Company accounts for modifications of its debt in accordance with ASC 470-50 "Modifications and Extinguishments." ASC 470-50 requires the modification of a convertible debt instrument that changes the fair value of an embedded conversion feature and the subsequent recognition of interest expense or the associated debt instrument when the modification does not result in a debt extinguishment.

The Company has the ability to increase the authorized common stock of the Company in the event that the convertible notes require additional shares to be issued, thus the Company recorded beneficial conversion features related to its convertible debt instead of derivative liabilities.

REVENUE RECOGNITION

The Company recognizes revenues from product sales when (a) persuasive evidence that an agreement exists; (b) the products have been delivered; (c) the prices are fixed and determinable and not subject to refund or adjustment; and (d) collection of the amounts due is reasonably assured. Sales tax is charged on retail sales in in the applicable district. Products are warrantied 24 hours of delivery if they are damaged during the shipping.

INVENTORY

Inventory is valued at the lower of cost or market, using the first-in, first-out (FIFO) method. The provides for an allowance for slow moving inventories based on current demand and competition.

COMMITMENTS AND CONTINGENCIES

The Company recorded the estimated settlement liability as of March 31, 2014 for the Warrant Shares issued and the Warrants that remain outstanding and unexercised that would be entitled to the same settlement based on the number of shares expected to be issued and the market price of the Company's common stock on the dates of the actual settlements from $4.72 per share to $7.25 per share, and market price of the first settlement of $7.25 for the unsettled claims. We believe the issuance of convertible notes in the three months ended March 31, 2014 triggered the full ratchet anti-dilution adjustment; before the provision was triggered, the fair value of the warrant liability was not significant as the exercise was so far out of the money. As a result of the above settlements with warrant holders, the Company recorded a loss on settlement of warrants of $29,528,844 during the six months ended March 31, 2014 and a long-term warrant liability of $29,430,022 as of March 31, 2014 based on 4,407,200 shares of common stock under the settlement at the Company's closing stock prices discussed above. As of September 30, 2015, the estimated settlement liability is $25,025 based on the fair market value of 1,184,727 remaining warrants and therefore the Company recorded a gain on the change in warrant liability of $2,439,207 during the year ended September 30, 2015.

PREFERRED STOCK

On April 1, 2014, the Board formally approved the filing of a Preferred Stock Designation in connection with the commitment of 500,000 Series A Shares to HIVE Ceramics, LLC on March 27, 2014 pursuant to its authority to issue blank check preferred stock as provided in the Company's Certificate of Incorporation. Per the Certificate of Designation (the "Designation"), there are 100,000,000 shares of preferred stock authorized by the Company's Certificate of Incorporation. The Company is authorized to commit 500,000 shares of Series A pursuant to the Designation. As provided in the Designation (and as set forth in the HIVE Asset Purchase Agreement), Series A Shares are entitled to vote at a 15-1 ratio to Common Stock and are convertible on a maximum 10 for one basis into Common Stock. (See NOTE 1 re HIVE Ceramics Asset Purchase). The acquisition of HIVE assets was not considered a business combination and was consummated under common control of the Company's Chief Executive officer and therefore the carryover basis of the assets was assigned to the Preferred Stock. The parties to the acquisition of HIVE closed the transaction on March 27, 2014. On June 19, 2014, the Company formally issued the 500,000 Series A Shares to HIVE.

15

On December 10, 2015, the Board formally approved the designation of Series B Preferred Stock. See Note 11 regarding Subsequent Events.

**Results of Operations**

The results of operations information below provides details on net loss and general and administrative expenses. General and administrative expenses provide details on continuing operations and include items such as management compensation, SEC compliance, insurance, office and other general expenses.

**For the Year Ended September 30, 2015 and 2014**

*Net Loss.* For the year ended September 30, 2015 and 2014, net loss was $1,230,147 and $25,063,658, respectively.

*Revenue.* For the year ended September 30, 2015 and 2014, revenue was $1,277,657 and $841,724, respectively. Revenue was greater in 2015 as it was HIVE Ceramics' first full year along with its new products. The Company derived its revenue from the sale of ceramics, supplies, glass, merchandise, and services.

*Cost of Revenue.* For the year ended September 30, 2015 and 2014, cost of revenue was $1,013,641 and $458,387, respectively. In 2015, cost of revenue included approximately $623,000 of ceramic products costs, $27,000 of supply costs, $97,000 of glass costs, $66,000 of merchandise costs and $200,000 of inventory reserve. In 2014, the recorded costs were ceramic product costs.

*Gross Profit.* For the year ended September 30, 2015 and 2014, gross profit was $264,016 or 36% and $383,337 or 46%, respectively. Gross profit decreased due to higher failure rates than expected of ceramics and low margin sales over multiple revenue streams.

*Sales and Marketing.* For the year ended September 30, 2015 and 2014, sales and marketing expenses were $715,292 and $219,891, respectively. In 2015, sales and marketing expenses included approximately $26,000 of general advertising, $54,000 of outside sales expense, $162,000 of payroll expenses, $156,000 of stock-based compensation, and $65,000 of trade show expenses. In 2014, it mostly consisted of approximately $92,000 of trade show expenses, $32,000 of promotional items, $21,000 of outside sales expense, $26,000 of E-commerce costs, and $12,000 of public relations.

*Research and Development. For* the year ended September 30, 2015 and 2014, research and development expenses were $212,424 and $45,757, respectively. In 2015, research and development expenses included approximately $117,000 for product design prototypes and research equipment, $47,000 of payroll expenses, $12,000 of employee benefits, $8,000 of travel expenses, and $27,000 of patent research. In 2014, it consisted of approximately $46,000 of product design prototypes and research equipment.

*General and Administrative.* For the year ended September 30, 2015 and 2014, general and administrative expenses were $2,127,594 and $1,315,710, respectively. In 2015, general and administrative expenses included approximately $45,000 of insurance expense, $110,000 of office expense, $481,000 of payroll expenses, $66,000 of accounting fees, $80,000 of business development expense, $182,000 of legal fees, $800,000 of stock-based compensation, and $121,000 of travel expense. It 2014, it mostly consisted of approximately $97,000 of investor relations and filing fees, $359,000 of payroll and taxes, $98,000 of accounting fees, and $114,000 of legal fees, $58,000 of office expense, $41,000 of bank and credit card processing fees, and $53,000 of travel expenses.

*Interest Expense. For* the year ended September 30, 2015 and 2014, interest expense was $788,038 and $241,065 respectively. In 2015, interest expense included approximately $609,000 of accretion of debt discounts, $51,000 of amortization of deferred financing costs, and $128,000 of interest expense. In 2014, interest expense on convertible notes payable was $241,065.

16

*Interest Expense - related party.* For the year ended September 30, 2015 and 2014, related party interest expense on convertible notes was $148,562 and $219,714, respectively. In 2015, interest expense included approximately $118,000 of accretion of debt discounts and $31,000 of interest expense. In 2014, interest expense on related party notes payable was $219,714.

*Change in Warrant Liability.* For the year ended September 30, 2015 and 2014, the gain and loss on change in warrant liability was $2,439,207 and ($23,404,058), respectively due to the fluctuation in the stock price.

*Gain on Settlement.* For the year ended September 30, 2015 and 2014, the gain on settlement was $625,461 and $0, respectively due to a confidential settlement by and between the Company and certain shareholders. On December 15, 2014, the Company recorded a gain on settlement of $257,930 for a confidential settlement by and between the Company and certain shareholders and related parties as settlement for certain potential legal claims held by the Company. As a result of the settlement, the Company received net proceeds of $62,930 and vendor credits of $200,000 during the year ended September 30, 2015. A total of $325,000 in vendor credits has been received in connection with the settlement and no further credits will be given. In January 2015, the Company received 440,625 shares from the settlement that was to be assigned to the officers of the Company. The officers decided it was in the best interest to return these shares to the Company to be used for future strategic issuances. Accordingly, the 440,625 shares were recorded as treasury stock and a gain on settlement valued at $367,531.

**Liquidity and Capital Resources**

As of September 30, 2015, we had cash of $273,904 and working capital of $122,107 as compared to cash of $48,370 and a working capital deficit of $36,138 as of September 30, 2014. See Note 11 for subsequent funding. We believe our current liquidity and securities purchase commitments will be sufficient to continue operating as a going concern through September 2016.

We had total liabilities of $1,392,465 as of September 30, 2015, including current liabilities of $115,938 of accounts payable, $208,665 of accrued expenses, customer deposits of $1,275, and $305,923 of convertible notes payable, and long-term liabilities of $458,404 of convertible notes payable, $265,000 of related party notes payable, $12,235 of other liabilities, and $25,025 of warrant liability. We had total liabilities of $3,802,237 as of September 30, 2014, consisting of current liabilities which consisted of $216,388 of accounts payable, $169,513 of accrued expenses, $187,667 of convertible notes payable, $45,832 of related party convertible notes payable, and long-term liabilities of $178,200 convertible notes payable, $199,115 of related party convertible notes payable, $341,290 of related party notes payable, and $2,464,232 of warrant liability.

We had a total stockholders' deficit of $185,013 and an accumulated deficit of $26,611,042 as of September 30, 2015.

We used $1,238,155 of cash in operating activities during the year ended September 30, 2015, which was primarily attributable to our net loss of $1,230,147, which was offset by $71,305 of depreciation, $2,439,207 gain on change in warrant liability, $625,461 gain on settlement, $695,795 of accretion of debt discounts, $969,577 of stock-based compensation, and $480,481 of net cash provided by change in operating assets and liabilities. We used $980,003 of cash in operating activities for the year ended September 30, 2014, which was attributable primarily to our net loss of $25,063,658, which was offset by $23,404,058 loss on settlement of warrants, $366,431 in accretion of debt discounts, fair value in excess of stock issued for conversion of notes payable of $1,323, fair value in excess of stock issued for conversion of related party notes payable of $44,239, fair value of officer services of $15,000, common stock issued for services of $133,200, stock-based compensation of $450,501, and net use in the change in operating assets and liabilities of $347,275.

Investing activities used $31,143 during the year ended September 30, 2015 consisting of $62,930 of net proceeds from settlement offset by $83,255 of capital expenditures, and $10,818 for trademarks and pending patents. We used $257,020 of cash in investing activities for the year ended September 30, 2014 consisting of $122,555 of capital expenditures and $134,465 for trademarks and pending patents.

We had $1,494,832 of net cash provided by financing activities during the year ended September 30, 2015 consisting of $1,657,660 of net proceeds from issuance of a convertible notes payable, repayments on convertible notes payable of $40,000, repayments on related party convertible notes payable of $50,000, and repayments on related party notes payable of $72,828. We had $1,284,825 of net cash provided by financing activities during the year ended September 30, 2014 consisting of $438,000 from convertible notes payable, $505,535 from related party convertible notes payable, and $341,290 from related party convertible notes payable.

Since we have limited liquidity and have suffered losses, we depend to a great degree on the ability to attract external financing in order to conduct our business activities and expand our operations.  These factors raise substantial doubt about the Company's ability to continue as a going concern. If we are unable to raise additional capital from conventional sources, including increases in related party and/or non-related party loans and/or additional sales of stock, we may be forced to curtail or cease our operations. Even if we are able to continue our operations, the failure to obtain financing could have a substantial adverse effect on our business and financial results. We have no commitments to provide us with financing in the future, other than described above.  Our independent registered public accounting firm included an explanatory paragraph raising substantial doubt about the Company's ability to continue as a going concern.

We anticipate generating losses and therefore may be unable to continue operations in the future. We anticipate that we will require additional capital in order to grow our business by increasing headcount and our budget for 2016. We may use a combination of equity and/or debt instruments to funds our growth strategy or enter into a strategic arrangement with a third party.

### Related Party Notes Payable Repayments

On May 12, 2014, the Company issued a note payable to its President, Joe Andreae in the amount of $40,000 for monies previously borrowed during the six months ended March 31, 2014 (the "Andreae Note").  The note is unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348. See Note 6 to the financial statements.

On August 11, 2014, the Company issued a 6% note payable to its President, Joe Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note II, the original principal balance is $12,828, and is not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240. See Note 6 to the financial statements.

### Kyle Tracey Convertible Notes

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on February 18, 2014 to its CEO, Kyle Tracey, to cover expenses of the Company (the "Tracey Note"). Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on May 12, 2014 to Mr. Tracey to cover expenses of the Company (the "Tracey Note II"). Mr. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

18

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on August 11, 2014 to Mr. Tracey to cover expenses of the Company (the "Tracey Note III"). Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note III was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on a 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements. See Note 5 to the financial statements.

*Michael Cook Convertible Notes*

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on May 12, 2014 to its Director of Business Development, Michael Cook, to cover expenses of the Company (the "Cook Note"). Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on August 11, 2014 to Mr. Cook to cover expenses of the Company (the "Cook Note II"). Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

*Misc. Convertible Notes*

On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 5 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued to a third party on March 19, 2014. The noteholder converted principal of $198,000 and outstanding accrued and unpaid interest of $9,764 into 207,764 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note payable. The conversion of this note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 5 to the financial statements.

Securities Purchase Agreement

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. The Company also paid a finder's fee in the amount of $25,000 in connection with this transaction, which was recorded as a

discount to the note as it was paid from the proceeds. The closing under the Securities Purchase Agreement occurred on December 3, 2014. The Company received $475,000 net proceeds after transactions costs.

19

The Note bears interest at the rate of 10% per annum and is convertible into common stock of the Company at a conversion price per share of 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions))(the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the Note is seventeen months from the date of issuance. On August 26, 2015, the Company and Investor entered into an Amendment whereby the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the Securities Purchase Agreement. See Note 5 to the financial statements.

### $2M Securities Purchase Agreement

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an OID of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015.

The $2M Note bears interest at the rate of 10% per annum and is immediately convertible into common stock of the Company at a conversion price per share of 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions)) (the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the $2M Note, together with accrued interest thereon, is due in twelve bi-monthly installments, commencing approximately six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the $2M Note is twelve months from the date of issuance.

During the year ended September 30, 2015, the Company received $800,000 toward the $2M Note with an original issue discount of $76,800 and transaction costs for net proceeds of $651,395, respectively. We amortized $45,600 of the discount to interest expense during the year ended September 30, 2015. In addition, we recorded a discount totaling $108,641 related to the beneficial conversion feature embedded in the note upon issuance.

On August 13, 2015, the Company entered into an Amendment, Waiver and Modification Agreement (the "Amendment") to its $2M Securities Purchase Agreement and related Transaction Documents with Redwood Management, LLC including any designees and or assignees thereto. Under the terms of the Amendment, the parties agreed to reduce the $2,000,000 outstanding balance of the $2M Note to $800,000 to reflect the total amount funded under the note, to terminate the offsetting investor note securing the additional unfunded balance and to waive any past claims of default or offsetting interest on the $2M Note or investor note. In addition, the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the $2M Securities Purchase Agreement. See Note 5 to the financial statements.

<u>Convertible Note Financing</u>

On August 5, 2015, the Company entered into a series of convertible note financings with several accredited investors totaling an aggregate of $517,000 in aggregate proceeds raised less certain fees and costs as set forth in the financing documents known as the "August 2015 Notes". The financing was disclosed on the Company's Current Report on Form 8-K filed on August 11, 2015 and is incorporated herein by reference.

On August 12, 2015, the Company entered into an additional convertible note financing transaction with an accredited investor in the principal amount of $105,000 less fees and costs. The closing under the financing occurred concurrently with the execution of the financing documents on August 12, 2015. The convertible note bears interest at the rate of 8% per annum and is convertible into common stock of the Company at any time after 180 days from issuance of the note at a conversion price per share equal to 58% of the average of the lowest trading price of the common stock in the thirteen (13) trading days immediately preceding the applicable conversion date. The Company has the option to prepay the convertible note in the first 180 days from closing subject to a prepayment penalty of 150% of principal plus interest. The maturity date of the convertible note is June 12, 2016 subject to the noteholder's right to extend maturity an additional nine (9) month period. See Note 5 to the financial statements.

## ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

Vape is a smaller reporting company and is therefore not required to provide this information.

## ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The consolidated financial statements and supplementary data of Vape called for by this item are submitted under a separate section of this report.  Reference is made to the Index of Financial Statements contained on page F-1 herein.

## ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A.  CONTROLS AND PROCEDURES

*(a) Evaluation of disclosure controls and procedures.*

Management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our chief executive officer and chief financial officer concluded that, as of September 30, 2015, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in internal control over financial reporting.*

We review our system of internal control over financial reporting and make changes to our processes and systems to improve controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

*(c) Management's report on internal control over financial reporting.*

Management is responsible for establishing and maintaining adequate control over financial reporting for Vape. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.  Internal controls over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Vape; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of Vape are being made only in accordance with authorizations of management and directors of Vape; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of Vape's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluations of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, with the participation of our principal executive officer and principal financial and accounting officer, conducted an evaluation of the effectiveness of Vape's internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of September 30, 2015.

ITEM 9B.   OTHER INFORMATION

None.

## PART III

ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The following table sets forth the names, ages and positions of our executive officers and directors. All directors serve for a term set to expire at the next annual meeting of stockholders of Vape or until their successors are elected and qualified. All officers are appointed by our board of directors and their terms of officer are, except to the extent governed by an employment contract, at the discretion of our board of directors.

| Name and Address | Age | Principal Occupation or Employment |
|---|---|---|
| Benjamin Beaulieu | 29 | Chief Operating Officer and Director since May 11, 2015 and Chairman of the Board since December 10, 2015 |
| Allan Viernes | 30 | Chief Financial Officer since June 25, 2014, Director since May 11, 2015 |
| Justin Braune | 34 | Chief Executive Officer and Director, since December 10, 2015. |
| Kyle Tracey | 34 | Former Chief Executive Officer, Secretary and Chairman of Vape beginning on December 30, 2013. Former Chief Financial Officer of Vape beginning on April 16, 2014, resigned June 25, 2014. Resigned as Chief Executive Officer, Chairman of the Board and all officer positions on December 10, 2015. |
| Joseph Andreae | 29 | Former President and Director of Vape beginning on March 26, 2014. Resigned as President and Director on December 10, 2015. |

There are no family relationships among Vape's directors and executive officers. None of the directors of Vape is a director of any company registered pursuant to Section 12 of the Exchange Act, or subject to the requirements of Section 15(d) of the Exchange Act, or any company registered as an investment company under the Investment Company Act of 1940, as amended.

## Directors

*Number of Directors.* Our board of directors currently consists of three individuals.

*Director Qualifications.* While the selection of directors is a complex and subjective process that requires considerations of many intangible factors, the Company believes that candidates should generally meet the following criteria:

- Broad training, experience and a successful track record at senior policy-making levels in business, government, education, technology, accounting, law, consulting and/or administration;
- The highest personal and professional ethics, integrity and values;
- Commitment to representing the long-term interests of the Company and all of its shareholders;
- An inquisitive and objective perspective, strength of character and the mature judgment essential to effective decision-making;
- Expertise that is useful to the Company and complementary to the background and experience of other Board members; and
- Sufficient time to devote to Board and committee activities and to enhance their knowledge of our business, operations and industry.

The Board believes that our current directors meet these criteria. In addition, as outlined below, the directors bring a strong and unique background and set of skills to the Board, giving the Board as a whole competence and experience in a wide variety of areas, including the legal cannabis industry, related horticulture and concentrate extraction industries, business and management, operations, corporate governance, board service and executive management. We believe that the Board as a whole and our directors possess the necessary qualifications and skills to effectively advise management on strategy, monitor our performance and serve our best interests and the best interests of our shareholders.

## Biographical Information

See Executive Officer Section below for biographical information for Mr. Tracey, Mr. Andreae, Mr. Viernes, Mr. Beaulieu, and Mr. Braune.

## Executive Officers

### Kyle Tracey, 34, Former Chief Executive Officer and Chairman

Kyle Tracey brings extensive developmental and managerial experience in the public cannabis space to the Vape Holdings executive team.

Mr. Tracey's diversified experience literally from the ground up to top executive positions includes tenures where he helped develop several integral brands in the space, working as an R&D Specialist for companies like BC Northern Lights and Eco Growing Systems, as well as owning and operating a major horticulture light manufacturer.

As Co-Founder and former President of GrowLife Inc., Mr. Tracey helped to grow the company's market cap from 10M to over 100M while establishing a trusted and respected industry brand. Upon his departure from GrowLife in 2013, Kyle recognized the market opportunity for a more sustainable and efficient vaporization medium, and developed the HIVE Ceramics brand under the VAPE umbrella.

23

Strategically appointed as Chairman and CEO of VAPE Holdings Inc. on December 30, 2013 for his industry credentials, work ethic, and capacity to innovate, market, and sell relative industry products, Mr. Tracey delivers the imperative contacts and respect to achieve market penetration for VAPE Holdings brands and products.

Kyle's association and experience with High Times Magazine, various live event promoters and high profile artists, and entertainment industry powerhouses, all have the potential to position VAPE Holdings business units for expansive sponsorship opportunities and global success.

Mr. Tracey holds a B.A. in Business Management from the University of Rhode Island.

### Joseph Andreae, 29, Former President and Board of Directors

Joseph Andreae, a native of the Washington D.C. area, has been an instrumental part of several top brands in the rapidly growing MMJ industry. After working in the hospitality sector, Joe decided to team with a dispensary and concentrates laboratory in Boulder, Colorado on a new initiative.

Joe's leadership and expertise assisted in making those companies successful and earned him useful relationships and pedigree in the emerging vertical. Mr. Andreae has spent the last 5 years moving from state to state, following the industry and laws as they've progressed. His most recent project in Colorado boasted an impressive 15,000 square foot cultivation facility, the city's first licensed indoor concentrate extraction laboratory, and a beautiful store front that saw a 650% increase to $6M in sales following Joe's arrival. Previously, Joe was also a national sales manager of a successful LED lighting company based out of California and remains an active member on several MMJ brand boards, executing a collective vision and strategy for the industry.

### Allan Viernes, 30, Chief Financial Officer and Board of Directors

Mr. Viernes, 30, is an accounting and financial advisor specializing in public and private accounting and finance, SEC matters, bankruptcy reporting and analysis, mergers and acquisitions, and financial modelling/analysis. Mr. Viernes has served in such positions as Chief Financial Officer of an oil and gas company, Corporate Controller of a software company, and consulted with various retail and restaurant franchises and real estate companies through troubled debt restructurings and leveraged buy outs. Mr. Viernes also has past experience as an auditor with McKennon Wilson & Morgan, a PCAOB registered accounting firm, focusing on audits of private and publicly-held companies. Mr. Viernes graduated with a Bachelor of Administration with a concentration in accounting from Devry University, earned a Master of Business Administration from the Keller Graduate School of Management, and is a Certified Public Accountant.

### Benjamin Beaulieu, 29, Chief Operating Officer and Chairman

Mr. Beaulieu delivers valued experience in the implementation and integration of operational and sales systems to the VAPE Holdings executive team. Mr. Beaulieu has owned operated several multi-million-dollar retail garden supply and technology businesses. With a focus on automation and functionality, Mr. Beaulieu has successfully expanded those companies from brick and mortar locations to E-commerce superstores with global sales and partnerships with the industry's top distributors in the United States and Canada. Mr. Beaulieu's experience operating various companies in the ancillary MMJ markets has already improved Hive Ceramics and VAPE Holdings employee management and development. With a focus on streamlining operations Mr. Beaulieu will allow Vape Holdings, Inc. and subsidiaries to rapidly grow while combating the associated costs responsibly.

### Justin Braune, 34, Chief Executive Officer and Board of Directors

On December 10, 2015, the Board appointed Justin Braune to serve as the Company's Chief Executive Officer and as a director, effective immediately.

Prior to joining the Company, Mr. Braune, 33, served as the chief operating officer of Voodoo Science, LLC and Vapor Wild from 2014 to 2015. From 2013 to 2014, Mr. Braune served as the Chief of Operations for Veracity Security, a technology company located in San Diego. From 2013-2014 Mr. Braune was the Director of Sales at Lear Capital. Since

2010 he owned and operated Braune Enterprises a real estate and investment brokerage firm. Mr. Braune graduated from the United States Naval Academy with a B.S. degree in electrical engineering in and was commissioned as an officer in the U.S. Navy. After earning his master's degree in nuclear engineering, Mr. Braune operated the nuclear reactors onboard the USS RONALD REAGAN aircraft carrier. He served in the U.S. Navy until 2009 and subsequently earned his MBA at the University of Southern California, Marshall School of Business. Our Board believes that Mr. Braune's extensive relationships and experience in the industry of vaporization products and e-cigarettes will bring added value to the Company's management team.

24

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires Vape's executive officers and directors, and persons who own more than ten percent of a registered class of Vape's equity securities, to file reports of ownership and changes of ownership on Forms 3, 4 and 5 with the Securities and Exchange Commission. Executive officers, directors and greater than ten percent stockholders are required by Securities and Exchange Commission regulation to furnish Vape with copies of all Forms 3, 4 and 5 they file.

Vape believes that all filings required to be made by its executive officers and directors pursuant to Section 16(a) of the Exchange Act have been filed within the time periods prescribed.

**Committees of the Board of Directors**

On May 11, 2015, the Board authorized the establishment of separate audit and compensation committees consisting of a certain numbers of independent directors. The Company is still in the process of seeking out independent directors for its Board and committees and, as a result, the Company has not yet begun use of these committees. As such, we do not currently have a separately designated audit, compensation, or nominating committee of our Board and the function customarily delegated to these committees are performed by our full Board. We are not a "listed company" under SEC rules and are therefore not required to have separate committees comprised of independent directors.

The Board does not have a nominations committee because the Board does not believe that a defined policy with regard to the consideration of candidates recommended by stockholders is necessary at this time because the functions of such committee are adequately performed by our Board. There are no specific minimum qualifications that the Board believes must be met by a candidate recommended by the Board. Currently, the entire Board decides on nominees, on the recommendation of any member of the Board, followed by the Board's review of the candidates' resumes and interviews of candidates. Based on the information gathered, the Board then makes a decision on whether to recommend the candidates as nominees for director. We do not pay any fee to any third party, or parties, to identify or evaluate or assist in identifying or evaluating potential nominees.

The Board has not yet begun use of an audit committee. However, for certain purposes of the rules and regulations of the SEC and in accordance with the Sarbanes-Oxley Act of 2002, our Board is deemed to be its audit committee and as such functions as an audit committee and performs some of the same functions as an audit committee including: (i) selection and oversight of our independent accountant; (ii) establishing procedures for the receipt, retention, and treatment of complaints regarding accounting, internal controls, and auditing matters; and (iii) engaging outside advisors. Our Board has determined that its members do not include a person who is an "audit committee financial expert" within the meaning of the rules and regulations of the SEC. Our Board has determined that each of its members is able to read and understand fundamental financial statements and has substantial business experience that results in that member's financial sophistication. Accordingly, our Board believes that each of its members has sufficient knowledge and experience to fulfill the duties and obligations of an audit committee.

The Board has not yet begun use of a compensation committee because the Board believes that it is not necessary to have a compensation committee at this time because the functions of such committee are adequately performed by our Board.

**Stockholder Communications**

Our Board has determined not to adopt a formal methodology for communications from stockholders directly to the Board on the belief that any communication sent to the Company's current investor relations firm, Hayden I.R., would be brought to the Board's attention by our Chief Executive Officer, Kyle Tracey.

25

## Meetings of the Board of Directors

The Board of Directors of Vape conducts business through meetings of the Board or by unanimous written consents of the Board. Such actions by written consent of all directors are, according to Delaware corporate law and our bylaws, valid and effective as if they had been passed at a meeting of the directors duly called and held. The Board of Directors for the fiscal year ended September 30, 2015 consisted of: Kyle Tracey, Joe Andreae, Allan Viernes, and Benjamin Beaulieu. None of Mr. Tracey, Mr. Andreae, Mr. Viernes, or Mr. Beaulieu qualifies as an "independent director" pursuant to the rules and regulations of the Securities and Exchange Commission. During the fiscal year ended September 30, 2015, the Board held no formal meetings, and the Board acted by unanimous written consent on multiple occasions.

On May 17, 2013, the Company selected the accounting firm of dbb*mckennon* to act as the then PeopleString's independent public accounting firm for the year ended December 31, 2012. dbb*mckennon* audited the financial statements of Vape for the year ended September 30, 2015 and 2014.

## Board Leadership Structure and Role in Risk Oversight

During the year ended September 30, 2015, we did not separate the roles of Chief Executive Officer and Chairman of the Board because we believe that such roles are adequately performed by Kyle Tracey. The benefits of Mr. Tracey's leadership of the Board stem from his experience in managing small to medium sized businesses and his involvement in the legal cannabis industry, which provide a unique understanding of our culture and business. Also, serving as both the Chief Executive Officer and Chairman of the Board ensures that a constant flow of Company related information is available between the Board and our senior management. This flow of communication enables Mr. Tracey to identify issues, proposals, strategies and other considerations for future Board discussions and to assume the lead in many of the resulting discussions during Board meetings. Our Board has responsibility for the oversight of risk management. A fundamental part of risk management is not only understanding the risks we face and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate for us. The involvement of the Board in setting our business strategy is a key part of its assessment of risk management and the determination of what constitutes our appropriate level of risk. The Board regularly discusses with management our major risk exposures, their potential impact on us, and the steps taken to manage these risks. In addition, the Board may retain, on such terms as determined by the Board, in its sole discretion, independent legal, financial, and other consultants and advisors to advise and assist the Board in fulfilling its oversight responsibilities. Subsequently, upon Kyle Tracey's resignation as Chief Executive Officer and Chairman of the Board and Justin Braune's appointment as Chief Executive Officer, we separated the roles of Chief Executive Officer and Chairman of the Board as Benjamin Beaulieu was appointed as Chairman.

## Code of Ethics

The executive officers of Vape are held to the highest standards of honest and ethical conduct when conducting the affairs of Vape. All such individuals must act ethically at all times in connection with services provided to the Company. We have adopted a formal, written corporate code of ethics that applies to our executive officers as of May 11, 2015.

## ITEM 11.    EXECUTIVE COMPENSATION

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the annual and long-term compensation of the Named Executive Officers (as defined below) for services in all capacities to Vape for the year ended September 30, 2015 and 2014. The Named Executive Officers are (1) Kyle Tracey, Chief Executive Officer and Chairman, (2) Joseph Andreae, President, (3) Allan Viernes, Chief Financial Officer, (4) Benjamin Beaulieu, Chief Operating Officer, and (4) Michael Cook, Former Director of Business Development (the "Named Executive Officers").

### 2015 SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Kyle Tracey, *Chief Executive Officer and Chairman* (2) | 2015 | $137,173 | $2,000 | $104,200 | $437,900 | $ - | $ - | $ - | $681,273 |
| | 2014 | $ 60,000 | $ - | $ - | $315,400 | $ - | $ - | $ - | $375,400 |
| Joseph Andreae, *President* (3) | 2015 | $112,756 | $2,000 | $104,200 | $437,900 | $ - | $ - | $ - | $656,856 |
| | 2014 | $ 31,731 | $ - | $ - | $315,400 | $ - | $ - | $ - | $347,131 |
| Allan Viernes, *Chief Financial Officer* (4) | 2015 | $ 96,977 | $5,000 | $ 18,300 | $122,500 | $ - | $ - | $ - | $242,777 |
| | 2014 | $ 17,676 | $ - | $ - | $ - | $ - | $ - | $ - | $ 17,676 |
| Benjamin Beaulieu, *Chief Operating Officer* (5) | 2015 | $110,246 | $5,000 | $ 18,300 | $437,900 | $ - | $ - | $ - | $571,446 |
| | 2014 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Michael Cook, *Director of Business Development* (6) | 2015 | $ 72,423 | $3,000 | $ - | $183,500 | $ - | $ - | $ - | $258,923 |
| | 2014 | $ 40,000 | $ - | $ - | $166,000 | $ - | $ - | $ - | $206,000 |

(1)    The amounts in this column reflect the dollar amount recognized for financial statement reporting purposes for the year ended September 30, 2015 and 2014 in accordance with ASC 718, of stock option awards pursuant to the Equity Incentive Plan (as defined below). The fair value of each option award is estimated on the date of grant using the Black-Scholes model.  Assumptions used in the calculation of these amounts are included in the footnotes to VAPE's audited financial statements furnished herewith. All issued and outstanding options were cancelled as of September 30, 2015.

(2)    As of September 30, 2015 and 2014, $50,000 and $53,885 of Mr. Tracey's salary remains unpaid, respectively.

On October 20, 2015, Kyle Tracey surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. On October 20, 2015, Kyle Tracey surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(3)    As of September 30, 2015, $13,333 of Mr. Andreae's salary remains unpaid. On October 20, 2015, Joe Andreae surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. On October 20, 2015, Joe Andreae surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

27

(4)    As of September 30, 2015, $1,667 of Mr. Viernes' salary remains unpaid. On December 21, 2015, Allan Viernes surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(5)    As of September 30, 2015, $1,667 of Mr. Beaulieu's salary remains unpaid. On December 21, 2015, Benjamin Beaulieu surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(6)    As of September 30, 2015 and 2014, $30,000 and $26,769 of Mr. Cook's salary remains unpaid, respectively. As of May 2015, Mr. Cook was removed as an officer and refocused as a Product Development Manager. All issued and outstanding options were cancelled as of September 30, 2015. As of May 2015, Mr. Cook was removed as an officer and refocused as a Product Development Manager.

**Outstanding Equity Awards at Fiscal Year End**

All issued and outstanding options were cancelled as of September 30, 2015.

**Risk Management**

The Board of Directors does not believe that Vape's executive compensation program gives rise to any risks that are reasonably likely to have a material adverse effect on Vape. Executive officers are compensated on a salary basis and have not been awarded any bonuses or other compensation in 2015 and 2014 that might encourage the taking of unnecessary or excessive risks that threaten the long-term value of Vape.

## DIRECTOR COMPENSATION

The following table sets forth information concerning the compensation of the directors of Vape for the year ended September 30, 2015.

### 2015 DIRECTOR COMPENSATION TABLE

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Kyle Tracey | $ -- | $ 61,000 | $ -- | $ -- | $ -- | $ -- | $ 61,000 |
| Joseph Andreae | $ -- | $ 61,000 | $ -- | $ -- | $ -- | $ -- | $ 61,000 |
| Benjamin Beaulieu | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |
| Allan Viernes | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |

(1)    Vape does not currently pay its directors any retainer or other fees for service on the Board or any committee thereof. Vape did not have non-employee directors as of September 30, 2015.

(2)    On October 20, 2015, Kyle Tracey and Joe Andreae each surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015.

28

## Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

**Principal Stockholders and Security Ownership of Management**

The following table sets forth information as of January 11, 2016 with respect to the beneficial ownership (as defined in Rule 13d-3 of the Exchange Act) of Vape's Common Stock by (1) each director of Vape, (2) the Named Executive Officers of Vape, (3) each person or group of persons known by Vape to be the beneficial owner of greater than 5% of Vape's outstanding Common Stock, and (4) all directors and officers of Vape as a group:

### BENEFICIAL OWNERSHIP OF COMMON STOCK

| Name and Address of Beneficial Owner(1)(2) | Amount and Nature of Beneficial Ownership | Percent of Class(3) |
|---|---|---|
| Kyle Tracey(4) | 33,307,969 | 17.2% |
| Joseph Andreae(5) | 585,555 | * |
| Michael Cook(6) | 1,365,760 | * |
| Benjamin Beaulieu(7) | 630,000 | * |
| Allan Viernes(8) | 600,000 | * |
| All Officers and Directors as a Group | 36,489,284 | 18.9% |
| | | |
| Shares issued and outstanding as of January 11, 2016 | 163,026,935 | |
| Options issued to Officers and Directors | 0 | |
| Shares of Preferred Stock issued to Officers and Directors | 30,500,000 | |
| | 193,526,935 | |

\*    Indicates shareholdings of less than 1%

(1)    In accordance with Rule 13d-3 of the Exchange Act, a person is deemed to be the beneficial owner, for purposes of this table, of any shares of Vape's Common Stock if he or she has voting or investment power with respect to such security. This includes shares (a) subject to options exercisable within sixty (60) days, and (b)(1) owned by a spouse, (2) owned by other immediate family members, or (3) held in trust or held in retirement accounts or funds for the benefit of the named individuals, over which shares the person named in the table may possess voting and/or investment power.

(2)    Except as otherwise noted, the address of each person is c/o the Company at 5304 Derry Avenue, Suite C, CA 91301.

(3)    The percentage of class is calculated pursuant to Rule 13d-3(d) of the Exchange Act.

(4)    Mr. Tracey is the former Chief Executive Officer of the Company.  Includes 30,000,000 shares of Series B Convertible Preferred Stock issuable to Hive Ceramics, LLC upon conversion of Secured Series B Preferred Stock Convertible Promissory Notes in the aggregate amount of $300,000. Mr. Kyle Tracey is the sole managing member with sole voting and dispositive power. Each share of Series B Preferred Stock is currently convertible into one share of common stock of the Issuer.  Also includes 500,000 shares of Series A Preferred Stock currently convertible on a 1:1 basis into the Company's Common Stock held in the name of HIVE Ceramics, LLC of which Mr. Tracey is the sole managing member (See "NOTE 9 – STOCKHOLDERS' DEFICIT").  As of the time of this filing, Mr. Tracey has not exercised any of his rights to convert preferred stock into common stock.

(5)    Mr. Andreae is the former President of the Company.

(6)    On May 11, 2015, the Board reassigned Michael Cook from his position of Director of Business Development to HIVE Sales and Product Development Manager. In doing so, the Board determined that Mr. Cook's new position does not meet the definition of "Executive Officer" under SEC Rules. Therefore, Mr. Cook has not been considered an executive officer since that time.

(7)    Mr. Beaulieu is the Chief Operating Officer of the Company.

(8)    Mr. Viernes is the Chief Financial Officer of the Company.

29

---

## ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

**Related Party Transactions**

<u>SUPPLIER</u>

We purchased $60,000 in high-end glass from Kyle Tracey for HIVE Glass, which accounted for 10% of purchases during the year ended September 30, 2015. Kyle Tracey brokered $60,000 of HIVE Glass purchases, which accounted for 10% of total purchases during the year ended September 30, 2015.

<u>RELATED PARTY NOTES PAYABLE, LONG-TERM</u>

The Company had outstanding accounts payable balance to a related party (shareholder of the Company) in the amount of $15,000 as of September 30, 2013. This payable was converted into a note payable on December 7, 2013. The note payable bears interest of 6% per annum with a maturity date of December 1, 2016. As of September 30, 2015, there is $1,645 in accrued interest expense related to this note and the Company recorded $913 in interest expense related to this note during the year ended September 30, 2015.

On December 7, 2013, the Company issued a note payable to a shareholder of the Company in the amount of $23,462 for monies previously borrowed from shareholder. The note is unsecured and bears interest of 6% per annum and matures on December 1, 2016. On January 22, 2015, the Company settled and paid the note and accrued interest of $1,504 for $20,000 and recorded a gain on extinguishment of the note of $3,462.

On February 28, 2014, the Company issued a note payable to HIVE (the "HIVE Note") for the principal amount of $250,000 in connection with the Hive asset acquisition. Per the terms of the HIVE Note, the maturity date is February 27, 2016 and the annual rate of interest is six percent (6%). No prepayment penalty exists. The HIVE Note is unsecured. As of September 30, 2015, there is $22,893 in accrued interest expense related to this note and the Company recorded $15,208 in interest expense related to this note during the year ended September 30, 2015, respectively.

On May 12, 2014, the Company issued a note payable to its President, Joseph Andreae in the amount of $40,000 for monies previously borrowed during the three and six months ended March 31, 2014 (the "Andreae Note"). The note was unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348 in full satisfaction on the Andreae Note.

On August 11, 2014, the Company issued a 6% note payable to its President, Joseph Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note, the original principal balance was $12,828, and was not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240 in full satisfaction of the Andreae Note II.

<u>RELATED PARTY CONVERTIBLE NOTES PAYABLE</u>

On February 18, 2014, the Company issued 8% Convertible Notes to two third parties to cover outstanding accounts payable in the amount of $20,000. Per the terms of the notes, the aggregate principal balance is $20,000, and was not secured by any collateral or any assets pledged to the holders. The maturity date is February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holders can, at their sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the notes was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $8,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,000 and $1,667 of the discount to interest expense during the three and nine months ended June 30, 2014, respectively. On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and

unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,333 to interest expense.

30

On February 18, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $10,612 (the "Tracey Note"). Per the terms of the Tracey Note, the original principal balance is $10,612, and was not secured by any collateral or any assets pledged to the holder. The maturity date was February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,245 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,415 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion the Tracey Note. Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $2,830 to interest expense.

On March 17, 2014, the Company issued an 8% Convertible Note to Jerome Kaiser, former CEO, CFO and Director of the Company for services rendered to the Company in the amount of $50,000 (the "Kaiser Note") which was charged to expense during the three months March 31, 2014. Per the terms of the Kaiser Note, the principal balance is $50,000, and is not secured by any collateral or any assets pledged to the holders. The maturity date is March 17, 2015, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at his sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Kaiser Note is the market closing price of the market day immediately preceding the date of conversion minus twenty percent (20%). We recorded a discount totaling $10,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $4,167 of the discount to interest expense during the year ended September 30, 2015. In March 2015, the Company paid the outstanding principal and accrued interest in satisfaction on the note of $50,000 and $4,000, respectively.

On May 12, 2014, in connection with the 6% Notes, the Company issued a note for $40,000 to Kyle Tracey, which was recorded as a related party convertible note payable. We recorded a discount totaling $16,000 related to the beneficial conversion feature embedded in the 6% note to Mr. Tracey upon issuance. We amortized $6,667 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $13,333 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $11,042 (the "Tracey Note II"). Per the terms of the Tracey Note II, the original principal balance is $11,042, and was not secured by any collateral or any assets pledged to the holder. The maturity date was May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,417 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $920 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note II. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,497 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to its Director of Business Development, Michael Cook, for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $11,825 (the "Cook Note"). Per the terms of the Cook Note, the original principal balance was $11,825, and was not secured by any collateral or any assets pledged to the holder. The maturity date is May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,730 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $985 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the "Cook Note. Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,745 to interest expense.

On August 11, 2014, the Company issued a second 8% Convertible Note to Mr. Cook for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $15,115 (the "Cook Note II"). Per the terms of the Cook Note II, the original principal balance was $15,115, and is was secured by any collateral or any assets pledged to the holder. The maturity date is August 11 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $6,046 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Cook Note II. Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,542 to interest expense.

On August 11, 2014, the Company issued an 8% Convertible Note to Mr. Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $216,001 (the "Tracey Note III"). Per the terms of the Tracey Note III, the original principal balance was $216,001, and is not secured by any collateral or any assets pledged to the holder. The maturity date was August 11, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note III was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $86,401 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note III. Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $79,200 to interest expense.

## ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.

*Audit Fees*

Vape incurred audit and review fees of $56,000 and $43,000 for the periods ended September 30, 2015 and 2014 to dbb*mckennon*.

*Audit Related Fees*

During the year ended September 30, 2014, Vape paid $16,000 for audit related services to dbb*mckennon* in connection with the merger.

32

*Tax Fees*

During the year ended September 30, 2015 and 2014, Vape paid $4,500 and $3,000 for tax services to dbb*mckennon*.

*All Other Fees*

As of September 30, 2015 and 2014, Vape has not paid any fees associated with non-audit services to dbb*mckennon*, or any other accounting firm.

**Policy on Pre-Approval of Audit and Permissible Non-Audit Services**

The Board (functioning in the capacity of an audit committee as discussed in Item 10 above) is responsible for appointing and setting compensation and overseeing the work of the independent registered public accounting firm. The Board approves, in advance, all audit and permissible non-audit services to be performed by the independent registered public accounting firm. Such approval process ensures that the independent registered public accounting firm does not provide any non-audit services to Vape that are prohibited by law or regulation.

**ITEM 15.    EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

(a)    Exhibits
Reference is made to the Index of Exhibits beginning on page E-1 herein.

(b)    Financial Statements
Reference is made to the Index to Consolidated Financial Statements on page F-1.

33

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

VAPE HOLDINGS, INC.

Date:  January 13, 2016

By:  */s/ Justin Braune*
_____
Justin Braune
Chief Executive Officer

Date:  January 13, 2016

By:  */s/ Allan Viernes*
_____
Allan Viernes
Chief Financial Officer

In accordance with Section 13 or 15(d) of the Exchange Act, the Registrant has caused this report to be signed by the following persons in the capacities and on the dates stated.

| Signatures | Title | Date |
|---|---|---|
| */s/ Justin Braune*<br>Justin Braune | Chief Executive Officer, Director<br>(Principal Executive Officer) | January 13, 2016 |
| */s/ Allan Viernes*<br>Allan Viernes | Chief Financial Officer, Director<br>(Principal Financial and Accounting Officer) | January 13, 2016 |
| */s/ Benjamin Beaulieu*<br>Benjamin Beaulieu | Chief Operating Officer,<br>Chairman of Board of Directors | January 13, 2016 |

34

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

## VAPE HOLDINGS, INC.

## (FORMERLY PEOPLESTRING CORPORATION)

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets at September 30, 2015 and 2014 | F-3 |
| Consolidated Statements of Operations for the years ended September 30, 2015 and 2014 | F-4 |
| Consolidated Statements of Stockholders' Deficit for the years ended September 30, 2015 and 2014 | F-5 |
| Consolidated Statements of Cash Flows for the years ended September 30, 2015 and 2014 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Vape Holdings, Inc.

We have audited the accompanying consolidated balance sheets of Vape Holdings, Inc. and subsidiaries (collectively, the "Company") as of September 30, 2015 and 2014, and the related consolidated statements of operations, stockholders' deficit and cash flows for the years then ended September 30, 2015 and 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of September 30, 2015 and 2014, and the results of their operations and their cash flows for the periods then ended, in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As more fully explained in Note 2 to the consolidated financial statements, the Company has incurred losses and has a working capital deficit as of September 30, 2015. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans with respect to these factors are also described on Note 2. The Company's consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties should the Company be unable to continue as a going concern.

 /s/ dbb*mckennon*
dbb*mckennon*
Newport Beach, California
January 13, 2016

F-2

# VAPE HOLDINGS, INC.
## CONSOLIDATED BALANCE SHEETS

|  | | September 30, 2015 | | September 30, 2014 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $ | 273,904 | $ | 48,370 |
| Accounts receivable | | 72,401 | | 16,771 |
| Inventory | | 194,937 | | 227,530 |
| Prepaid inventory | | 64,079 | | 246,491 |
| Other current assets | | 40,679 | | 44,100 |
| Deferred financing costs | | 107,908 | | - |
| Total current assets | | 753,908 | | 583,262 |
| | | | | |
| Fixed assets, net of accumulated depreciation | | 118,327 | | 106,377 |
| Trademarks | | 123,150 | | 119,575 |
| Pending patents | | - | | 14,890 |
| Deferred financing costs, long-term | | 12,067 | | - |
| TOTAL ASSETS | $ | 1,007,452 | $ | 824,104 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 115,938 | $ | 216,388 |
| Accrued expenses | | 208,665 | | 169,513 |
| Customer deposits | | 1,275 | | - |
| Convertible notes payable, net of unamortized discount of $369,569 and $32,333, respectively | | 305,923 | | 187,667 |
| Related party convertible notes payable, net of unamortized discount of $4,168 at September 30, 2014 | | - | | 45,832 |
| Total current liabilities | | 631,801 | | 619,400 |
| | | | | |
| Long term liabilities: | | | | |
| Convertible notes payable, long-term, net of unamortized discount of $507,360 and $19,800, respectively | | 458,404 | | 178,200 |
| Related party convertible notes payable, long-term, net of unamortized discount of $125,480 at September 30, 2014 | | - | | 199,115 |
| Related party notes payable, long-term | | 265,000 | | 341,290 |
| Other liabilities, long-term | | 12,235 | | - |
| Warrant liability | | 25,025 | | 2,464,232 |
| Total liabilities | | 1,392,465 | | 3,802,237 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Stockholders' deficit: | | | | |
| Preferred stock, $0.00001 par value - 100,000,000 authorized; 500,000 outstanding at September 30, 2015 and September 30, 2014 | | - | | - |
| Common stock, $0.00001 par value - authorized 1,000,000,000 shares; 19,896,521 issued at September 30, 2015, 19,455,896 outstanding at September 30, 2015, and 10,032,436 issued and outstanding at September 30, 2014 | | 192 | | 100 |
| Additional paid-in capital | | 26,660,868 | | 22,402,662 |
| Treasury stock, 690,625 shares at September 30, 2015 | | (435,031) | | |
| Accumulated deficit | | (26,611,042) | | (25,380,895) |

| | | | |
|---|---|---:|---:|
| Total stockholders' deficit | | (385,013) | (2,978,133) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ | 1,007,452 | $ 824,104 |

See notes to consolidated financial statements.

F-3

# VAPE HOLDINGS, INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS

|  | For the Year Ended September 30, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Revenue | $ 1,277,657 | $ 841,724 |
| Cost of revenue [A] | 1,013,641 | 458,387 |
| Gross profit | 264,016 | 383,337 |
| Operating expenses: | | |
| Sales and marketing [B] | 715,292 | 219,891 |
| Research and development | 212,424 | 45,757 |
| General and administrative [C] | 2,127,594 | 1,315,710 |
| Total operating expenses | 3,055,310 | 1,581,358 |
| Operating loss | (2,791,294) | (1,198,021) |
| Other income (expense): | | |
| Interest expense | (788,038) | (241,065) |
| Interest expense - related party | (148,562) | (219,714) |
| Change in warrant liability | 2,439,207 | (23,404,058) |
| Gain on settlement | 625,461 | - |
| Loss on debt extinguishments, net | (564,712) | - |
| Total other income (expense), net | 1,563,356 | (23,864,837) |
| Loss before provision for income taxes | (1,227,938) | (25,062,858) |
| Provision for income taxes | 2,209 | 800 |
| Net loss | $ (1,230,147) | $(25,063,658) |
| Net loss available to common shareholders: | | |
| Loss per common share - basic | $         (0.11) | $         (3.20) |
| Loss per common share - diluted | $         (0.11) | $         (3.20) |
| Weighted average shares - basic | 11,563,247 | 7,822,212 |
| Weighted average shares - diluted | 11,563,247 | 7,822,212 |

[A] Stock-based compensation was $50,558 and $0 for the years ended September 30, 2015 and 2014, respectively.

[B] Stock-based compensation was $156,086 and $0 for the years ended September 30, 2015 and 2014, respectively.

[C] Stock-based compensation was $799,699 and $450,501 for the years ended September 30, 2015 and 2014, respectively.

See notes to consolidated financial statements.

F-4

# VAPE HOLDINGS, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT

| | Series A Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at September 30, 2013 - Prior to merger | - | $ - | 4,684,537 | $ 46 | $ - | $ (317,237) | $ - | $ (317,191) |
| Shares retained by PeopleString shareholders upon merger on September 30, 2013 | - | - | 1,565,463 | 16 | - | - | - | 16 |
| Conversion of related party notes payable and accrued interest | - | - | 571,630 | 7 | 341,538 | - | - | 341,545 |
| Conversion of note payables and accrued interest | - | - | 28,836 | - | 55,586 | - | - | 55,586 |
| Fair value of officer services | - | - | - | - | 15,000 | - | - | 15,000 |
| Common stock issued for services | - | - | 50,000 | - | 133,200 | - | - | 133,200 |
| Discount on convertible note payable at 10% | - | - | - | - | 4,424 | - | - | 4,424 |
| Discount on convertible notes payable at 8% | - | - | - | - | 158,402 | - | - | 158,402 |
| Discount on convertible note payable at 6% | - | - | - | - | 108,000 | - | - | 108,000 |
| Discount on related party convertible note payable at 8% | - | - | - | - | 193,217 | - | - | 193,217 |
| Discount on related party convertible note payable at 6% | - | - | - | - | 3,000 | - | - | 3,000 |
| Common stock issued in connection with warrant settlement | - | - | 3,542 | - | 98,822 | - | - | 98,822 |
| Cashless exercise of warrants | - | - | 3,128,428 | 31 | 20,840,972 | - | - | 20,841,003 |
| Stock-based compensation - employee options | - | - | - | - | 326,812 | - | - | 326,812 |
| Stock-based compensation - non - employee options | - | - | - | - | 123,689 | - | - | 123,689 |
| Issuance of preferred stock for HIVE asset acquisition | 500,000 | - | - | - | - | (25,063,658) | - | (25,063,658) |
| Net loss | - | - | - | - | - | (25,063,658) | - | (25,063,658) |
| Balance at September 30, 2014 | 500,000 | $ - | 10,032,436 | $ 100 | $22,402,662 | $ (25,380,895) | $ - | $ (2,978,133) |
| Conversion of related party notes payable and accrued interest | - | - | 625,478 | 6 | 341,741 | - | - | 341,747 |
| Conversion of notes payable and accrued interest | - | - | 8,230,155 | 80 | 813,985 | - | - | 814,065 |
| Conversion of unpaid wages | - | - | 158,175 | 2 | 96,485 | - | - | 96,487 |
| Common stock issued for services | - | - | 60,277 | 1 | 36,768 | - | - | 36,769 |
| Common stock issued for bonuses | - | - | 440,000 | 6 | 288,196 | - | - | 288,202 |
| Stock issued for settlement of accounts payable | - | - | 100,000 | 1 | 99,999 | - | - | 100,000 |
| Discount on convertible note payable at 12% | - | - | - | - | 142,800 | - | - | 142,800 |
| Discount on convertible note payable at 10% | - | - | - | - | 252,079 | - | - | 252,079 |
| Discount on convertible notes payable at 8% | - | - | - | - | 220,400 | - | - | 220,400 |
| Discount on related party convertible note payable at 10% | - | - | - | - | 641,666 | - | - | 641,666 |
| Discount on related party convertible note payable at 6% | - | - | - | - | 5,410 | - | - | 5,410 |
| Extinguishment of related party accrued interest | - | - | - | - | 1,625 | - | - | 1,625 |
| Modification of convertible notes payable | - | - | - | - | 568,174 | - | - | 568,174 |
| Stock-based compensation - employee options | - | - | - | - | 606,362 | - | - | 606,362 |
| Stock-based compensation - non- employee options | - | - | - | - | 75,012 | - | - | 75,012 |
| Issuance of common stock for BetterChem Acquisition | - | - | 250,000 | 3 | 67,497 | - | - | 67,500 |
| Unwinding of BetterChem Acquisition | - | - | (250,000) | (3) | 3 | - | (67,500) | (67,500) |
| Surrender of common stock | - | - | (440,625) | (4) | 4 | - | (367,531) | (367,531) |
| Net income | - | - | - | - | - | (1,230,147) | - | (1,230,147) |
| Balance at September 30, 2015 | 500,000 | $ - | 19,205,896 | $ 192 | $26,660,868 | $ (26,611,042) | $ (435,031) | $ (385,013) |

See notes to consolidated financial statements.

# VAPE HOLDINGS, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | For the Year Ended September 30, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Cash flows from operating activities: |  |  |
| Net loss | $(1,230,147) | $(25,063,658) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |  |
| Depreciation | 71,305 | 16,178 |
| Accretion of debt discounts and deferred financing costs | 695,795 | 366,431 |
| Fair value in excess of stock issued for conversion of notes payable and accrued interest | 15,895 | 1,323 |
| Fair value in excess of stock issued for conversion of related party notes payable and accrued interest | 22,128 | 44,239 |
| Gain on change in warrant liability | (2,439,207) | 23,404,058 |
| Gain on settlement | (625,461) | - |
| Loss on debt extinguishments, net | 564,712 | - |
| Fair value of officer services | - | 15,000 |
| Common stock issued for services | 36,769 | 133,200 |
| Stock-based compensation | 969,577 | 450,501 |
| Changes in operating assets and liabilities: |  |  |
| Accounts receivable | (55,630) | (16,771) |
| Inventory | 215,005 | (474,021) |
| Other assets | 25,554 | (2,433) |
| Accounts payable | 194,549 | 156,042 |
| Accrued expenses | 301,001 | (10,092) |
| Net cash used in operating activities | (1,238,155) | (980,003) |
|  |  |  |
| Cash flows from investing activities: |  |  |
| Capital expenditures | (83,255) | (122,555) |
| Purchase of trademarks | (10,818) | (134,465) |
| Net proceeds from settlement | 62,930 | - |
| Net cash used in investing activities | (31,143) | (257,020) |
|  |  |  |
| Cash flows from financing activities: |  |  |
| Net proceeds from issuance of convertible note payable | 1,657,660 | 438,000 |
| Net proceeds from issuances of related party convertible notes payable | - | 505,535 |
| Net proceeds from issuances of related party notes payable | - | 341,290 |
| Repayments on convertible notes payable | (40,000) | - |
| Repayments on related party convertible notes payable | (50,000) | - |
| Repayments on related party notes payable | (72,828) | - |
| Net cash provided by financing activities | 1,494,832 | 1,284,825 |
|  |  |  |
| Net change in cash | 225,534 | 47,802 |
| Cash, beginning of period | 48,370 | 568 |
| Cash, end of period | $ 273,904 | $ 48,370 |
|  |  |  |
| Supplemental disclosures of cash flow information Cash paid during the period for: |  |  |
| Interest | $ 18,788 | $ - |
| Taxes | $ 2,209 | $ - |

Non-cash investing and financing activities:

| | | | |
|---|---|---|---|
| Conversion of notes payable and accrued interest | $ | 814,065 | $ | 55,586 |
| Conversion of related party notes payable and accrued interest | $ | 341,747 | $ | 341,545 |
| Issuance of convertible note payable for services | $ | - | $ | 41,667 |
| Issuance of convertible note payable for former officer services | $ | - | $ | 50,000 |
| Issuance of common stock in connection with warrant settlement | $ | - | $ | 98,822 |
| Beneficial conversion feature recorded with convertible notes payable | $ | 615,279 | $ | - |
| Beneficial conversion feature recorded with related party convertible note payable | $ | 647,076 | $ | - |

See notes to consolidated financial statements.

F-6

## VAPE HOLDINGS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 1. DESCRIPTION OF BUSINESS, RECENT ACQUISITIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

<u>BUSINESS</u>

Vape Holdings, Inc. ("VAPE," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company designs, markets and distributes ceramic vaporization products under a unique brand. The Company has introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

## HIVE CERAMICS

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, and the HIVE x D-Nail 16mm and 20mm attachments.

The Company has recently launched 'HIVE Glass.' HIVE Glass is VAPE's newest line of products under the HIVE brand name. The HIVE GLASS line is precision made using state of the art manufacturing processes and techniques, and exclusively uses German Schott glass caliber and fittings through all production phases. The aim with HIVE Glass is to create an affordable, high quality glass product that is both aesthetically pleasing and a highly functional vaporization product. VAPE's existing customer base and distribution network will be the catalyst for expansion of this new HIVE product line. Under HIVE Glass, the Company also buys and sells high-end collector pieces. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

VAPE has also recently launched 'HIVE Supply.' HIVE Supply is a packaging and sourcing division of VAPE designed to serve as a competitively priced, comprehensive "one-stop shop" for all medical and recreational marijuana packaging needs. As with all of VAPE's products, HIVE Supply will operate in full compliance with all federal laws and the laws of each individual state in which it does business. HIVE Supply will focus on providing much-needed support to cannabis businesses in regards to sourcing consumer products, brand management and marketing services. HIVE Supply is currently operated out of three (3) locations: HIVE Supply in Southern California, HIVE Supply Washington in Spokane and HIVE Supply Oregon in Portland. Under HIVE Supply, the Company also buys and sells high-end manufacturing machines. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

In connection with its launch of HIVE Supply and HIVE Glass, the Company opened 'THE HIVE' retail store and gallery in Los Angeles, an end-user experience to showcase the complete line of HIVE Ceramics and HIVE Glass products, while introducing HIVE Supply and all the new products being tested and developed through each vertical. Subsequent to year end, the Company curtailed its retail store in order to reduce overhead costs and focus on HIVE Ceramics.

F-7

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products through business alliances and acquisitions, as well as developing its branded retail business expansion. VAPE and its business units are organized and directed to operate strictly in accordance with all applicable state and federal laws.

## REVIVAL PRODUCTS

On December 28, 2015, the Company created a new wholly-owned subsidiary, Revival Products, LLC ("Revival"), which is in the business of portable vaporization devices. Revival will disposable cartridge complement HIVE Ceramic's product lines utilizing its sales and distribution channels and via its own designated e-commerce site at www.revivalvapes.com.

## BETTERCHEM

On July 1, 2015, the Company entered into a Share Exchange Agreement with BetterChem Consulting, Inc. ("BetterChem"), a Pennsylvania corporation, and its sole shareholder and the Company's current Chief Science Officer Dr. Mark Scialdone ("Dr. Scialdone"), whereby the Company acquired a controlling 80% interest in BetterChem from Dr. Scialdone in exchange for up to 400,000 shares of the Company's restricted common stock. In consideration for the issuance of the shares to Dr. Scialdone, the Company acquired 80 shares of the common stock of BetterChem which represents 80% of the issued and outstanding shares of BetterChem. Dr. Scialdone retained a 20% interest in BetterChem. The Share Exchange Agreement transaction closed concurrently with its execution on July 1, 2015 and was approved by Unanimous Written Consent of the Board of Directors (the "Board") of the Company on the same date. At closing, the Company issued 250,000 shares of its common stock valued at $67,500 to BetterChem. The Company acquired an 80% controlling interest of the business in order to expand its science consulting segment and research and development. BetterChem had no assets and liabilities upon closing.

An additional up to 150,000 shares of common stock to be issued to Dr. Scialdone will be subject to the following terms:

1. Due to the uncertain nature of the valuation of BetterChem, a privately held consulting business, the parties have agreed that Dr. Scialdone shall have a nonassignable contingent contractual right to receive additional shares contingent on the future gross revenues of BetterChem as follows:

   a. On the one year anniversary of the closing, Dr. Scialdone shall be entitled to an additional 75,000 shares if BetterChem has generated at least $100,000 in gross revenues beginning on the date of closing and up to the one year anniversary of the closing. The additional stock issuance will be calculated on a pro rata basis (i.e. If BetterChem only generates $50,000 in gross revenues in the first year then Dr. Scialdone will be entitled to only 37,500 shares).

F-8

b.  On the two year anniversary of the closing, Dr. Scialdone shall be entitled to an additional 75,000 shares if BetterChem has generated at least $100,000 in gross revenues beginning on the one year anniversary of the closing up to the two year anniversary of the closing. The additional stock issuance will be calculated on a pro rata basis (i.e. If BetterChem only generates $50,000 in gross revenues in the second year then Dr. Scialdone will be entitled to only 37,500 shares).

2.  In the event of a change in control of BetterChem or a sale of all or substantially all of the assets of BetterChem during the two year period, the additional 150,000 shares shall automatically vest and be payable in full to Dr. Scialdone and any salary compensation due Dr. Scialdone under the 2 year term of his employment agreement with the Company dated May 1, 2015, or extensions of that Employment Agreement which the parties may thereafter execute, shall be accelerated and shall be due and payable in full within 30 days of the event of change in control of BetterChem.

In connection with the Share Exchange Agreement, on July 1, 2015, Dr. Scialdone and the Company entered into an Intellectual Property Rights Transfer Agreement (the "I.P. Agreement") whereby Dr. Scialdone agreed to transfer and assign to Company the entire right, title and interest in and to any and all intellectual property in which Dr. Scialdone has a right to convey an interest, including intellectual property conceived, developed, reduced to practice, assigned or acquired by Dr. Scialdone prior to the date of the I.P. Agreement as well as intellectual property held, conceived, developed, reduced to practice, assigned or acquired by BetterChem. There were no assets or liabilities assumed by the Company. On January 12, 2016, the Company unwound the transaction and curtailed the subsidiary's operations in order to reduce overhead costs and focus on HIVE Ceramics and reflected such as of September 30, 2015 in the consolidated financial statements. As of September 30, 2015, the 250,000 shares issued to BetterChem were recorded as treasury stock valued at $67,500 as a result of the settlement to receive the shares back as part of the unwind.

VAPE is organized and directed to operate strictly in accordance with all applicable state and federal laws. Subsequent to year end, the Company abandoned such plans in order to reduce overhead costs and focus on HIVE Ceramics.

Subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue.

BASIS OF PRESENTATION

The accompanying unaudited interim consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the SEC. Certain information and disclosures normally included in the annual financial statements prepared in accordance with the accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. In the opinion of management, all adjustments and disclosures necessary for a fair presentation of these consolidated financial statements have been included. Such adjustments consist of normal recurring adjustments. The current results are not an indication of the full year.

CONSOLIDATION

The consolidated financial statements include the assets, liabilities, and operating results of the Company and its wholly-owned subsidiaries, HIVE Ceramics, Offset, and Nouveau after elimination of all material inter-company accounts and transactions. No segment information is presented as the assets, liabilities, and results of HIVE represent over 90% of the Company's operations.

USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make certain estimates and assumptions that affect the reported amounts of assets

and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates and assumptions include losses for warrant contingencies and the valuation of conversion features in notes.

F-9

FAIR VALUE OF FINANCIAL INSTRUMENTS

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants as of the measurement date. Applicable accounting guidance provides an established hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in valuing the asset or liability and are developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the factors that market participants would use in valuing the asset or liability. There are three levels of inputs that may be used to measure fair value:

Level 1 - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.
Level 2 - Include other inputs that are directly or indirectly observable in the marketplace.
Level 3 - Unobservable inputs which are supported by little or no market activity.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. Derivative instruments include the warrant liability (Level 2). Derivative instruments are valued using standard calculations/models that are primarily based on observable inputs, including volatilities and interest rates. Therefore, derivative instruments are included in Level 2.

Fair-value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of September 30, 2015 and 2014. The respective carrying value of certain on-balance-sheet financial instruments approximated their fair values. These financial instruments include cash, prepaid expenses, accounts payable, accrued liabilities, and notes payable. Fair values for these items were assumed to approximate carrying values because of their short-term nature or they are payable on demand.

The following table presents the Company's fair value hierarchy for assets measured at fair value on a recurring basis at September 30, 2015:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Cash and cash equivalents | $ 273,904 | $ - | $ - | $ 273,904 |
| Total assets measured at fair value | $ 273,904 | $ - | $ - | $ 273,904 |
| | | | | |
| Liabilities | | | | |
| Derivative instruments | $ - | $ 25,025 | $ - | $ 25,025 |
| Total liabilities measured at fair value | $ - | $ 25,025 | $ - | $ 25,025 |

The following table presents the Company's fair value hierarchy for assets and liabilities measured at fair value on a recurring basis at September 30, 2014:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Cash and cash equivalents | $ 48,370 | $ - | $ - | $ 48,370 |
| Total assets measured at fair value | $ 48,370 | $ - | $ - | $ 48,370 |
| | | | | |
| Liabilities | | | | |
| Derivative instruments | $ - | $ 2,464,232 | $ - | $ 2,464,232 |
| Total liabilities measured at fair value | $ - | $ 2,464,232 | $ - | $ 2,464,232 |

F-10

## CONCENTRATION

*Credit Risk*

At times, the Company maintains cash balances at a financial institution in excess of the FDIC insurance limit. In addition, at we extend credit to customers in the normal course of business, after we evaluate the credit worthiness. The Company does not expect to take any unnecessary credit risks causing significant write-offs of potentially uncollectible accounts.

*Customers*

One (1) customer accounted for 37% of our accounts receivable as of September 30, 2015. The loss of this customer would have a significant impact on the Company's financial results.

*Suppliers*

One (1) supplier accounted for 54% of our purchases during the year ended September 30, 2015. We purchased $60,000 in high-end glass from Kyle Tracey for HIVE Glass, which accounted for 10% of purchases during the year ended September 30, 2015. The loss of these suppliers would have a significant impact on the Company's financial results.

## REVENUE RECOGNITION

The Company recognizes revenues from product sales when (a) persuasive evidence that an agreement exists; (b) the products have been delivered; (c) the prices are fixed and determinable and not subject to refund or adjustment; and (d) collection of the amounts due is reasonably assured. Revenue is recorded when sales orders are shipped.

## INVENTORY

Inventory is valued at the lower of cost or market, as determined primarily by the average cost inventory method, and are stated using the first-in, first-out (FIFO) method. Management will record a provision for loss for obsolete or slow moving inventory to reduce carrying amounts to net realizable value.

We purchase product sourced from China which we are required to pay 50% upon placing the order. Amounts paid for products, which have not been received, are recorded as prepaid inventory. There are no amounts paid which are in dispute or considered impaired.

## FIXED ASSETS

Fixed assets are recorded at cost and depreciation is provided over the estimated useful lives of the related assets using the straight-line method for financial statement purposes. The estimated life of tooling related to our ceramic products is three (3) years. The estimated life of our leasehold improvements is the lesser of the term of the related lease and useful life.

F-11

## IMPAIRMENT OF LONG-LIVED AND PURCHASED INTANGIBLE ASSETS

The Company has adopted Accounting Standards Codification ("ASC") 350 "Intangibles - Goodwill and Other." The Statement requires that long-lived assets and certain identifiable intangibles held and used by the Company be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Events relating to recoverability may include significant unfavorable changes in business conditions, recurring losses, or a forecasted inability to achieve break-even operating results over an extended period. The Company evaluates the recoverability of long-lived assets based upon forecasted undiscounted cash flows. Should impairment in value be indicated, the carrying value of intangible assets will be adjusted, based on estimates of future discounted cash flows resulting from the use and ultimate disposition of the asset. ASC 350 also requires assets to be disposed of be reported at the lower of the carrying amount or the fair value less costs to sell.

Long-lived assets, such as fixed assets and purchased intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the asset is measured by comparison of its carrying amount to undiscounted future net cash flows the asset is expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the asset exceeds its fair market value. Estimates of expected future cash flows represent management's best estimate based on currently available information and reasonable and supportable assumptions. Any impairment recognized is permanent and may not be restored. During the year ended September 30, 2015 and 2014, the Company recorded $22,133 and $0 of impairment of its pending patents as its expected cash flows did not exceed its carrying amounts and none towards its trademarks as its expected future cash flows are in excess of their carrying amounts.

## RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred. The costs of materials and equipment that will be acquired or constructed for research and development activities, and that have alternative future uses, both in research and development, marketing or sales, will be classified as fixed assets and depreciated over their estimated useful lives. To date, research and development costs include the research and development expenses related to prototypes of the Company's products. During the year ended September 30, 2015 and 2014, research and development costs were $212,424 and $45,757, respectively.

## CONVERTIBLE DEBT

Convertible debt is accounted for under the guidelines established by ASC 470-20 "Debt with Conversion and Other Options." ASC 470-20 governs the calculation of an embedded beneficial conversion, which is treated as an additional discount to the instruments where derivative accounting (explained below) does not apply. The amount of the value of warrants and beneficial conversion feature may reduce the carrying value of the instrument to zero, but no further. The discounts relating to the initial recording of the derivatives or beneficial conversion features are accreted over the term of the debt. Many of the conversion features embedded in the Company's convertible notes are variable and are adjusted based on a discount to market prices which could cause an unlimited number of common stock to be issued. The management and board of directors currently have the ability to authorize additional shares of common stock primarily through their super voting rights under the Series A Preferred stock (See "NOTE 8 - STOCKHOLDERS' DEFICIT").

When applicable, the Company calculates the fair value of warrants and conversion features issued with the convertible instruments using the Black-Scholes valuation method, using the same assumptions used for valuing employee options for purposes of ASC 718 "Compensation - Stock Compensation", except that the contractual life of the warrant or conversion feature is used. Under these guidelines, the Company allocates the value of the proceeds received from a convertible debt transaction between the conversion feature and any other detachable instruments (such as warrants) on a relative fair value basis. The allocated fair value is recorded as a debt discount or premium and is amortized over the expected term of the convertible debt to interest expense. If the fair value exceeds the carrying value of the debt, an immediate charge to operations is recorded by management. Each reporting period, the Company will compute the estimated fair value of derivatives and record changes to operations. Currently no instruments are being recorded as such.

The Company accounts for modifications of its BCF's in accordance with ASC 470-50 "Modifications and Extinguishments." ASC 470-50 requires the modification of a convertible debt instrument that changes the fair value of an embedded conversion feature and the subsequent recognition of interest expense or the associated debt instrument when the modification does not result in a debt extinguishment.

F-12

## DERIVATIVE FINANCIAL INSTRUMENTS

Derivative financial instruments, as defined in ASC 815, "Accounting for Derivative Financial Instruments and Hedging Activities", consist of financial instruments or other contracts that contain a notional amount and one or more underlying (e.g. interest rate, security price or other variable), require no initial net investment and permit net settlement. Derivative financial instruments may be free-standing or embedded in other financial instruments. Further, derivative financial instruments are initially, and subsequently, measured at fair value and recorded as liabilities or, in rare instances, assets.

The Company does not use derivative financial instruments to hedge exposures to cash-flow, market or foreign-currency risks. However, the Company has issued financial instruments including senior convertible notes payable and freestanding stock purchase warrants with features that are either (i) not afforded equity classification, (ii) embody risks not clearly and closely related to host contracts, or (iii) may be net-cash settled by the counterparty. As required by ASC 815, in certain instances, these instruments are required to be carried as derivative liabilities, at fair value, in our consolidated financial statements.

The Company estimates the fair values of derivative financial instruments using various techniques (and combinations thereof) that are considered to be consistent with objectively measuring fair values. In selecting the appropriate technique, consideration is given to, among other factors, the nature of the instrument, the market risks that it embodies and the expected means of settlement. For less complex derivative instruments, such as free-standing warrants, the Company generally uses the Black-Scholes option valuation technique because it embodies all of the requisite assumptions (including trading volatility, estimated terms and risk free rates) necessary to fair value these instruments. Estimating fair values of derivative financial instruments requires the development of significant and subjective estimates that may, and are likely to, change over the duration of the instrument with related changes in internal and external market factors. In addition, option-based techniques are highly volatile and sensitive to changes in the trading market price of our common stock, which has a high-historical volatility. Since derivative financial instruments are initially and subsequently carried at fair values, the Company's operating results will reflect the volatility in these estimate and assumption changes.

## EARNINGS PER COMMON SHARE

Basic earnings per common share is computed by dividing net income available to common shareholders by the weighted-average number of common shares outstanding during the reporting period. Diluted earnings per common share is computed by dividing net income available to common shareholders by the combination of dilutive common share equivalents, comprised of shares issuable under the Company's share-based compensation plans and the weighted-average number of common shares outstanding during the reporting period. Dilutive common share equivalents include the dilutive effect of in-the-money share equivalents, which are calculated, based on the average share price for each period using the treasury stock method. Under the treasury stock method, the exercise price of an award, if any, the amount of compensation cost, if any, for future service that the Company has not yet recognized, and the estimated tax benefits that would be recorded in paid-in capital, if any, when an award is settled are assumed to be used to repurchase shares in the current period.

The following is a summary of outstanding securities that would have been included in the calculation of diluted shares outstanding since the exercise prices did not exceed the average market value of the Company's common stock if the Company generated net income for the year ended September 30, 2015 and 2014:

|  | For the Year Ended September 30, 2015 | For the Year Ended September 30, 2014 |
|---|---|---|
| Series A Preferred stock | 500,000 | 500,000 |
| Common stock options | - | 303,889 |
| Common stock warrants | 1,184,727 | 1,184,727 |
| Convertible notes | 79,699,946 | 843,213 |
|  | 81,384,673 | 2,831,829 |

F-13

The Company would have excluded 125,000 options from the computation for the year ended September 30, 2014 as their exercise prices were in excess of the average closing market price of the Company's common stock, causing their effects to be anti-dilutive using the treasury stock method.

<u>STOCK-BASED COMPENSATION</u>

ASC 718, "Share-Based Payment" requires that compensation cost related to share-based payment transactions be recognized in the consolidated financial statements. Share-based payment transactions within the scope of ASC 718 include stock options, restricted stock plans, performance-based awards, stock appreciation rights, and employee share purchase plans.

The Company adopted ASC 718, which requires disclosure of the fair value and other characteristics of stock options and more prominent disclosure about the effects of an entity's accounting policy decisions with respect to stock-based compensation on reported net loss. The Company has reflected the expense of such stock based compensation based on the fair value at the grant date for awards consistent with the provisions of ASC 718.

In connection with the adoption of ASC 718, the fair value of our share-based compensation has been determined utilizing the Black-Scholes pricing model. The fair value of the options granted is amortized as compensation expense on a straight line basis over the requisite service period of the award, which is generally the vesting period. The fair value calculations involve significant judgments, assumptions, estimates and complexities that impact the amount of compensation expense to be recorded in current and future periods. Upon option exercise, the Company issues new shares of stock.

The following weighted average variables were used in the Black Scholes model for all option issuances valued during the year ended September 30, 2015 and 2014:

| Year Ended September 30, | Stock Price at Grant Date | | Dividend Yield | Exercise Price | | Risk Free Interest Rate | Volatility | Average Life |
|---|---|---|---|---|---|---|---|---|
| 2015 | $ | 0.73 | -% | $ | 0.73 | 2.2% | 380% | 10.0 |
| 2014 | $ | 1.66 | -% | $ | 1.66 | 2.5% | 401% | 10.0 |

The Company's accounting policy for equity instruments issued to consultants and vendors in exchange for goods and services follows the provisions of Emerging Issues Task Force ("EITF") 96-18, "Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services", codified into ASC 505-50. The measurement date for the fair value of the equity instruments issued is determined at the earlier of (i) the date at which a commitment for performance by the consultant or vendor is reached or (ii) the date at which the consultant or vendor's performance is complete. In the case of equity instruments issued to consultants, the fair value of the equity instrument is recognized over the term of the consulting agreement.

<u>RECENT ACCOUNTING PRONOUNCEMENTS</u>

In May 2014, the FASB issued Accounting Standards Update No. 2014-09, "Revenue from Contracts with Customers", which supersedes most of the current revenue recognition requirements. The core principle of the new guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for these goods or services. New disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers are also required. This guidance is effective for the Company in the first quarter of fiscal year 2018 and early application is not permitted. Entities must adopt the new guidance using one of two retrospective application methods. The Company is currently evaluating the standard but does not expect it to have a material impact on our financial position, results of operations or cash flows.

In August 2014, the FASB issued ASU 2014-15, which provides guidance on determining when and how to disclose going-concern uncertainties in the financial statements. The new standard requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date the financial

statements are issued.2 An entity must provide certain disclosures if "conditions or events raise substantial doubt about the entity's ability to continue as a going concern." The ASU applies to all entities and is effective for annual periods ending after December 15, 2016, and interim periods thereafter, with early adoption permitted.

F-14

The Financial Accounting Standards Board issues Accounting Standard Updates ("ASUs") to amend the authoritative literature in Accounting Standards Codification ("ASC"). There have been a number of ASUs to date that amend the original text of ASC. The Company believes those issued to date either (i) provide supplemental guidance, (ii) are technical corrections, (iii) are not applicable to the Company or (iv) are not expected to have a significant impact on the Company.

RISKS AND UNCERTAINTIES

Although forward-looking statements in this Quarterly Report reflect our good faith judgment, such statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include without limitation those discussed under the heading "Risk Factors" below, as well as those discussed elsewhere in this Quarterly Report. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Quarterly Report. We undertake no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Quarterly Report. Readers are urged to carefully review and consider the various disclosures made in this Quarterly Report, which attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

**NOTE 2. GOING CONCERN**

VAPE's consolidated financial statements reflect a net loss of $1,230,147 during the year ended September 30, 2015. As of September 30, 2015, we had cash of $273,904 and working capital of $122,107. VAPE has suffered an accumulated deficit of $26,411,042 and subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue. All of which have resulted in losses and opportunity costs. In addition, the ongoing need to obtain financing to fund operations also raise substantial doubt about the ability of Vape to continue as a going concern. Management expects to obtain funding for the new operations for the foreseeable future; however, there are no assurances that the Company will obtain such funding. VAPE's financial statements do not include any adjustments to reflect the possible effects on recoverability and classification of assets or the amounts and classification of liabilities that may result from the inability to continue as a going concern. See Note 11 for subsequent events regarding financing activities.

**NOTE 3. FIXED ASSETS**

The following is a summary of fixed assets as of September 30, 2015 and 2014:

|  | September 30, 2015 | September 30, 2014 |
|---|---|---|
| Molds and Tooling | $ 176,015 | $ 122,555 |
| Leasehold improvements | 29,795 | - |
| Accumulated depreciation | (87,483) | (16,178) |
|  | $ 118,327 | $ 106,377 |

During the year ended September 30, 2015 and 2014, depreciation expense included in cost of revenue were $71,305 and $16,178, respectively.

Case 1:16-cv-01343-RJS   Document 12   Filed 03/01/16   Page 83 of 122

**NOTE 4. ACCRUED EXPENSES**

The following is a summary of accrued expenses as of September 30, 2015 and 2014:

|  | September 30, 2015 | September 30, 2014 |
|---|---|---|
| Accrued interest | $ 46,337 | $ 16,300 |
| Accrued interest - related party | 24,538 | 18,325 |
| Accrued wages and taxes | 112,322 | 108,374 |
| Other | 25,468 | 26,514 |
|  | $ 208,665 | $ 169,513 |

As of September 30, 2015 and 2014, the Company recorded accrued wages and taxes for Kyle Tracey of $55,000 and $59,273, Joe Andreae of $14,667 and $0, Allan Viernes of $1,833 and $0, and Benjamin Beaulieu of $1,833 and $0, respectively.

**NOTE 5.  THIRD PARTY DEBT**

<u>CONVERTIBLE NOTES PAYABLE</u>

Beginning on February 11, 2014, the Company issued 6% Convertible Notes (the "6% Notes") pursuant to subscription agreements to ten (10) accredited investors (the "Holders") with the aggregate principal amount of $230,000. The 6% Notes are not secured by any collateral or any assets pledged to the Holders. The maturity dates are from February 28, 2015 to March 31, 2015, and the annual rate of interest is six percent (6%). Subject to certain limitations, the Holders can, at their sole discretion, convert the outstanding and unpaid principal and interest of their notes into fully paid and nonassessable shares of the Company's common stock. The conversion price of these 6% Notes is the average of the fifteen (15) lowest daily VWAP's occurring during the twenty (20) consecutive trading days immediately preceding the date each Holder elects convert all of their 6% Note minus a discount of 40%. In no event will the conversion price be less than $1.00 per share or greater than $3.00 per share. The Company had a preexisting relationship with each of the Holders, and no general solicitation or advertising was used in connection with the issuance of the 6% Notes. We recorded a discount totaling $92,000 related to the beneficial conversion feature embedded in the notes upon issuance and amortized $32,333 and $57,667 of the discount to interest expense during the year ended September 30, 2015 and 2014, respectively.

On March 12, 2015, the Company offered to pay accrued interest and modify the terms of the six (6) Holders' outstanding 6% Notes, decreasing the conversion floor from $1.00 to $0.50 in order to encourage the noteholders to convert their promissory notes. The Company recorded a loss on debt extinguishment of $23,443 as a result of the fair value in excess of the modified conversion floor. In March 2015, the Company paid all accrued interest on the 6% notes of $17,200. Five (5) of the six (6) holders converted in full a total of $80,000 of 6% Notes into 160,000 shares of common stock. The remaining note holder partially converted $20,000 of 6% Notes into 40,000 of common shares and extended the terms on the remaining $30,000 for six (6) months. As of September 30, 2015, there is $1,010 in accrued interest expense related to the one (1) remaining note and the Company recorded $1,010 in interest expense related to the 6% note during the year ended September 30, 2015. On December 14, 2015, the note holder converted $30,000 in principal and $1,351 of accrued interest into 13,063,013 shares of common stock. As a result of the subsequent conversion the principal balance and accrued interest as of September 30, 2015 were classified as long-term.

<u>Securities Purchase Agreement</u>

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. The Company also paid a finder's fee in the amount of $25,000 in connection with this transaction, which was recorded as a discount to the note as it was paid from the proceeds. The closing under the Securities Purchase Agreement occurred on December 3, 2014. The Company received $475,000 net proceeds after transactions costs. We amortized $27,778 of the

discount to interest expense during the year ended September 30, 2015. In addition, the Company recorded $45,940 in deferred financing costs and amortized $25,522 to interest expense during the year ended September 30, 2015. As of September 30, 2015, the Company had unamortized costs of $20,418 in current deferred financing costs. The deferred financing costs are amortized through the maturity date.

F-16

The Note bears interest at the rate of 10% per annum and is convertible into common stock of the Company at a conversion price per share of 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions))(the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the Note is seventeen months from the date of issuance. We recorded a discount totaling $168,000 related to the beneficial conversion feature embedded in the note upon issuance. On August 26, 2015, the Company and Investor entered into an Amendment whereby the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the Securities Purchase Agreement. As a result, we expensed the unamortized discount of $168,000 to interest expense, recorded a loss on debt extinguishment of $158,916, and recorded a new discount of $242,916. We amortized $30,365 of the discount to interest expense during the year ended September 30, 2015. On December 10, 2015, the Company and the Investor entered into a forbearance agreement regarding the Investor's convertible note and added $105,000 to the principal. See Note 11 to the consolidated financial statements.

Between June 2015 and September 2015, the Company issued the following conversions for payment towards Investor:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| June 4, 2015 | $ | 46,667 | $ | 28,871 | $ | 75,538 | $ | 0.342 | 220,949 |
| July 3, 2015 | | 46,667 | | 4,295 | | 50,962 | $ | 0.194 | 263,141 |
| August 11, 2015 | | 25,000 | | - | | 25,000 | $ | 0.138 | 181,818 |
| September 3, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 445,196 |
| September 23, 2015 | | 25,000 | | - | | 25,000 | $ | 0.041 | 606,061 |
| September 29, 2015 | | 23,000 | | - | | 23,000 | $ | 0.015 | 1,548,822 |
| | $ | 191,334 | $ | 33,166 | $ | 224,500 | | | 3,265,987 |

Subsequent to year end, the Investor also enacted the following conversions:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| October 8, 2015 | $ | 21,000 | $ | - | $ | 21,000 | $ | 0.012 | 1,818,182 |
| October 16, 2015 | | 18,900 | | - | | 18,900 | $ | 0.012 | 1,636,364 |
| October 22, 2015 | | 25,800 | | - | | 25,800 | $ | 0.011 | 2,333,786 |
| October 29, 2015 | | 22,460 | | - | | 22,460 | $ | 0.011 | 2,031,660 |
| November 11, 2015 | | 33,500 | | - | | 33,500 | $ | 0.007 | 4,649,549 |
| November 18, 2015 | | 24,000 | | - | | 24,000 | $ | 0.006 | 4,195,804 |
| November 30, 2015 | | 30,000 | | - | | 30,000 | $ | 0.005 | 5,741,627 |
| December 11, 2015 | | 22,000 | | - | | 22,000 | $ | 0.002 | 9,090,909 |
| December 28, 2015 | | 22,500 | | - | | 22,500 | $ | 0.002 | 9,297,521 |
| January 7, 2016 | | 20,000 | | - | | 20,000 | $ | 0.002 | 10,101,010 |
| | $ | 240,160 | $ | - | $ | 240,160 | | | 50,896,412 |

As a result, as of September 30, 2015, $46,671 and $87,221, net of total unamortized discounts of $81,835 and

$152,939 are classified as current and long-term on the accompanying consolidated balance sheet. As of September 30, 2015, there is $9,945 in accrued interest expense related to this note and the Company recorded $43,111 in interest expense related to this note during the year ended September 30, 2015.

F-17

<u>$2M Securities Purchase Agreement</u>

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an OID of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015.

The $2M Note bears interest at the rate of 10% per annum and is immediately convertible into common stock of the Company at a conversion price per share of 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions)) (the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the $2M Note, together with accrued interest thereon, is due in twelve bi-monthly installments, commencing approximately six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the $2M Note is twelve months from the date of issuance.

During the year ended September 30, 2015, the Company received $800,000 toward the $2M Note with an original issue discount of $148,600 and transaction costs for net proceeds of $651,395, respectively. We amortized $45,600 of the discount to interest expense during the year ended September 30, 2015. In addition, we recorded a discount totaling $108,641 related to the beneficial conversion feature embedded in the note upon issuance.

On August 13, 2015, the Company entered into an Amendment, Waiver and Modification Agreement (the "Amendment") to its $2M Securities Purchase Agreement and related Transaction Documents with Redwood Management, LLC including any designees and or assignees thereto.  Under the terms of the Amendment, the parties agreed to reduce the $2,000,000 outstanding balance of the $2M Note to $800,000 to reflect the total amount funded under the note, to terminate the offsetting investor note securing the additional unfunded balance and to waive any past claims of default or offsetting interest on the $2M Note or investor note. In addition, the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the $2M Securities Purchase Agreement. As a result, we expensed the unamortized discount of $108,641 to interest expense, recorded a loss on debt extinguishment of $385,815, and recorded a new discount of $440,000. We amortized $94,131 of the discount to interest expense during the year ended September 30, 2015.

F-18

The following is summary of conversions by the $2M Note holder during the year ended September 30, 2015:

| Conversion Date | Principal Converted | | Accrued Interest Converted | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|
| August 13, 2015 | $ | 50,000 | - | $ | 50,000 | $ | 0.127 | 393,701 |
| August 26, 2015 | | 25,000 | - | | 25,000 | $ | 0.056 | 446,428 |
| September 8, 2015 | | 25,000 | - | | 25,000 | $ | 0.056 | 446,428 |
| September 14, 2015 | | 25,000 | $ - | | 25,000 | $ | 0.053 | 469,925 |
| September 16, 2015 | | 10,000 | - | | 10,000 | $ | 0.053 | 188,679 |
| September 17, 2015 | | 25,000 | - | | 25,000 | $ | 0.053 | 469,925 |
| September 22, 2015 | | 10,000 | - | | 10,000 | $ | 0.043 | 232,558 |
| September 24, 2015 | | 10,000 | - | | 10,000 | $ | 0.026 | 390,625 |
| September 25, 2015 | | 10,000 | - | | 10,000 | $ | 0.019 | 518,135 |
| September 29, 2015 | | 13,410 | - | | 13,410 | $ | 0.015 | 900,000 |
| | $ | 203,410 | $ - | $ | 203,410 | | | 4,456,404 |

F-19

Subsequent to year end, the $2M Note holder also enacted the following conversions:

| Conversion Date | Principal Converted | Accrued Interest Converted | Total Converted | Conversion Rate | Common Shares Issued |
|---|---|---|---|---|---|
| October 1, 2015 | $ 10,000 | $ - | $ 10,000 | $ 0.0148 | 675,676 |
| October 5, 2015 | 10,000 | - | 10,000 | $ 0.0148 | 675,676 |
| October 6, 2015 | 13,262 | - | 13,262 | $ 0.0138 | 961,000 |
| October 7, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 9, 2015 | 11,728 | - | 11,728 | $ 0.0116 | 1,011,000 |
| October 9, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 12, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 13, 2015 | 11,601 | - | 11,601 | $ 0.0116 | 1,000,052 |
| October 15, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 19, 2015 | 17,400 | - | 17,400 | $ 0.0116 | 1,500,000 |
| October 19, 2015 | 15,000 | - | 15,000 | $ 0.0116 | 1,298,701 |
| October 20, 2015 | 16,650 | - | 16,650 | $ 0.0111 | 1,500,000 |
| October 21, 2015 | 17,500 | - | 17,500 | $ 0.0115 | 1,515,152 |
| October 23, 2015 | 20,000 | - | 20,000 | $ 0.0115 | 1,731,602 |
| October 26, 2015 | 24,420 | - | 24,420 | $ 0.0111 | 2,200,000 |
| October 29, 2015 | 26,640 | - | 26,640 | $ 0.0111 | 2,400,000 |
| November 2, 2015 | 29,970 | - | 29,970 | $ 0.0111 | 2,700,000 |
| November 2, 2015 | 20,000 | - | 20,000 | $ 0.0111 | 1,809,136 |
| November 5, 2015 | 32,190 | - | 32,190 | $ 0.0111 | 2,900,000 |
| November 10, 2015 | 28,800 | - | 28,800 | $ 0.0096 | 3,000,000 |
| November 12, 2015 | 23,930 | - | 23,930 | $ 0.0072 | 3,323,611 |
| November 17, 2015 | 16,500 | - | 16,500 | $ 0.0060 | 2,727,273 |
| November 19, 2015 | 1,640 | 11,225 | 12,865 | $ 0.0056 | 2,316,013 |
| November 23, 2015 | 23,111 | - | 23,111 | $ 0.0056 | 4,127,000 |
| November 27, 2015 | 24,750 | - | 24,750 | $ 0.0055 | 4,500,000 |
| December 2, 2015 | 18,450 | - | 18,450 | $ 0.0041 | 4,500,000 |
| December 8, 2015 | 18,000 | - | 18,000 | $ 0.0036 | 5,000,000 |
| December 11, 2015 | 13,368 | - | 13,368 | $ 0.0024 | 5,570,000 |
| December 16, 2015 | 14,181 | - | 14,181 | $ 0.0024 | 5,860,000 |
| December 22, 2015 | 15,488 | - | 15,488 | $ 0.0024 | 6,400,000 |
| December 29, 2015 | 17,666 | - | 17,666 | $ 0.0024 | 7,300,000 |
| | $ 541,604 | $ 11,225 | $ 552,830 | | 82,775,494 |

As a result, as of September 30, 2015, $25,445 and $246,785, net of total unamortized discounts of $29,541 and $294,819 are classified as current and long-term on the accompanying consolidated balance sheet. As of September 30, 2015, there is $26,861 and $11,225 in current and long-term accrued interest expense related to this note, respectively, and the Company recorded $38,086 in interest expense related to this note during the year ended September 30, 2015.

Convertible Note Financing

     On August 5, 2015, the Company entered into a series of convertible note financings with several accredited investors totaling an aggregate of $541,000 in aggregate proceeds raised less certain fees and costs as set forth in the financing documents known as the "August 2015 Notes". The financing was disclosed on the Company's Current Report on Form 8-K filed on August 11, 2015 and is incorporated herein by reference. The Company recorded an original issue discount of $12,500 along with these notes and amortized $1,042 of the discount to interest expense during the year ended September 30, 2015. The Company also recorded a beneficial conversion feature of $253,617 towards the notes and amortized $48,683 of the discount to interest expense during the year ended September 30, 2015. As of September 30, 2015, there is $8,388 of accrued interest related to these notes and the Company recorded $8,388 in interest expense related to these notes during the year ended September 30, 2015.

F-20

On August 12, 2015, the Company entered into an additional convertible note financing transaction with an accredited investor in the principal amount of $105,000 less fees and costs. The closing under the financing occurred concurrently with the execution of the financing documents on August 12, 2015. The convertible note bears interest at the rate of 8% per annum and is convertible into common stock of the Company at any time after 180 days from issuance of the note at a conversion price per share equal to 58% of the average of the lowest trading price of the common stock in the thirteen (13) trading days immediately preceding the applicable conversion date. The Company has the option to prepay the convertible note in the first 180 days from closing subject to a prepayment penalty of 150% of principal plus interest. The maturity date of the convertible note is June 12, 2016 subject to the noteholder's right to extend maturity an additional nine (9) month period. The Company recorded an original issue discount of $5,000 along with these notes and amortized $1,000 of the discount to interest expense during the year ended September 30, 2015. The Company also recorded a beneficial conversion feature of $60,900 towards the notes and amortized $12,180 of the discount to interest expense during the year ended September 30, 2015. As of September 30, 2015, there is f $1,143 of accrued interest related to these notes and the Company recorded $1,143 in interest expense related to the notes during the year ended September 30, 2015.

The foregoing descriptions of the August 12, 2015 note financing and related documentation do not purport to be complete and are qualified in their entirety by reference to the full text of the documents, which are filed as exhibits to this Quarterly Report on Form 10-K and are incorporated herein by reference.

As of September 30, 2015, future minimum principal payments for the years ending September 30, 2016 and 2017 are $1,487,256 and $154,000, respectively. As of September 30, 2015, expected amortization of debt discounts for the years ending September 30, 2016 and 2017 are $333,013 and $543,916, respectively. As of September 30, 2015, expected amortization of deferred financing costs for the years ending September 30, 2016 and 2017 are $107,909 and $12,067, respectively. The Company has the ability to increase the authorized common stock of the Company in the event that the convertible notes require more shares than available.

## NOTE 6. RELATED PARTY DEBT

### RELATED PARTY NOTES PAYABLE, LONG-TERM

The Company had outstanding accounts payable balance to a related party (shareholder of the Company) in the amount of $15,000 as of September 30, 2013. This payable was converted into a note payable on December 7, 2013. The note payable bears interest of 6% per annum with a maturity date of December 1, 2016. As of September 30, 2015, there is $1,645 in accrued interest expense related to this note and the Company recorded $913 in interest expense related to this note during the year ended September 30, 2015.

On December 7, 2013, the Company issued a note payable to a shareholder of the Company in the amount of $23,462 for monies previously borrowed from shareholder. The note is unsecured and bears interest of 6% per annum and matures on December 1, 2016. On January 22, 2015, the Company settled and paid the note and accrued interest of $1,504 for $20,000 and recorded a gain on extinguishment of the note of $3,462.

On February 28, 2014, the Company issued a note payable to HIVE (the "HIVE Note") for the principal amount of $250,000 in connection with the Hive asset acquisition. Per the terms of the HIVE Note, the maturity date is February 27, 2016 and the annual rate of interest is six percent (6%). No prepayment penalty exists. The HIVE Note is unsecured. As of September 30, 2015, there is $22,893 in accrued interest expense related to this note and the Company recorded $15,208 in interest expense related to this note during the year ended September 30, 2015, respectively. On December 10, 2015, the HIVE Note was converted into a Series B Convertible Preferred Note payable and the maturity date was extended to December 10, 2016. See Note 11 to the consolidated financial statements.

On May 12, 2014, the Company issued a note payable to its President, Joseph Andreae in the amount of $40,000 for monies previously borrowed during the three and six months ended March 31, 2014 (the "Andreae Note"). The note was unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348 in full satisfaction on the Andreae Note.

On August 11, 2014, the Company issued a 6% note payable to its President, Joseph Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note, the original principal balance was $12,828, and was not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240 in full satisfaction of the Andreae Note II.

RELATED PARTY CONVERTIBLE NOTES PAYABLE

On February 18, 2014, the Company issued 8% Convertible Notes to two third parties to cover outstanding accounts payable in the amount of $20,000. Per the terms of the notes, the aggregate principal balance is $20,000, and was not secured by any collateral or any assets pledged to the holders. The maturity date is February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holders can, at their sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the notes was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $8,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,000 and $1,667 of the discount to interest expense during the three and nine months ended June 30, 2014, respectively. On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,333 to interest expense.

On February 18, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $10,612 (the "Tracey Note"). Per the terms of the Tracey Note, the original principal balance is $10,612, and was not secured by any collateral or any assets pledged to the holder. The maturity date was February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,245 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,415 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion the Tracey Note. Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $2,830 to interest expense.

On March 17, 2014, the Company issued an 8% Convertible Note to Jerome Kaiser, former CEO, CFO and Director of the Company for services rendered to the Company in the amount of $50,000 (the "Kaiser Note") which was charged to expense during the three months March 31, 2014. Per the terms of the Kaiser Note, the principal balance is $50,000, and is not secured by any collateral or any assets pledged to the holders. The maturity date is March 17, 2015, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at his sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Kaiser Note is the market closing price of the market day immediately preceding the date of conversion minus twenty percent (20%). We recorded a discount totaling $10,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $4,167 of the discount to interest expense during the year ended September 30, 2015. In March 2015, the Company paid the outstanding principal and accrued interest in satisfaction on the note of $50,000 and $4,000, respectively.

F-22

On May 12, 2014, in connection with the 6% Notes, the Company issued a note for $40,000 to Kyle Tracey, which was recorded as a related party convertible note payable. We recorded a discount totaling $16,000 related to the beneficial conversion feature embedded in the 6% note to Mr. Tracey upon issuance. We amortized $6,667 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $13,333 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $11,042 (the "Tracey Note II"). Per the terms of the Tracey Note II, the original principal balance is $11,042, and was not secured by any collateral or any assets pledged to the holder. The maturity date was May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,417 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $920 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note II. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,497 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to its Director of Business Development, Michael Cook, for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $11,825 (the "Cook Note"). Per the terms of the Cook Note, the original principal balance was $11,825, and was not secured by any collateral or any assets pledged to the holder. The maturity date is May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,730 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $985 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the "Cook Note. Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,745 to interest expense.

On August 11, 2014, the Company issued a second 8% Convertible Note to Mr. Cook for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $15,115 (the "Cook Note II"). Per the terms of the Cook Note II, the original principal balance was $15,115, and is was secured by any collateral or any assets pledged to the holder. The maturity date is August 11 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $6,046 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Cook Note II. Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,542 to interest expense.

F-23

On August 11, 2014, the Company issued an 8% Convertible Note to Mr. Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $216,001 (the "Tracey Note III"). Per the terms of the Tracey Note III, the original principal balance was $216,001, and is not secured by any collateral or any assets pledged to the holder. The maturity date was August 11, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note III was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $86,401 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note III. Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $79,200 to interest expense.

## NOTE 7. COMMITMENTS AND CONTINGENCIES

<ins>Office Lease</ins>

As of September 30, 2015, the Company leases a 5,000 square foot office in Chatsworth, California for $4,947 per month which expires in November 2015.

<ins>Warrant Liability</ins>

The Company recorded the estimated settlement liability as of March 31, 2014 for the Warrant Shares issued and the Warrants that remain outstanding and unexercised that would be entitled to the same settlement based on the number of shares expected to be issued and the market price of the Company's common stock on the dates of the actual settlements from $4.72 per share to $7.25 per share, and market price of the first settlement of $7.25 for the unsettled claims. We believe the issuance of convertible notes in the three months ended March 31, 2014 triggered the full ratchet anti-dilution adjustment; before the provision was triggered, the fair value of the warrant liability was not significant as the exercise was so far out of the money. As a result of the above settlements with warrant holders, the Company recorded a loss on settlement of warrants of $29,528,844 during the six months ended March 31, 2014 and a long-term warrant liability of $29,430,022 as of March 31, 2014 based on 4,407,200 shares of common stock under the settlement at the Company's closing stock prices discussed above. As of September 30, 2015, the estimated settlement liability is $25,025 based on the fair market value of 1,184,727 remaining warrants and using the Black-Scholes model and therefore the Company recorded a gain on the change in warrant liability of $2,439,207 during the year ended September 30, 2015.

<ins>Settlement of Company Legal Claims</ins>

On December 15, 2014, the Company recorded a gain on settlement of $257,930 for a confidential settlement by and between the Company and certain shareholders and related parties as settlement for certain potential legal claims held by the Company. As a result of the settlement, the Company received net proceeds of $62,930 and vendor credits of $200,000 during the year ended September 30, 2015. A total of $325,000 in vendor credits has been received in connection with the settlement and no further credits will be given. In January 2015, the Company received 440,625 shares from the settlement that was assigned to officers of the Company. The officers decided it was in the best interest of the Company to return these shares to the Company to be used for future strategic issuances. Accordingly, the 440,625 shares valued at $367,531 were recorded as treasury stock as of September 30, 2015, and the Company recorded a gain on settlement of $625,461 during the year ended September 30, 2015.

<ins>Chief Science Officer</ins>

On May 1, 2015, the Company appointed Dr. Mark A. Scialdone to the newly-created executive officer position of Chief Science Officer.

Dr. Scialdone's Executive Employment Agreement was for a period of two (2) years. Dr. Scialdone shall receive an

annual salary of $102,000, he shall be eligible for any benefits made generally available by the Company, he shall be eligible to receive any bonuses made generally available by the Company, and he shall be reimbursed for any reasonable expenses incurred while performing his duties as the Company's Chief Science Officer. Additionally, Dr. Scialdone is entitled to receive severance equal to six (6) months base salary if terminated without cause by the Company.

F-24

The Chief Science Officer was also receive bonus compensation associated with revenue generated from consulting services revenues generated over the term of this Agreement such bonus compensation to be calculated in accordance with the schedule below.

On January 12, 2016, the Company unwound the transaction and curtailed the subsidiary's operations in order to reduce overhead costs and focus on HIVE Ceramics and reflected such as of September 30, 2015 in the consolidated financial statements. As of September 30, 2015, the 250,000 shares issued to BetterChem were recorded as treasury stock valued at $67,500 as a result of the settlement to receive the shares back as part of the unwind.

<u>Officer & Director Appointments and Related Matters</u>

Pursuant to Board consent on May 11, 2015, the Company made several changes to its management structure.

The Company confirmed the appointment of Dr. Mark Scialdone to the newly-created officer position of Chief Science Officer which was announced by Current Report on Form 8-K dated May 5, 2015 which is incorporated by reference herein. See above in this section for more information about Dr. Scialdone.

**NOTE 8. INCOME TAXES**

The following table presents the current and deferred income tax provision for federal and state income taxes for the year ended September 30, 2015 and 2014:

|  | 2015 | 2014 |
|---|---|---|
| Current tax provision (benefit): |  |  |
| Federal | $ - | $ - |
| State | 2,209 | 800 |
| Total | 2,209 | 800 |
| Deferred tax provision (benefit) |  |  |
| Federal | (418,000) | (262,000) |
| State | - | - |
| Valuation allowance | 418,000 | 262,000 |
| Total | - | - |
| Total provision (benefit) for income taxes | $ 2,209 | $ 800 |

Reconciliations of the U.S. federal statutory rate to the actual tax rate for the year ended September 30, 2015 and 2014:

|  | 2015 | 2014 |
|---|---|---|
| US federal statutory income tax rate | (34.0%) | (34.0%) |
| State tax – net of benefit | (6.0%) | (6.0%) |
|  | (40.0%) | (40.0%) |
| Permanent differences: | -% | 38.7% |
| Stock-based compensation | 2.8% | 0.2% |
| Changes in warrant liability | -% | 1.0% |
| Increase in valuation allowance | 37.2% | 0.1% |
| Effective tax rate | -% | -% |

The Company incurred certain non-cash transactions which are not includable or deductible for income tax reporting purposes, such the change in fair value of warrant liability, certain stock-based compensation and accretion of debt discounts.

The components of the Company's deferred tax assets and (liabilities) for federal and state income taxes as of September 30, 2015 and 2014:

| | As of September, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Current deferred tax assets (liabilities): | | |
| Accrued expenses and other | $ - | $ - |
| Total current deferred tax assets | - | - |
| Non-current deferred tax assets and liabilities: | | |
| Property, plant and equipment | 29,000 | 29,000 |
| Net operating losses | 680,000 | 262,000 |
| Total non-current deferred tax assets | 709,000 | 291,000 |
| Valuation allowance | (709,000) | (291,000) |
| Total non-current deferred tax assets | - | - |
| Net deferred tax assets | $ - | $ - |

During the year ended September 30, 2015 and 2014 the valuation allowance increased by $418,000 and $233,000, respectively. At September 30, 2015, the Company had approximately $680,000 of federal and state gross net operating losses allocated to continuing operations available. The net operating loss carry forwards, if not utilized, will begin to expire in 2033 for federal purposes and 2031 for state purposes.

Based on the available objective evidence, including the Company's limited operating history and current liabilities in excess of assets, management believes it is more likely than not that some of the net deferred tax assets, specifically certain net operating losses, at September 30, 2014 will not be fully realizable. In addition, subsequent to year end significant shares were issued to shareholders in connection with the conversion of notes payable and a subscription for the purchase of common stock. In connection, with these issuances the Company determined that the historical NOLs have probably been impaired due to IRS Section 382 limitations. Due to the uncertainty surrounding realization of the remaining deferred tax assets, specifically the NOLs, the Company has provided a valuation allowance of $709,000 and $291,000 against its net deferred tax assets at September 30, 2015 and 2014, respectively. We will continue to monitor the recoverability of our net deferred tax assets.

As of September 30, 2015 and 2014, the Company has a State tax liability of $0 and $0, respectively. As of September 30, 2015 and 2014, the Company recorded no estimated taxes payable for Federal and State.

The Company has filed all United States Federal and State tax returns. The Company has identified the United States Federal tax returns as its "major" tax jurisdiction. The United States Federal return years 2014 through 2015 are still subject to tax examination by the United States Internal Revenue Service; however, we do not currently have any ongoing tax examinations. The Company is subject to examination by the California Franchise Tax Board for the year ended 2014 through 2015 and currently does not have any ongoing tax examinations.

## NOTE 9. STOCKHOLDERS' DEFICIT

### COMMON STOCK

On November 27, 2013, the Board and shareholders approved an increase in the authorized number of shares of common and preferred stock which may be issued by the Company to 1,000,000,000 shares and 100,000,000 shares, respectively. On December 3, 2013, the certificate of amendment was filed with the Secretary of State of Delaware to reflect the increase in authorized.

F-26

## PREFERRED STOCK

On April 1, 2014, the Board formally approved the filing of a Preferred Stock Designation in connection with the commitment of 500,000 Series A Shares to HIVE on March 27, 2014 pursuant to its authority to issue blank check preferred stock as provided in the Company's Certificate of Incorporation. Per the Certificate of Designation (the "Designation"), there are 100,000,000 shares of preferred stock authorized by the Company's Certificate of Incorporation. The Company is authorized to issue 500,000 shares of Series A Shares pursuant to the Designation. As provided in the Designation (and as set forth in the HIVE Asset Purchase Agreement), Series A Shares are entitled to vote at a 15-1 ratio to Common Stock. Each share of preferred stock shall initially be convertible into one share of common stock (500,000 shares of common stock in the aggregate). On the two year anniversary of the transaction of HIVE, the preferred stock conversion ratio shall be adjusted as follows: a one-time pro rata adjustment of up to ten-for-one (10-1) based upon the Company generating aggregate gross revenues over the two years of at least $8,000,000 (e.g. If the Company generates only $4,000,000 in aggregate gross revenues over the two year period then the convertible ratio will adjust to 5-1). In no event will the issuance convert into more than 5,000,000 shares of common stock of the Company.

On June 19, 2014, the Company formally issued the 500,000 Series A Shares to HIVE.

The value ascribed to the Series A Shares was based on the historical costs of the assets acquired on March 27, 2014 from HIVE since the transfer of assets was made among entities under common control.

## COMMON STOCK ISSUED FOR BONUSES

On October 20, 2014, the Company's Board of Directors issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Benjamin Beaulieu. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $24,900, $24,900, and $24,900 being charged to general and administrative expense during the year ended September 30, 2015.

On March 12, 2015, the Company's Board of Directors issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Allan Viernes. In addition, a total of 60,000 shares were granted to three (3) employees. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $9,150, $9,150, and $195,200 being charged to cost of revenue, sales and marketing, and general and administrative expense during the year ended September 30, 2015.

## COMMON STOCK ISSUED FOR SERVICES

On March 12, 2015, the Company's Board of Directors issued a bonus stock grant of 60,277 shares of restricted common stock to an outside sales consultant for services performed. This issuance based on the fair market value on the date of issuance immediately vested resulting in $36,769 being charged to sales and marketing expense during the year ended September 30, 2015.

## COMMON STOCK ISSUED FOR ACCRUED WAGES

On March 12, 2015, Kyle Tracey converted $59,718 of accrued wages into 97,898 shares of immediately vested restricted common stock based on the fair market value on the date of issuance.

On March 12, 2015, Michael Cook converted $36,769 of accrued wages into 60,277 shares of immediately vested restricted common stock based on the fair market value on the date of issuance.

## COMMON STOCK ISSUED AS DIRECTOR COMPENSATION

On March 12, 2015, the Company's Board of Directors issued 100,000 shares of restricted common stock each were granted to Kyle Tracey and Joseph Andreae for serving on the Board of Directors.

## COMMON STOCK ISSUED FOR ACCOUNTS PAYABLE

On June 1, 2015, the Board issued 100,000 shares of restricted common stock at $1.00 per share for payment of accrued legal services. This $100,000 issuance was based on the fair market value of $50,000 and additional consideration of $50,000 given on the date of issuance.

F-27

<u>COMMON STOCK ISSUED FOR ACQUISITION OF BETTERCHEM</u>

     See Note 1 for common stock issued for the acquisition of BetterChem.

<u>WARRANTS</u>

     The table below summarizes the Company's warrant activity during the year ended September 30, 2015:

| | Shares | | Weighted Average Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Warrants outstanding at September 30, 2014 | 1,184,726 | $ | 0.114 | 1.6 | $ | 7,217,234 |
| Warrants issued | - | | - | | | |
| Warrants exercised | - | | - | | | |
| Cancelled/forfeited/expired | - | | - | | | |
| Warrants outstanding at September 30, 2015 | 1,184,726 | $ | 0.021 | 0.6 | $ | 694,008 |

     As a result of the anti-dilution provision of the warrants, the exercise price as of September 30, 2015 was reduced to $0.021 per share using the following weighted average variables in the Black Scholes model during the year ended September 30, 2015:

| Year Ended September 30, | Stock Price at Grant Date | | Dividend Yield | Exercise Price | | Risk Free Interest Rate | Volatility | Average Life |
|---|---|---|---|---|---|---|---|---|
| 2015 | $ | 0.04 | -% | $ | 0.023 | 0.08% | 351% | 0.7 |

     The Company's warrants above are accounted for as derivative liabilities in the accompanying consolidated balance sheets.

<u>OPTIONS</u>

     On June 27, 2014, the Company authorized the "2014 Incentive and Nonstatutory Stock Option Plan" (the "Plan") whereby a maximum of 2,000,000 shares of the Company's common stock could be granted in the form of incentive and nonstatutory stock options. If any shares of common stock subject to an award under the Plan are forfeited, expire, are settled for cash or are tendered by the participant or withheld by us to satisfy any tax withholding obligation, then, in each case, the shares subject to the award may be used again for awards under the Plan to the extent of the forfeiture, expiration, cash settlement or withholding. The stock option awards issuable under the Plan can be made up of any combination of incentive and nonstatutory stock options. The stock options will be granted at fair market value on the date of grant and will vest as directed by the Board. Incentive stock options are available to employees only whereas nonstatutory stock options are available to independent contractors and consultants of the Company.

     On June 27, 2014, concurrent with the formal adoption of the Plan, the Company's Board granted a total of 1,000,000 stock options to certain employees, consultants and/or independent contractors of the Company (the "Option Grant"). The Option Grant includes options to purchase 520,000 shares granted to employees, consultants and/or independent contractors of the Company that are not executive officers. In addition, the Board determined that executive officer Michael Cook, Director of Business Development, should receive options to purchase 100,000 shares and that Kyle Tracey, Chief Executive Officer and Chairman, and Joseph Andreae, President and member of the Board, should receive options to purchase 190,000 shares each. The options were granted at the market price of the Company's common stock at close of business ($1.66 per share) on June 27, 2014, pursuant to the Company's standard form stock option agreements under the Plan. The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 1,000,000 options on the grant date was $1,660,000 and the amount expensed upon the grant date was $415,000 as result of 250,000 options immediately vested. On September 30, 2014 an additional $22,312 was expensed due to the

revaluing 212,500 non-employee options.

The description of the incentive and nonstatutory stock options herein is qualified in its entirety by reference to the full text of the Form of Incentive Stock Option Agreement and Nonstatutory Stock Option Agreement, which are attached as Exhibits 10.2 and 10.3, respectively, to the Current Report on Form 8-K filed with the SEC on July 3, 2014.

F-28

*Additional Option Grants Under 2014 Stock Option Plan*

On October 20, 2014, the Board granted a total of 20,000 stock options to certain employees and canceled 20,000 options previously allocated (but not issued) to employees. The options were granted at the market price of the Company's common stock at close of business ($0.83 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 20,000 options on the grant date was $16,600 and the amount expensed upon the grant date was $4,150 as result of 5,000 options immediately vested.

On December 22, 2014, the Company's Board granted a total of 775,000 stock options to certain employees. The option grant includes options to purchase 225,000 shares granted to employees that are not executive officers. In addition, the Board determined that executive officer Michael Cook, Director of Business Development, should receive options to purchase 25,000 shares and that Kyle Tracey, Chief Executive Officer and Chairman, and Joseph Andreae, President and member of the Board, and Allan Viernes, Chief Financial Officer should receive options to purchase 175,000 shares each. The options were granted at the market price of the Company's common stock at close of business ($0.70 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 775,000 options on the grant date was $542,500 and the amount expensed upon the grant date was $135,625 as result of 193,750 options immediately vested.

*Consulting Agreements*

On October 20, 2014, the Company entered into consulting agreements with two consultants to provide business development and acquisition services to the Company. The consultants were each issued 100,000 options to purchase common stock of the Company by the Board as consideration for consulting services. The options were granted at the market price of the Company's common stock at close of business ($0.83 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 200,000 options on the grant date was $166,000 and the amount expensed upon the grant date was $41,500 as result of 50,000 options immediately vested. On December 31, 2014 an additional $3,000 was expensed due to the revaluing the 200,000 non-employee options.

*Cancellation of Option Plans*

Collectively, officers, employees, and consultants of the Company decided to surrender and cancel all options outstanding.

Option activity during the year ended September 30, 2015, was as follows:

| | Shares | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Options outstanding at September 30, 2014 | 1,150,000 | $ | 2.92 | | 8.7 | $ | 4,648,294 |
| Options granted | 995,000 | $ | 0.73 | | 10.0 | | |
| Options exercised | - | $ | - | | - | | |
| Options cancelled/forfeited/expired | (2,145,000) | $ | 1.91 | | 9.0 | | |
| Options outstanding at September 30, 2015 | - | $ | - | | - | $ | - |
| Options exercisable at September 30, 2015 | - | $ | - | | - | $ | - |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the aggregate difference between the closing stock prices of VAPE's common stock at the specified dates and the exercise prices for in-the-money options) that would have been received by the option holders if all in-the-money options had been exercised on the specified dates.

The fair value of each option award is estimated on the date of grant using the Black-Scholes valuation model,

consistent with the provisions of ASC 718. Because option-pricing models require the use of subjective assumptions, changes in these assumptions can materially affect the fair value of the options. VAPE has limited relevant historical information to support the expected exercise behavior because no exercises have taken place.

During the year ended September 30, 2015 and 2014, $1,006,343 and $681,375 were recorded as stock-based compensation related to options, respectively. As of September 30, 2015, there is no future stock compensation expense related to options.

F-29

## NOTE 10. INTELLECTUAL PROPERTY

The Company plans to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has begun to execute on this plan with the acquisition of the patent pending HIVE Ceramic vaporization product and the HIVE trademark as well as several pending trademark applications. The Company intends to continue to create or acquire proprietary vaporizers and e-cigarettes, and various trademarks, patents and/or copyrights for brands which are developed.

TRADEMARKS

On March 27, 2014, the Company and Stone Arch Studio, LLC entered into a Trademark Assignment Agreement whereby the Company acquired all right, title, priority and interest to the HIVE trademark U.S. Registration No. 44513069 as registered with the U.S. Patent and Trade Office ("USPTO"). This acquisition further protects the Company's HIVE Ceramics brand vaporization line. As of September 30, 2015, the Company has capitalized $123,150 in costs paid related to the trademarks.

PATENTS

On March 27, 2014, the Company formally closed its acquisition of the patent pending HIVE Ceramics vaporization technology. The Company has already begun exploiting this technology and intends to prosecute the patent application to completion. As of September 30, 2015, the Company has capitalized had no costs of patents capitalized and recorded impairment to pending patents of $22,133 based on its expected cash flow not exceeding its carrying amount.

The Company also has been in discussions to acquire additional patented technology from third parties to further grow and develop its branded product lines in the vaporization market.

## NOTE 11. SUBSEQUENT EVENTS

**Common Stock Issued for Accrued Wages**

On October 22, 2015, the Company's Board of Directors issued 2,083,333 shares of restricted common stock each to Kyle Tracey at $0.024 per share for payment of $50,000 in accrued wages. On October 22, 2015, the Company's Board of Directors issued 555,555 shares of restricted common stock each to Kyle Tracey at $0.024 per share for payment of $13,333 in accrued wages. On October 22, 2015, the Company's Board of Directors issued 1,250,000 shares of restricted common stock each to Michael Cook at $0.024 per share for payment of $3,000 in accrued wages.

**Common Stock Issued for Bonuses**

On October 22, 2015, the Company's Board of Directors issued bonus stock grants of 600,000 shares of restricted common stock each to Allan Viernes and Benjamin Beaulieu at $0.024 per share. In addition, the Company issued 300,000 shares of restricted common stock to employees at $0.024 per share. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $36,000 being charged to general and administrative expense during the three months ended December 31, 2015.

On October 22, 2015, the Company's Board of Directors issued bonus stock grants of 1,250,000 shares of restricted common stock an outside sales consultant at $0.024 per share. The issuance was based on the fair market value on the date of issuance immediately vested and resulted in $30,000 being charged to sales and marketing expense during the three months ended December 31, 2015.

**Common Stock Surrenders**

On October 22, 2015, the Kyle Tracey and Joe Andreae each surrendered 130,000 shares of restricted common stock, with 60,000 shares valued at $49,800 and 200,000 shares valued at $122,000. As result, 260,000 shares of common

stock were recorded as treasury stock valued at $171,800. In addition, on October 22, 2015, an employee also surrendered 30,000 shares valued at $9,150 which was recorded as treasury stock.

On December 21, 2015, the Allan Viernes and Benjamin Beaulieu each surrendered 30,000 shares of restricted common stock valued at $36,600. As result, 60,000 shares of common stock were recorded as treasury stock valued at $36,600.

**Appointment of Justin Braune as Chief Executive Officer**

On December 10, 2015, the Board appointed Justin Braune to serve as the Company's Chief Executive Officer and as a director, effective immediately.

Prior to joining the Company, Mr. Braune, 33, served as the chief operating officer of Voodoo Science, LLC and Vapor Wild from 2014 to 2015. From 2013 to 2014, Mr. Braune served as the Chief of Operations for Veracity Security, a technology company located in San Diego. From 2013-2014 Mr. Braune was the Director of Sales at Lear Capital. Since 2010 he owned and operated Braune Enterprises a real estate and investment brokerage firm. Mr. Braune graduated from the United States Naval Academy with a B.S. degree in electrical engineering in and was commissioned as an officer in the U.S. Navy. After earning his master's degree in nuclear engineering, Mr. Braune operated the nuclear reactors onboard the USS RONALD REAGAN aircraft carrier. He served in the U.S. Navy until 2009 and subsequently earned his MBA at the University of Southern California, Marshall School of Business. Our Board believes that Mr. Braune's extensive relationships and experience in the industry of vaporization products and e-cigarettes will bring added value to the Company's management team.

F-30

In connection with his appointment as Chief Executive Officer and a member of our Board, Mr. Braune entered into an employment agreement dated as of December 10, 2015 (the "Employment Agreement") with the Company pursuant to which he will receive an annual salary of $150,000, subject to adjustment, and bi-monthly sales-based compensation of $1.00 USD per unit of wholesale sales of Mr. Braune's new vaporizer pen product line and $3.00 USD per unit on retail sales. The sales-based compensation and salary is payable in cash or stock as further described in the Employment Agreement.

In addition, the Company will issue to Mr. Braune 20,000,000 shares of the Company's common stock, to be held in escrow and released by the Company to Mr. Braune in accordance with the following vesting schedule: (i) 5,000,000 shares shall vest on June 10, 2015, (ii) 5,000,000 shares shall vest on December 10, 2016, (iii) 5,000,000 shares shall vest on June 10, 2016, and (iv) 5,000,000 shares shall vest on December 10, 2016. Mr. Braune also is eligible to participate in any stock option plan maintained by the Company and available to other employees and standard benefit programs for similarly situated employees. The Employment Agreement continues until terminated by either party upon 30 days' prior written notice.

### Resignations of Kyle Tracey and Joe Andreae; Appointment of Benjamin Beaulieu as Chairman

On December 10, 2015, the Board accepted the resignation of Kyle Tracey as Chief Executive Officer, Chairman of the Board and all other officer positions held by him with the Company. Mr. Tracey will remain in a consultant role with the Company focusing on sales and business development of HIVE Ceramics for a period of two (2) years. Mr. Tracey also retains a large block of voting control of the Company due to the above issuance of the Series B Notes issued to HIVE Ceramics, LLC an entity he co-owns. The Board also accepted the resignation of Joe Andreae as President and a director as of December 10, 2015. The President seat will remain vacant until a qualified candidate is located.

Benjamin Beaulieu was elevated from his position as a member of the Board to Chairman of the Board on December 10, 2015 to replace Mr. Tracey. Mr. Beaulieu also currently serves as the Company's COO and will remain in that role.

### Series B Preferred Stock Convertible Notes

On December 10, 2015, the Company entered into two Secured Series B Preferred Stock Convertible Notes (the "Series B Notes") for an aggregate principal of $300,000 including 1) $50,000 from Hive Ceramics, LLC in new capital to the Company and 2) an amended and restated note for Hive Ceramics LLC in the amount of $250,000 for capital previously contributed which is soon to be due and payable.

The Series B Notes accrue interest at eight percent (8%) per annum, mature one (1) year from issuance and are secured by all of the assets and property of the Company. Upon the election of the noteholder, the Series B Notes are convertible into newly created Series B Preferred Stock on a one-for-one (1:1) basis into shares of common stock of the Company at a fixed price per share of $0.01.

Concurrently, the Company filed a Certificate of Designation with the Delaware Secretary of State on the Series B Preferred Stock which provides, in pertinent part, for the following rights and privileges:

Authorized Amount of Series B Preferred Stock: There are authorized 30,000,000 shares of Series B Preferred Stock, subject to the Certificate of Designation. There shall be no additional Series B Shares authorized or issued.

Voting Rights: Each share of Series B shall be entitled to five (5) votes for every one (1) vote entitled to each share of Common Stock.

Rank: All shares of Series B shall rank (i) senior to the Company's Common Stock, (ii) *pari passu* with all other series of preferred stock whether currently outstanding or hereafter created, including the Series A Preferred Stock, and specifically ranking, by its terms, on par with Series B, and (iii) junior to any class or series of capital stock of the Company hereafter created specifically ranking, by its terms, senior to the Series B, in each case as to the distribution of assets upon liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

The Board of Directors authorized the designation of the Series B Preferred Stock pursuant to the authority of the Certificate of Incorporation, which confers said authority on the Board, and the issuance of the Series B Notes pursuant to a unanimous written consent of the Board dated December 10, 2015.

F-31

**Equity Investment by the Investor**

On December 10, 2015, the Investor purchased $90,000 in common stock at a purchase price equal to 90% of the average of the closing prices of the common stock for the three (3) trading days immediately preceding the date that is 6 months from the date of the agreement.

**Forbearance Agreement**

On December 10, 2015, the Company and the Investor entered into a forbearance agreement regarding the Investor's convertible note. The Investor alleged certain breaches by the Company of its obligations under the note. The Company denied any breaches or defaults occurred under the note. However, in an effort to avoid protracted litigation about the dispute, the parties agreed to enter into the forbearance agreement which provided that the outstanding balance of the note increased by $105,000 as provided for in the original note.

**Additional Funding Under August 2015 Note**

On December 15, 2015, an accredited investor provided the Company with $50,000 in additional proceeds under the same terms of their original convertible note.

*Third Party Debt Conversions*

See Note 5 for subsequent conversions related to third party debt.

*Unwinding of BetterChem Acquisition*

See Note 1 for the unwinding of BetterChem.

F-32

## INDEX OF EXHIBITS

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 3.1 | Certificate of Incorporation of Vape Holdings, Inc., as amended, placed into effect on January 2, 2009, incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-1 (Registration No. 333-163290) filed with the SEC on November 23, 2009. |
| 3.2 | Amended and Restated By-laws of Vape Holdings, Inc., incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1 (Registration No. 333-163290) filed with the SEC on November 23, 2009. |
| 3.3 | Certificate of Designation for Series A Preferred Stock, incorporated by reference to Exhibit 2.1(E) to the Company's Current Report on Form 8-K filed with the SEC on February 28, 2014. |
| 3.4 | Certificate of Designation for Series B Preferred Stock, incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.1 | Securities Purchase Agreement entered into by and between Vape Holdings, Inc. and Redwood Management, LLC dated February 10, 2015, incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on February 17, 2015. |
| 10.2 | Unsecured Convertible Promissory Note entered into by and between Vape Holdings, Inc. and Redwood Management, LLC dated February 10, 2015, incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed with the SEC on February 17, 2015. |
| 10.3 | Executive Employment Agreement by and between Vape Holdings, Inc. and Dr. Mark Scialdone, dated May 1, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on May 5, 2015. |
| 10.4 | Form of Stock Surrender Agreement Stock, incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 10.5 | Form of Option Surrender Agreement, incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 10.6 | Share Exchange Agreement by and between Vape Holdings, Inc. and BetterChem Consulting, Inc., dated July 1, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on July 1, 2015. |
| 10.7 | Intellectual Property Rights Transfer Agreement by and between Vape Holdings, Inc. and BetterChem Consulting, Inc., dated July 1, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on July 1, 2015. |
| 10.8 | Form of Securities Purchase Agreement, dated August 5, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.9 | Form of 8% Note, dated August 5, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.10 | Form of Back End Note, dated August 5, 2015, incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.11 | Form of Collateralized Note, dated August 5, 2015, incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.12 | 12% Note I, dated August 5, 2015, incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.13 | 12% Note II, dated August 5, 2015, incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.14 | Securities Purchase Agreement, dated August 12, 2015, by and between Darling Capital LLC and the Company, incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.15 | 8% Convertible Promissory Note, dated August 12, 2015, by and between Darling Capital LLC and the Company, incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.16 | Amendment, Waiver and Modification Agreement, dated August 13, 2015, by and among the Company and Redwood Management, LLC including any designees or assignees thereto, incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.17 | Amendment to Unsecured Convertible Promissory Note, dated August 26, 2015, by and between Vape Holdings, Inc. and Typenex Co-Investment, LLC. * |

| 10.18 | Form of Option Surrender Agreement, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on October 22, 2015. |
|---|---|
| 10.19 | Form of Stock Surrender Agreement Stock, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on October 22, 2015. |
| 10.20 | Secured Series B Preferred Stock Convertible Promissory Note by and between the Company and Hive Ceramics LLC, dated December 10, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.21 | Amended and Restated Secured Series B Preferred Stock Convertible Promissory Note by and between the Company and Hive Ceramics LLC, dated December 10, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.22 | Executive Employment Agreement, dated December 10, 2015, by and between the Company and Justin Braune, incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.23 | Consulting Agreement, dated December 10, 2015, by and between the Company and Kyle Tracey, incorporated by reference to Exhibit 99.2 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.24 | Common Stock Purchase Agreement, dated December 10, 2015, by and between Vape Holdings, Inc. and Odyssey Research and Trading, LLC. * |
| 10.25 | Forbearance Agreement, dated December 10, 2015, by and between Vape Holdings, Inc. and Typenex Co-Investment, LLC. * |
| 10.26 | Share Exchange Unwind Agreement, dated January 12, 2015, by and among Vape Holdings, Inc., BetterChem Consulting, Inc. and Mark Scialdone. * |

E-1

| Exhibit No. | Description of Exhibit |
|---|---|
| 14.1 | Code of Ethics, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 21.1 | List of Subsidiaries of Vape Holdings, Inc. * |
| 23.1 | Consent of DBBMcKennon, Independent Registered Public Accountants, as to the report relating to the consolidated financial statements of Vape Holdings, Inc. * |
| 31.1 | Section 302 Certification of Chief Executive Officer * |
| 31.2 | Section 302 Certification of Chief Financial Officer * |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 * |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 * |
| 99.1 | Audit Committee Charter, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 99.2 | Compensation Committee Charter, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 99.3 | Insider Trading Policy, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 101.INS ** | XBRL Instance Document |
| 101.SCH ** | XBRL Taxonomy Schema |
| 101.CAL ** | XBRL Taxonomy Calculation Linkbase |
| 101.DEF ** | XBRL Taxonomy Definition Linkbase |
| 101.LAB ** | XBRL Taxonomy Label Linkbase |
| 101.PRE ** | XBRL Taxonomy Presentation Linkbase |

*Filed herewith

**Furnished herewith. XBRL (Extensible Business Reporting Language) information is furnished and not filed or a part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise is not subject to liability under these sections.

E-2

EXHIBIT "C"

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# Form 10-K

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended September 30, 2015**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition Period from _____ to _____.**

**Commission File Number 333-163290**

# VAPE HOLDINGS, INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **90-0436540** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**5304 Derry Avenue, Suite C, Agoura Hills, CA 91301**
(Address of principal executive offices) (Zip Code)

**(877) 827-3959**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

**None**

Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, par value $0.00001**
(Title of class)

Indicate by check mark if the Registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Website, if any,

every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

At January 11, 2016, the aggregate market value of shares held by non-affiliates of the Registrant (based upon the closing sale price of such shares on OTCQB on January 11, 2016 of $0.005) was $789,135.

At January 11, 2016, there were 163,026,935 shares of the Registrant's common stock outstanding.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain information included in this Annual Report on Form 10-K and other filings of the Registrant under the Securities Act of 1933, as amended (the "Securities Act"), and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as well as information communicated orally or in writing between the dates of such filings, contains or may contain "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. Forward-looking statements in this Annual Report on Form 10-K, including without limitation, statements related to our plans, strategies, objectives, expectations, intentions and adequacy of resources, are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements are subject to certain risks, trends and uncertainties that could cause actual results to differ materially from expected results. Among these risks, trends and uncertainties are the availability of working capital to fund our operations, the competitive market in which we operate, the efficient and uninterrupted operation of our computer and communications systems, our ability to generate a profit and execute our business plan, the retention of key personnel, our ability to protect and defend our intellectual property, the effects of governmental regulation and other risks identified in the Registrant's filings with the Securities and Exchange Commission from time to time.

In some cases, forward-looking statements can be identified by terminology such as "may," "will," "should," "could," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of such terms or other comparable terminology. Although the Registrant believes that the expectations reflected in the forward-looking statements contained herein are reasonable, the Registrant cannot guarantee future results, levels of activity, performance or achievements. Moreover, neither the Registrant, nor any other person, assumes responsibility for the accuracy and completeness of such statements. The Registrant is under no duty to update any of the forward-looking statements contained herein after the date of this Annual Report on Form 10-K.

2

# VAPE HOLDINGS INC.

## **INDEX TO FORM 10-K**

**PART I**                                                                                                     PAGE

Item 1.    Business                                                                                              4
Item 1A.   Risk Factors                                                                                         7
Item 1B.   Unresolved Staff Comments                                                                            7
Item 2.    Properties                                                                                           7
Item 3.    Legal Proceedings                                                                                    7
Item 4.    Mine Safety Disclosure                                                                               7

**PART II**

Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Small Business Issuer Purchases
           of Equity Securities                                                                                 8
Item 6.    Selected Financial Data                                                                              12
Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operation                 12
Item 7A.   Quantitative and Qualitative Disclosures About Market Risk                                           21
Item 8.    Financial Statements and Supplementary Data                                                          21
Item 9.    Changes in and Disagreements With Accountants on Accounting and Financial Disclosure                 21
Item 9A.   Controls and Procedures                                                                              21
Item 9B.   Other Information                                                                                    22

**PART III**

Item 10.   Directors, Executive Officers and Corporate Governance                                              22
Item 11.   Executive Compensation                                                                              27
Item 12.   Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters       29
Item 13.   Certain Relationships and Related Transactions and Director Independence                            30
Item 14.   Principal Accountant Fees and Services                                                              32
Item 15.   Exhibits, Financial Statement Schedules                                                             33
           Index to Consolidated Financial Statements                                                          F-1
           Index of Exhibits

Signatures                                                                                                     34

3

# PART I

ITEM 1.　　<u>BUSINESS</u>

## Background

On August 9, 2013, PeopleString Corporation, and its wholly-owned subsidiary, RewardString Corporation ("RewardString"), and Vape Holdings, Inc., a Nevada corporation (the "Private Company"), entered into a Merger and Reorganization Agreement (the "Agreement") whereby the Private Company merged with RewardString, with the Private Company being the surviving entity (the "Merger"). In consideration for the merger, the shareholders of the Private Company received a total of approximately 4,684,538 shares of common stock of the merged company on a pro rata basis in exchange for 8,875 shares of the Private Company's common stock, representing 100% of the outstanding common stock of the Private Company. The total shares of the merged company issued on a pro rata basis to the Private Company shareholders represented approximately 74.95% of the total issued and outstanding common stock of the merged company.

The merger among PeopleString, RewardString and the Private Company was accounted for as a reverse acquisition and change in reporting entity, whereby the Private Company was the accounting acquirer. The Merger was accounted for using the purchase method of accounting in accordance with ASC 805 "Business Combinations", whereby the estimated purchase was allocated to tangible net assets acquired based upon preliminary fair values at the date of acquisition. Accordingly, the assets and liabilities of PeopleString and RewardString were recorded at fair value; the assets of PeopleString Corporation were not significant. The historical results of operations and cash flows of the Private Company are being reported beginning in the quarter ended December 31, 2013 in this Quarterly Report. The Merger closed on September 30, 2013. On September 30, 2013, the Company approved a change in fiscal year end of the Company from December 31st to September 30th. The Company's decision to change the fiscal year end was related to the Merger. Following such change, the date of the Company's next fiscal year end is September 30, 2014.

On March 27, 2014, the Company formally closed its asset purchase of the HIVE Ceramics LLC ("HIVE") vaporization product and related intellectual property and has begun distributing the HIVE products through various wholesale distribution channels. HIVE had been in development of a ceramic product for use in the vaporization market. The development for one product line was completed in 2014. No sales of this product line were made prior to Vape's acquisition of the HIVE ceramic product line on March 27, 2014. We determined that HIVE's assets acquired were not deemed a business prior to being acquired by the Company under Rule 11-01(d) of Regulation S-X since there were no significant revenue activities, physical assets, employees or customers.

## Overview

### General

Vape Holdings, Inc. ("Vape," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company has designed, and recently began marketing, and distributing ceramic vaporization products under a unique brand. The Company has also introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products

through business alliances and acquisitions, as well as developing its branded retail business expansion.

Vape is organized and directed to operate strictly in accordance with all applicable state and federal laws.

4

*HIVE Ceramics*

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, the HIVE x D-Nail 16mm and 20mm attachments and the highly anticipated Brothership Ceramic Honey Bucket developed on collaboration with Mothership Glass.

*Revival*

On December 28, 2015, the Company created a new wholly-owned subsidiary, Revival Products, LLC ("Revival"), which is in the business of portable vaporization devices. Revival will complement HIVE Ceramics' product lines utilizing its sales and distribution channels.

*Distribution Channels*

HIVECERAMICS.COM is the Company's e-commerce site for its premier HIVE Ceramics product line. The website will also be used in connection with the Company's new HIVE Glass product line. A beta version of the e-commerce site was successfully launched in April 2014 with a limited product line and no paid or formal advertising. The e-commerce site has since become fully operational since July 1, 2014 with a full product line and is taking orders daily with same or next day shipping available direct to the consumer on all orders.

The Company's AUTHORIZED DEALER NETWORK has grown to over 1,100 authorized shops for the Company's wholesale distribution platform. The Company and its principals have relied on their industry reputation and contacts to rapidly expand this vast wholesale distribution network in a matter of months. The Company has already funneled the HIVE Ceramics product line through these channels and anticipates parlaying this expansive network into the success of future product lines and related ventures, including the HIVE Glass line.

5

GOTVAPE.COM is an Orange County, California based online distributor that boasts the top online vaporizer retail site in the world and sells a full range of vaporization products for shipment nationwide. The Company has partnered with GotVape.com for the U.S. distribution of its HIVE product lines through its expansive nationwide distribution chain.

DNA GENETICS is a world-renowned name in cannabis genetics with a global reach and trusted brand poised to assist the Company with its expansion into the emerging European markets. DNA Genetics will serve as the Company's European distributor assisting the Company in reaching the European market from its base in Amsterdam.

PURE DNA is DNA Genetics' South American distributor based in Chile which will partner with the Company to distribute HIVE products throughout the South American Market. Pure DNA is backed by DNA Genetics' brand which can be found throughout the world.

PUFF PIPES is a Vancouver, B.C. Canada based distributor and one of two Canadian distributors partnering with the Company to blanket the Canadian market. Puff Pipes is one of Canada's leading suppliers of high quality glass works for over 20 years and a trusted name in the vaporizer industry.

WEST COAST GIFTS is also based in Vancouver, B.C. Canada and is known for having an excellent reputation as one of the longest-running distributors of nationally recognized brands of vaporizers and related accessories in Canada.

Subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue.

*Competition*

Vape's brands and retail and online distributions channels compete for customers and sales with many different companies and products that are competitive today and likely to be even more competitive in the future. Accordingly, it is essential that Vape and its HIVE brand product lines continue to innovate, expand, develop and refine its product and the underlying value offered to consumers. Competition in the retail and wholesale vaporizer and e-cigarette industries is significant as competing shops, manufacturers and distributors continually open.

The competition for the Company's premier HIVE Ceramics product line, which offers a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element that can be used for a range of applications exists in the form of traditional quartz and titanium vaporization products and other lesser grade ceramic vaporizers.

With regard to our company's size relative to its competition, that is difficult to gauge as most of our competition is privately held and does not publicly report their earnings. We do know of several competitors who own and operate larger online retail vaporizer and e-cigarette stores than we currently do, but, like our Company, many are in their initial stages of development and are focusing on different areas of this industry.

While our management believes that we have the opportunity to be an innovative group of industry professionals focused on providing the most relevant and effective products to our consumers, there can be no assurance that we will be successful in accomplishing our business initiatives, or that we will be able to maintain significant levels of revenues, or recognize net income, from the sale of our products and services.

*Intellectual Property and Proprietary Rights*

Our intellectual property consists of our brands and their related trademarks and websites, expansive customer lists and affiliations, product know-how and technology and related marketing intangibles plus our pending patent applications

on our ceramic vaporizer line of products.

The Company intends to prosecute all of its pending patent applications to completions as well as its current and planned brand names for which the Company has applied for federal trademark protection.

6

We have a policy of entering into confidentiality and non-disclosure agreements with our employees and some of our vendors and customers as we deem necessary. These agreements and policies are intended to protect our intellectual property, but we cannot ensure that these agreements or the other steps we have taken to protect our intellectual property will be sufficient to prevent theft, unauthorized use or adverse infringement claims. We cannot prevent piracy of our methods and features, and we cannot fully determine the extent to which our methods and features are being pirated.

*Employees*

As of September 30, 2015, we had 8 employees. Since inception, we have never had a work stoppage, and our employees are not represented by a labor union. We consider our relationship with our employees to be positive.

**ITEM 1A.    RISK FACTORS**

Vape is a smaller reporting company and is therefore not required to provide this information.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.       PROPERTIES**

As of September 30, 2015, the Company leases a 5,000 square foot office in Chatsworth, California.

**ITEM 3.       LEGAL PROCEEDINGS**

Vape is not currently a party to, and none of its property is the subject of, any pending legal proceedings. To Vape's knowledge, no governmental authority is contemplating any such proceedings.

**ITEM 4.       MINE SAFETY DISCLOSURE**

Not applicable.

7

## PART II

**ITEM 5.**　**MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock commenced quotation on the OTCQB under the trading symbol "VAPE" on January 8, 2014. Our common stock is currently quoted on OTCQB. The closing price of our common stock on September 30, 2015 was $0.04 per share. The following table sets forth, for the periods indicated, the high and low sales prices for our common stock as reported on the OTCQB. This information reflects inter-dealer prices, without retail mark-up, mark-down or commission and may not represent actual transactions.

| From the Year Ended September 30, 2015 | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 1.92 | $ | 0.52 |
| Second Quarter | $ | 0.92 | $ | 0.51 |
| Third Quarter | $ | 0.60 | $ | 0.26 |
| Fourth Quarter | $ | 0.43 | $ | 0.03 |

The OTCQB is generally considered to be a less active and efficient market than the NASDAQ Global Market, the NASDAQ Capital Market or any national exchange and will not provide investors with the liquidity that the NASDAQ Global Market, the NASDAQ Capital Market or a national exchange would offer.

**Holders**

As of September 30, 2015, the approximate number of registered holders of our common stock was 71. As of September 30, 2015, the number of outstanding shares of our common stock was 19,455,896; there were 1,184,727 shares of common stock subject to outstanding warrants, and there were no shares of common stock subject to outstanding stock options.

**Dividends**

No dividends were declared on Vape's common stock in the year ended September 30, 2015 and 2014, and it is anticipated that cash dividends will not be declared on Vape's common stock in the foreseeable future. Our dividend policy is subject to the discretion of our board of directors and depends upon a number of factors, including operating results, financial condition and general business conditions. Holders of common stock are entitled to receive dividends as, if and when declared by our board of directors out of funds legally available therefor. We may pay cash dividends if net income available to stockholders fully funds the proposed dividends, and the expected rate of earnings retention is consistent with capital needs, asset quality and overall financial condition.

**Details of Issuance of Shares of Our Common Stock in Connection with Investor Relation Services**

On January 31, 2014, the Company entered into an agreement to issue a 10% convertible promissory note to a consultant as compensation for investor relations services for a period of up to one (1) year. The agreement was terminated after five (5) months. On July 10, 2014, the holder converted principal of $41,667 and outstanding accrued and unpaid interest of $345 into 21,006 shares of the Company's common stock at a per share conversion price of $2.00, which is in accordance with the terms of the convertible note payable. The conversion of the 10% Note was in full satisfaction of the note payable. See Note 4 for terms of the 10% Note.

On June 6, 2014, the Company entered into an agreement to issue 20,000 shares of its common stock to a consultant as compensation for investor relations services for a period of six (6) months valued at $29,600 at the date of issuance and $41,600 as of September 30, 2014. Per the terms of the agreement, 10,000 shares vest immediately, 5,000 shares vest after ninety (90) days, and 5,000 shares vest after one hundred days. The 20,000 shares were formally issued on August 4, 2014. The fair value of the stock vested and recorded during the year ended September 30, 2014 was $31,200.

**Securities Authorized for Issuance under Equity Compensation Plans**

As of September 30, 2015, there were no options issued and outstanding under the 2014 Plan and 2009 Plan as all options were forfeited and cancelled as of September 30, 2015.

8

**Recent Sales of Unregistered Securities**

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. See Note 5 for more details regarding the Securities Purchase Agreement and Note.

Between June 2015 and September 2015, the Company issued the following conversions for repayment of the Note by Investor:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| June 4, 2015 | $ | 46,667 | $ | 28,871 | $ | 75,538 | $ | 0.342 | 220,949 |
| July 3, 2015 | | 46,667 | | 4,295 | | 50,962 | $ | 0.194 | 263,141 |
| August 11, 2015 | | 25,000 | | - | | 25,000 | $ | 0.138 | 181,818 |
| September 3, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 445,196 |
| September 23, 2015 | | 25,000 | | - | | 25,000 | $ | 0.041 | 606,061 |
| September 29, 2015 | | 23,000 | | - | | 23,000 | $ | 0.015 | 1,548,822 |
| | $ | 191,334 | $ | 33,166 | $ | 224,500 | | | 3,265,987 |

Subsequent to year end, the Company issued the following conversions:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| October 8, 2015 | $ | 21,000 | $ | - | $ | 21,000 | $ | 0.012 | 1,818,182 |
| October 16, 2015 | | 18,900 | | - | | 18,900 | $ | 0.012 | 1,636,364 |
| October 22, 2015 | | 25,800 | | - | | 25,800 | $ | 0.011 | 2,333,786 |
| October 29, 2015 | | 22,460 | | - | | 22,460 | $ | 0.011 | 2,031,660 |
| November 11, 2015 | | 33,500 | | - | | 33,500 | $ | 0.007 | 4,649,549 |
| November 18, 2015 | | 24,000 | | - | | 24,000 | $ | 0.006 | 4,195,804 |
| November 30, 2015 | | 30,000 | | - | | 30,000 | $ | 0.005 | 5,741,627 |
| December 11, 2015 | | 22,000 | | - | | 22,000 | $ | 0.002 | 9,090,909 |
| December 28, 2015 | | 22,500 | | - | | 22,500 | $ | 0.002 | 9,297,521 |
| January 7, 2016 | | 20,000 | | - | | 20,000 | $ | 0.002 | 10,101,010 |
| | $ | 240,160 | $ | - | $ | 240,160 | | | 50,896,412 |

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an original issue discount ("OID") of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015. The accredited investor only funded a total of $800,000 in principal under the $2M Note. See Note 5 for more details regarding $2M Securities Purchase Agreement and $2M Note.

9

The following is summary of conversions by the $2M Note holder and its assignees during the year ended September 30, 2015:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| August 13, 2015 | $ | 50,000 | $ | - | $ | 50,000 | $ | 0.127 | 393,701 |
| August 26, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 446,428 |
| September 8, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 446,428 |
| September 14, 2015 | | 25,000 | | - | | 25,000 | $ | 0.053 | 469,925 |
| September 16, 2015 | | 10,000 | | - | | 10,000 | $ | 0.053 | 188,679 |
| September 17, 2015 | | 25,000 | | - | | 25,000 | $ | 0.053 | 469,925 |
| September 22, 2015 | | 10,000 | | - | | 10,000 | $ | 0.043 | 232,558 |
| September 24, 2015 | | 10,000 | | - | | 10,000 | $ | 0.026 | 390,625 |
| September 25, 2015 | | 10,000 | | - | | 10,000 | $ | 0.019 | 518,135 |
| September 29, 2015 | | 13,410 | | - | | 13,410 | $ | 0.015 | 900,000 |
| | $ | 203,410 | $ | - | $ | 203,410 | | | 4,456,404 |

Subsequent to year end, the $2M Note holder and its assignees also enacted the following conversions:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| October 1, 2015 | $ | 10,000 | $ | - | $ | 10,000 | $ | 0.0148 | 675,676 |
| October 5, 2015 | | 10,000 | | - | | 10,000 | $ | 0.0148 | 675,676 |
| October 6, 2015 | | 13,262 | | - | | 13,262 | $ | 0.0138 | 961,000 |
| October 7, 2015 | | 10,000 | | - | | 10,000 | $ | 0.0115 | 865,801 |
| October 9, 2015 | | 11,728 | | - | | 11,728 | $ | 0.0116 | 1,011,000 |
| October 9, 2015 | | 10,000 | | - | | 10,000 | $ | 0.0115 | 865,801 |
| October 12, 2015 | | 14,680 | | - | | 14,680 | $ | 0.0115 | 1,271,000 |
| October 13, 2015 | | 11,601 | | - | | 11,601 | $ | 0.0116 | 1,000,052 |
| October 15, 2015 | | 14,680 | | - | | 14,680 | $ | 0.0115 | 1,271,000 |
| October 19, 2015 | | 17,400 | | - | | 17,400 | $ | 0.0116 | 1,500,000 |
| October 19, 2015 | | 15,000 | | - | | 15,000 | $ | 0.0116 | 1,298,701 |
| October 20, 2015 | | 16,650 | | - | | 16,650 | $ | 0.0111 | 1,500,000 |
| October 21, 2015 | | 17,500 | | - | | 17,500 | $ | 0.0115 | 1,515,152 |
| October 23, 2015 | | 20,000 | | - | | 20,000 | $ | 0.0115 | 1,731,602 |
| October 26, 2015 | | 24,420 | | - | | 24,420 | $ | 0.0111 | 2,200,000 |
| October 29, 2015 | | 26,640 | | - | | 26,640 | $ | 0.0111 | 2,400,000 |
| November 2, 2015 | | 29,970 | | - | | 29,970 | $ | 0.0111 | 2,700,000 |
| November 2, 2015 | | 20,000 | | - | | 20,000 | $ | 0.0111 | 1,809,136 |
| November 5, 2015 | | 32,190 | | - | | 32,190 | $ | 0.0111 | 2,900,000 |
| November 10, 2015 | | 28,800 | | - | | 28,800 | $ | 0.0096 | 3,000,000 |
| November 12, 2015 | | 23,930 | | - | | 23,930 | $ | 0.0072 | 3,323,611 |
| November 17, 2015 | | 16,500 | | - | | 16,500 | $ | 0.0060 | 2,727,273 |
| November 19, 2015 | | 1,640 | | 11,225 | | 12,865 | $ | 0.0056 | 2,316,013 |
| November 23, 2015 | | 23,111 | | - | | 23,111 | $ | 0.0056 | 4,127,000 |
| November 27, 2015 | | 24,750 | | - | | 24,750 | $ | 0.0055 | 4,500,000 |
| December 2, 2015 | | 18,450 | | - | | 18,450 | $ | 0.0041 | 4,500,000 |
| December 8, 2015 | | 18,000 | | - | | 18,000 | $ | 0.0036 | 5,000,000 |
| December 11, 2015 | | 13,368 | | - | | 13,368 | $ | 0.0024 | 5,570,000 |
| December 16, 2015 | | 14,181 | | - | | 14,181 | $ | 0.0024 | 5,860,000 |
| December 22, 2015 | | 15,488 | | - | | 15,488 | $ | 0.0024 | 6,400,000 |

| December 29, 2015 | | 17,666 | | - | | 17,666 | $ | 0.0024 | | 7,300,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ | 541,604 | $ | 11,225 | $ | 552,830 | | | | 82,775,494 |

10

On March 12, 2015, the Board issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Allan Viernes. An additional 100,000 shares of restricted common stock each were granted to Kyle Tracey and Joseph Andreae for serving on the Board. In addition, a total of 60,000 shares were granted to three (3) employees. These immediately vested issuances resulted in $9,150, $9,150, and $195,200 being charged to cost of revenue, sales and marketing, and general and administrative expense during the three and six months ended March 31, 2015, respectively.

On March 12, 2015, the Board issued a bonus stock grant of 60,277 shares of restricted common stock to an outside sales consultant for services performed. This immediately vested issuance resulted in $36,769 being charged to sales and marketing expense during the three and six months ended March 31, 2015.

On March 12, 2015, Kyle Tracey converted $59,718 of accrued wages into 97,898 shares of immediately vested restricted common stock.

On March 12, 2015, Michael Cook converted $36,769 of accrued wages into 60,277 shares of immediately vested restricted common stock.

On March 12, 2015, the Company offered to pay accrued interest and modify the terms of the six (6) Holders' outstanding 6% Notes, decreasing the conversion floor from $1.00 to $0.50 in order to entice the noteholders to convert their promissory notes. The Company recorded a loss on debt extinguishment of $23,443 as a result of the fair value in excess of the modified conversion floor. In March 2015, the Company paid all accrued interest on the 6% notes of $17,200. Five (5) of the six (6) holders converted in full a total of $80,000 of 6% Notes into 160,000 shares of common stock. The remaining note holder partially converted $20,000 of 6% Notes into 40,000 of common shares and extended the terms on the remaining $30,000 for six (6) months. See Note 5 regarding Convertible Notes Payable.

On June 1, 2015, the Board issued 100,000 shares of restricted common stock at $0.50 per share for payment of $82,648 of accrued legal services.

On July 1, 2015, the Company issued 250,000 shares of common stock to its Chief Science Officer Dr. Mark Scialdone in exchange for 80% of the outstanding common stock of BetterChem Consulting, Inc. See Note 1 regarding the acquisition of 80% of BetterChem.

---

11

Case 1:16-cv-01343-RJS   Document 12   Filed 09/01/16   Page 132 of 222

On August 5, 2015, and August 12, 2015, the Company issued convertible notes totaling an aggregate of $622,000 pursuant to a series of convertible note financings with several accredited investors. None of these convertible notes have been converted in whole or in part to date. See Note 5 regarding convertible note financings.

In connection with the above stock sales, we did not pay any underwriting discounts or commissions. None of the sales of securities described or referred to above was registered under the Securities Act of 1933, as amended (the "Securities Act"). We had or one of our affiliates had a prior business relationship with each of the purchasers, and no general solicitation or advertising was used in connection with the sales. In making the sales without registration under the Securities Act, we relied upon the exemption from registration contained in Section 4(a)(2) of the Securities Act.

ITEM 6.    SELECTED FINANCIAL DATA

Vape is a smaller reporting company and is therefore not required to provide this information.

ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION

The following discussion and analysis is intended to provide information about Vape's financial condition and results of operations for the year ended September 30, 2015 and 2014. This information should be read in conjunction with Vape's audited consolidated financial statements for the year ended September 30, 2015 and 2014, which begin on page F-2 of this report. Some of the information contained in this Management's Discussion and Analysis of Financial Condition and Results of Operations, and elsewhere in this report, includes forward-looking statements based on our current management's expectations. There can be no assurance that actual results, outcomes, or business conditions will not differ materially from those projected or suggested in such forward-looking statements. Some of the factors that may cause results to differ are described in the forward-looking statements cautionary language on page two of this report.

**Background**

On August 9, 2013, PeopleString Corporation, and its wholly-owned subsidiary, RewardString Corporation ("RewardString"), and Vape Holdings, Inc., a Nevada corporation (the "Private Company"), entered into a Merger and Reorganization Agreement (the "Agreement") whereby the Private Company merged with RewardString, with the Private Company being the surviving entity (the "Merger"). In consideration for the merger, the shareholders of the Private Company received a total of approximately 4,684,538 shares of common stock of the merged company on a pro rata basis in exchange for 8,875 shares of the Private Company's common stock, representing 100% of the outstanding common stock of the Private Company. The total shares of the merged company issued on a pro rata basis to the Private Company shareholders represented approximately 74.95% of the total issued and outstanding common stock of the merged company.

12

The merger among PeopleString, RewardString and the Private Company was accounted for as a reverse acquisition and change in reporting entity, whereby the Private Company was the accounting acquirer. The Merger was accounted for using the purchase method of accounting in accordance with ASC 805 "Business Combinations", whereby the estimated purchase was allocated to tangible net assets acquired based upon preliminary fair values at the date of acquisition. Accordingly, the assets and liabilities of PeopleString and RewardString were recorded at fair value; the assets of PeopleString Corporation were not significant. The historical results of operations and cash flows of the Private Company are being reported beginning in the quarter ended December 31, 2013 in this Quarterly Report. The Merger closed on September 30, 2013. On September 30, 2013, the Company approved a change in fiscal year end of the Company from December 31st to September 30th. The Company's decision to change the fiscal year end was related to the Merger.

On March 27, 2014, the Company formally closed its asset purchase of the HIVE Ceramics LLC ("HIVE") vaporization product and related intellectual property and has begun distributing the HIVE products through various wholesale distribution channels. HIVE had been in development of a ceramic product for use in the vaporization market. The development for one product line was completed in 2014. No sales of this product line were made prior to Vape's acquisition of the HIVE ceramic product line on March 27, 2014. We determined that HIVE's assets acquired were not deemed a business prior to being acquired by the Company under Rule 11-01(d) of Regulation S-X since there were no significant revenue activities.

**Overview**

*General*

Vape Holdings, Inc. (formerly PeopleString Corporation) ("Vape," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company has designed, and recently began marketing, and distributing ceramic vaporization products under a unique brand. The Company has also introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, and the HIVE x D-Nail 16mm and 20mm attachments.

The Company has also launched 'HIVE Glass.' HIVE Glass is VAPE's newest line of products under the HIVE brand name. The HIVE GLASS line is precision made using state of the art manufacturing processes and techniques, and exclusively uses German Schott glass caliber and fittings through all production phases. The aim with HIVE Glass is to create an affordable, high quality glass product that is both aesthetically pleasing and a highly functional vaporization product. VAPE's existing customer base and distribution network will be the catalyst for expansion of this new HIVE product line. Under HIVE Glass, the Company also buys and sells high-end collector pieces. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

13

VAPE has also recently launched 'HIVE Supply.' HIVE Supply is a packaging and sourcing division of VAPE designed to serve as a competitively priced, comprehensive "one-stop shop" for all medical and recreational marijuana packaging needs. As with all of VAPE's products, HIVE Supply will operate in full compliance with all federal laws and the laws of each individual state in which it does business. HIVE Supply will focus on providing much-needed support to cannabis businesses in regards to sourcing consumer products, brand management and marketing services. HIVE Supply is currently operated out of three (3) locations: HIVE Supply in Southern California, HIVE Supply Washington in Spokane and HIVE Supply Oregon in Portland. Under HIVE Supply, the Company also buys and sells high-end manufacturing machines. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

In connection with its launch of HIVE Supply and HIVE Glass, the Company opened 'THE HIVE' retail store and gallery in Los Angeles, an end-user experience to showcase the complete line of HIVE Ceramics and HIVE Glass products, while introducing HIVE Supply and all the new products being tested and developed through each vertical. Subsequent to year end, the Company curtailed its retail store in order to reduce overhead costs and focus on HIVE Ceramics.

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products through business alliances and acquisitions, as well as developing its branded retail business expansion. VAPE and its business units are organized and directed to operate strictly in accordance with all applicable state and federal laws.

## Critical Accounting Policies

Vape's discussion and analysis of financial condition and results of operations are based upon Vape's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these unaudited consolidated financial statements requires Vape to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosure of contingent assets and liabilities. Vape evaluated its estimates, including but not limited to those related to such items as costs to complete performance contracts, accruals, depreciable/useful lives, revenue recognition and valuation allowances for deferred tax assets. Vape based its estimates on historical experience and on various other assumptions that were believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that were not readily apparent from other sources. Actual results could differ from those estimates.

## CONVERTIBLE DEBT

Convertible debt is accounted for under the guidelines established by Accounting Standards Codification ("ASC") 470-20 "Debt with Conversion and Other Options". ASC 470-20 governs the calculation of an embedded beneficial conversion, which is treated as an additional discount to the instruments where derivative accounting (explained below) does not apply. The amount of the value of warrants and beneficial conversion feature may reduce the carrying value of the instrument to zero, but no further. The discounts relating to the initial recording of the derivatives or beneficial conversion features are accreted over the term of the debt. Many of the conversion features embedded in the Company's convertible notes are variable and are adjusted based on a discount to market prices which could cause an unlimited number of common stock to be issued. The management and board of directors currently have the ability to authorize additional shares of common stock through their voting power in the Series A Preferred Stock.

When applicable, the Company calculates the fair value of warrants and conversion features issued with the convertible instruments using the Black-Scholes valuation method, in lieu of a lattice model for simplicity, using the same assumptions used for valuing employee options for purposes of ASC 718 "Compensation – Stock Compensation", except that the contractual life of the warrant or conversion feature is used. Under these guidelines, the Company allocates the value of the proceeds received from a convertible debt transaction between the conversion feature and any other detachable instruments (such as warrants) on a relative fair value basis. The allocated fair value is recorded as a debt discount or premium and is amortized over the expected term of the convertible debt to interest expense. If the fair value exceeds the carrying value of the debt, an immediate charge to operations is recorded by management.

The Company accounts for modifications of its debt in accordance with ASC 470-50 "Modifications and Extinguishments." ASC 470-50 requires the modification of a convertible debt instrument that changes the fair value of an embedded conversion feature and the subsequent recognition of interest expense or the associated debt instrument when the modification does not result in a debt extinguishment.

The Company has the ability to increase the authorized common stock of the Company in the event that the convertible notes require additional shares to be issued, thus the Company recorded beneficial conversion features related to its convertible debt instead of derivative liabilities.

## REVENUE RECOGNITION

The Company recognizes revenues from product sales when (a) persuasive evidence that an agreement exists; (b) the products have been delivered; (c) the prices are fixed and determinable and not subject to refund or adjustment; and (d) collection of the amounts due is reasonably assured. Sales tax is charged on retail sales in in the applicable district. Products are warrantied 24 hours of delivery if they are damaged during the shipping.

## INVENTORY

Inventory is valued at the lower of cost or market, using the first-in, first-out (FIFO) method. The provides for an allowance for slow moving inventories based on current demand and competition.

## COMMITMENTS AND CONTINGENCIES

The Company recorded the estimated settlement liability as of March 31, 2014 for the Warrant Shares issued and the Warrants that remain outstanding and unexercised that would be entitled to the same settlement based on the number of shares expected to be issued and the market price of the Company's common stock on the dates of the actual settlements from $4.72 per share to $7.25 per share, and market price of the first settlement of $7.25 for the unsettled claims. We believe the issuance of convertible notes in the three months ended March 31, 2014 triggered the full ratchet anti-dilution adjustment; before the provision was triggered, the fair value of the warrant liability was not significant as the exercise was so far out of the money. As a result of the above settlements with warrant holders, the Company recorded a loss on settlement of warrants of $29,528,844 during the six months ended March 31, 2014 and a long-term warrant liability of $29,430,022 as of March 31, 2014 based on 4,407,200 shares of common stock under the settlement at the Company's closing stock prices discussed above. As of September 30, 2015, the estimated settlement liability is $25,025 based on the fair market value of 1,184,727 remaining warrants and therefore the Company recorded a gain on the change in warrant liability of $2,439,207 during the year ended September 30, 2015.

## PREFERRED STOCK

On April 1, 2014, the Board formally approved the filing of a Preferred Stock Designation in connection with the commitment of 500,000 Series A Shares to HIVE Ceramics, LLC on March 27, 2014 pursuant to its authority to issue blank check preferred stock as provided in the Company's Certificate of Incorporation. Per the Certificate of Designation (the "Designation"), there are 100,000,000 shares of preferred stock authorized by the Company's Certificate of Incorporation. The Company is authorized to commit 500,000 shares of Series A pursuant to the Designation. As provided in the Designation (and as set forth in the HIVE Asset Purchase Agreement), Series A Shares are entitled to vote at a 15-1 ratio to Common Stock and are convertible on a maximum 10 for one basis into Common Stock. (See NOTE 1 re HIVE Ceramics Asset Purchase). The acquisition of HIVE assets was not considered a business combination and was consummated under common control of the Company's Chief Executive officer and therefore the carryover basis of the assets was assigned to the Preferred Stock. The parties to the acquisition of HIVE closed the transaction on March 27, 2014. On June 19, 2014, the Company formally issued the 500,000 Series A Shares to HIVE.

15

On December 10, 2015, the Board formally approved the designation of Series B Preferred Stock. See Note 11 regarding Subsequent Events.

**Results of Operations**

The results of operations information below provides details on net loss and general and administrative expenses. General and administrative expenses provide details on continuing operations and include items such as management compensation, SEC compliance, insurance, office and other general expenses.

**For the Year Ended September 30, 2015 and 2014**

*Net Loss.* For the year ended September 30, 2015 and 2014, net loss was $1,230,147 and $25,063,658, respectively.

*Revenue.* For the year ended September 30, 2015 and 2014, revenue was $1,277,657 and $841,724, respectively. Revenue was greater in 2015 as it was HIVE Ceramics' first full year along with its new products. The Company derived its revenue from the sale of ceramics, supplies, glass, merchandise, and services.

*Cost of Revenue.* For the year ended September 30, 2015 and 2014, cost of revenue was $1,013,641 and $458,387, respectively. In 2015, cost of revenue included approximately $623,000 of ceramic products costs, $27,000 of supply costs, $97,000 of glass costs, $66,000 of merchandise costs and $200,000 of inventory reserve. In 2014, the recorded costs were ceramic product costs.

*Gross Profit.* For the year ended September 30, 2015 and 2014, gross profit was $264,016 or 36% and $383,337 or 46%, respectively. Gross profit decreased due to higher failure rates than expected of ceramics and low margin sales over multiple revenue streams.

*Sales and Marketing.* For the year ended September 30, 2015 and 2014, sales and marketing expenses were $715,292 and $219,891, respectively. In 2015, sales and marketing expenses included approximately $26,000 of general advertising, $54,000 of outside sales expense, $162,000 of payroll expenses, $156,000 of stock-based compensation, and $65,000 of trade show expenses. In 2014, it mostly consisted of approximately $92,000 of trade show expenses, $32,000 of promotional items, $21,000 of outside sales expense, $26,000 of E-commerce costs, and $12,000 of public relations.

*Research and Development. For* the year ended September 30, 2015 and 2014, research and development expenses were $212,424 and $45,757, respectively. In 2015, research and development expenses included approximately $117,000 for product design prototypes and research equipment, $47,000 of payroll expenses, $12,000 of employee benefits, $8,000 of travel expenses, and $27,000 of patent research. In 2014, it consisted of approximately $46,000 of product design prototypes and research equipment.

*General and Administrative.* For the year ended September 30, 2015 and 2014, general and administrative expenses were $2,127,594 and $1,315,710, respectively. In 2015, general and administrative expenses included approximately $45,000 of insurance expense, $110,000 of office expense, $481,000 of payroll expenses, $66,000 of accounting fees, $80,000 of business development expense, $182,000 of legal fees, $800,000 of stock-based compensation, and $121,000 of travel expense. It 2014, it mostly consisted of approximately $97,000 of investor relations and filing fees, $359,000 of payroll and taxes, $98,000 of accounting fees, and $114,000 of legal fees, $58,000 of office expense, $41,000 of bank and credit card processing fees, and $53,000 of travel expenses.

*Interest Expense. For* the year ended September 30, 2015 and 2014, interest expense was $788,038 and $241,065 respectively. In 2015, interest expense included approximately $609,000 of accretion of debt discounts, $51,000 of amortization of deferred financing costs, and $128,000 of interest expense. In 2014, interest expense on convertible notes payable was $241,065.

16

*Interest Expense - related party.* For the year ended September 30, 2015 and 2014, related party interest expense on convertible notes was $148,562 and $219,714, respectively. In 2015, interest expense included approximately $118,000 of accretion of debt discounts and $31,000 of interest expense. In 2014, interest expense on related party notes payable was $219,714.

*Change in Warrant Liability.* For the year ended September 30, 2015 and 2014, the gain and loss on change in warrant liability was $2,439,207 and ($23,404,058), respectively due to the fluctuation in the stock price.

*Gain on Settlement.* For the year ended September 30, 2015 and 2014, the gain on settlement was $625,461 and $0, respectively due to a confidential settlement by and between the Company and certain shareholders. On December 15, 2014, the Company recorded a gain on settlement of $257,930 for a confidential settlement by and between the Company and certain shareholders and related parties as settlement for certain potential legal claims held by the Company. As a result of the settlement, the Company received net proceeds of $62,930 and vendor credits of $200,000 during the year ended September 30, 2015. A total of $325,000 in vendor credits has been received in connection with the settlement and no further credits will be given. In January 2015, the Company received 440,625 shares from the settlement that was to be assigned to the officers of the Company. The officers decided it was in the best interest to return these shares to the Company to be used for future strategic issuances. Accordingly, the 440,625 shares were recorded as treasury stock and a gain on settlement valued at $367,531.

**Liquidity and Capital Resources**

As of September 30, 2015, we had cash of $273,904 and working capital of $122,107 as compared to cash of $48,370 and a working capital deficit of $36,138 as of September 30, 2014. See Note 11 for subsequent funding. We believe our current liquidity and securities purchase commitments will be sufficient to continue operating as a going concern through September 2016.

We had total liabilities of $1,392,465 as of September 30, 2015, including current liabilities of $115,938 of accounts payable, $208,665 of accrued expenses, customer deposits of $1,275, and $305,923 of convertible notes payable, and long-term liabilities of $458,404 of convertible notes payable, $265,000 of related party notes payable, $12,235 of other liabilities, and $25,025 of warrant liability. We had total liabilities of $3,802,237 as of September 30, 2014, consisting of current liabilities which consisted of $216,388 of accounts payable, $169,513 of accrued expenses, $187,667 of convertible notes payable, $45,832 of related party convertible notes payable, and long-term liabilities of $178,200 convertible notes payable, $199,115 of related party convertible notes payable, $341,290 of related party notes payable, and $2,464,232 of warrant liability.

We had a total stockholders' deficit of $185,013 and an accumulated deficit of $26,611,042 as of September 30, 2015.

We used $1,238,155 of cash in operating activities during the year ended September 30, 2015, which was primarily attributable to our net loss of $1,230,147, which was offset by $71,305 of depreciation, $2,439,207 gain on change in warrant liability, $625,461 gain on settlement, $695,795 of accretion of debt discounts, $969,577 of stock-based compensation, and $480,481 of net cash provided by change in operating assets and liabilities. We used $980,003 of cash in operating activities for the year ended September 30, 2014, which was attributable primarily to our net loss of $25,063,658, which was offset by $23,404,058 loss on settlement of warrants, $366,431 in accretion of debt discounts, fair value in excess of stock issued for conversion of notes payable of $1,323, fair value in excess of stock issued for conversion of related party notes payable of $44,239, fair value of officer services of $15,000, common stock issued for services of $133,200, stock-based compensation of $450,501, and net use in the change in operating assets and liabilities of $347,275.

Investing activities used $31,143 during the year ended September 30, 2015 consisting of $62,930 of net proceeds from settlement offset by $83,255 of capital expenditures, and $10,818 for trademarks and pending patents. We used $257,020 of cash in investing activities for the year ended September 30, 2014 consisting of $122,555 of capital expenditures and $134,465 for trademarks and pending patents.

We had $1,494,832 of net cash provided by financing activities during the year ended September 30, 2015 consisting of $1,657,660 of net proceeds from issuance of a convertible notes payable, repayments on convertible notes payable of $40,000, repayments on related party convertible notes payable of $50,000, and repayments on related party notes payable of $72,828. We had $1,284,825 of net cash provided by financing activities during the year ended September 30, 2014 consisting of $438,000 from convertible notes payable, $505,535 from related party convertible notes payable, and $341,290 from related party convertible notes payable.

Since we have limited liquidity and have suffered losses, we depend to a great degree on the ability to attract external financing in order to conduct our business activities and expand our operations. These factors raise substantial doubt about the Company's ability to continue as a going concern. If we are unable to raise additional capital from conventional sources, including increases in related party and non-related party loans and/or additional sales of stock, we may be forced to curtail or cease our operations. Even if we are able to continue our operations, the failure to obtain financing could have a substantial adverse effect on our business and financial results. We have no commitments to provide us with financing in the future, other than described above. Our independent registered public accounting firm included an explanatory paragraph raising substantial doubt about the Company's ability to continue as a going concern.

We anticipate generating losses and therefore may be unable to continue operations in the future. We anticipate that we will require additional capital in order to grow our business by increasing headcount and our budget for 2016. We may use a combination of equity and/or debt instruments to funds our growth strategy or enter into a strategic arrangement with a third party.

### Related Party Notes Payable Repayments

On May 12, 2014, the Company issued a note payable to its President, Joe Andreae in the amount of $40,000 for monies previously borrowed during the six months ended March 31, 2014 (the "Andreae Note"). The note is unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348. See Note 6 to the financial statements.

On August 11, 2014, the Company issued a 6% note payable to its President, Joe Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note II, the original principal balance is $12,828, and is not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240. See Note 6 to the financial statements.

### Kyle Tracey Convertible Notes

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on February 18, 2014 to its CEO, Kyle Tracey, to cover expenses of the Company (the "Tracey Note"). Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on May 12, 2014 to Mr. Tracey to cover expenses of the Company (the "Tracey Note II"). Mr. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

18

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on August 11, 2014 to Mr. Tracey to cover expenses of the Company (the "Tracey Note III"). Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note III was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on a 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements. See Note 5 to the financial statements.

### Michael Cook Convertible Notes

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on May 12, 2014 to its Director of Business Development, Michael Cook, to cover expenses of the Company (the "Cook Note"). Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued on August 11, 2014 to Mr. Cook to cover expenses of the Company (the "Cook Note II"). Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 6 to the financial statements.

### Misc. Convertible Notes

On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 5 to the financial statements.

On October 28, 2014, the Company received a Notice of Conversion on an 8% Convertible Note issued to a third party on March 19, 2014. The noteholder converted principal of $198,000 and outstanding accrued and unpaid interest of $9,764 into 207,764 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note payable. The conversion of this note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. See Note 5 to the financial statements.

<u>Securities Purchase Agreement</u>

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. The Company also paid a finder's fee in the amount of $25,000 in connection with this transaction, which was recorded as a

discount to the note as it was paid from the proceeds. The closing under the Securities Purchase Agreement occurred on December 3, 2014. The Company received $475,000 net proceeds after transactions costs.

19

The Note bears interest at the rate of 10% per annum and is convertible into common stock of the Company at a conversion price per share of 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions))(the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the Note is seventeen months from the date of issuance. On August 26, 2015, the Company and Investor entered into an Amendment whereby the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the Securities Purchase Agreement. See Note 5 to the financial statements.

## $2M Securities Purchase Agreement

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an OID of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015.

The $2M Note bears interest at the rate of 10% per annum and is immediately convertible into common stock of the Company at a conversion price per share of 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions)) (the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the $2M Note, together with accrued interest thereon, is due in twelve bi-monthly installments, commencing approximately six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the $2M Note is twelve months from the date of issuance.

During the year ended September 30, 2015, the Company received $800,000 toward the $2M Note with an original issue discount of $76,800 and transaction costs for net proceeds of $651,395, respectively. We amortized $45,600 of the discount to interest expense during the year ended September 30, 2015. In addition, we recorded a discount totaling $108,641 related to the beneficial conversion feature embedded in the note upon issuance.

On August 13, 2015, the Company entered into an Amendment, Waiver and Modification Agreement (the "Amendment") to its $2M Securities Purchase Agreement and related Transaction Documents with Redwood Management, LLC including any designees and or assignees thereto. Under the terms of the Amendment, the parties agreed to reduce the $2,000,000 outstanding balance of the $2M Note to $800,000 to reflect the total amount funded under the note, to terminate the offsetting investor note securing the additional unfunded balance and to waive any past claims of default or offsetting interest on the $2M Note or investor note. In addition, the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the $2M Securities Purchase Agreement. See Note 5 to the financial statements.

20

Convertible Note Financing

On August 5, 2015, the Company entered into a series of convertible note financings with several accredited investors totaling an aggregate of $517,000 in aggregate proceeds raised less certain fees and costs as set forth in the financing documents known as the "August 2015 Notes". The financing was disclosed on the Company's Current Report on Form 8-K filed on August 11, 2015 and is incorporated herein by reference.

On August 12, 2015, the Company entered into an additional convertible note financing transaction with an accredited investor in the principal amount of $105,000 less fees and costs. The closing under the financing occurred concurrently with the execution of the financing documents on August 12, 2015. The convertible note bears interest at the rate of 8% per annum and is convertible into common stock of the Company at any time after 180 days from issuance of the note at a conversion price per share equal to 58% of the average of the lowest trading price of the common stock in the thirteen (13) trading days immediately preceding the applicable conversion date. The Company has the option to prepay the convertible note in the first 180 days from closing subject to a prepayment penalty of 150% of principal plus interest. The maturity date of the convertible note is June 12, 2016 subject to the noteholder's right to extend maturity an additional nine (9) month period. See Note 5 to the financial statements.

ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

Vape is a smaller reporting company and is therefore not required to provide this information.

ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The consolidated financial statements and supplementary data of Vape called for by this item are submitted under a separate section of this report.  Reference is made to the Index of Financial Statements contained on page F-1 herein.

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

ITEM 9A.    CONTROLS AND PROCEDURES

(a) Evaluation of disclosure controls and procedures.

Management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our chief executive officer and chief financial officer concluded that, as of September 30, 2015, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

(b) Changes in internal control over financial reporting.

We review our system of internal control over financial reporting and make changes to our processes and systems to improve controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

*(c) Management's report on internal control over financial reporting.*

Management is responsible for establishing and maintaining adequate control over financial reporting for Vape. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.  Internal controls over financial reporting includes those policies and procedures that: (1) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Vape; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that receipts and expenditures of Vape are being made only in accordance with authorizations of management and directors of Vape; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of Vape's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluations of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management, with the participation of our principal executive officer and principal financial and accounting officer, conducted an evaluation of the effectiveness of Vape's internal control over financial reporting based on the framework in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of September 30, 2015.

### ITEM 9B.    OTHER INFORMATION

None.

## PART III

### ITEM 10.    DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The following table sets forth the names, ages and positions of our executive officers and directors. All directors serve for a term set to expire at the next annual meeting of stockholders of Vape or until their successors are elected and qualified. All officers are appointed by our board of directors and their terms of officer are, except to the extent governed by an employment contract, at the discretion of our board of directors.

| Name and Address | Age | Principal Occupation or Employment |
| --- | --- | --- |
| Benjamin Beaulieu | 29 | Chief Operating Officer and Director since May 11, 2015 and Chairman of the Board since December 10, 2015 |
| Allan Viernes | 30 | Chief Financial Officer since June 25, 2014, Director since May 11, 2015 |
| Justin Braune | 34 | Chief Executive Officer and Director, since December 10, 2015. |
| Kyle Tracey | 34 | Former Chief Executive Officer, Secretary and Chairman of Vape beginning on December 30, 2013. Former Chief Financial Officer of Vape beginning on April 16, 2014, resigned June 25, 2014. Resigned as Chief Executive Officer, Chairman of the Board and all officer positions on December 10, 2015. |
| Joseph Andreae | 29 | Former President and Director of Vape beginning on March 26, 2014. Resigned as President and Director on December 10, 2015. |

There are no family relationships among Vape's directors and executive officers. None of the directors of Vape is a director of any company registered pursuant to Section 12 of the Exchange Act, or subject to the requirements of Section 15(d) of the Exchange Act, or any company registered as an investment company under the Investment Company Act of 1940, as amended.

## Directors

*Number of Directors.* Our board of directors currently consists of three individuals.

*Director Qualifications.* While the selection of directors is a complex and subjective process that requires considerations of many intangible factors, the Company believes that candidates should generally meet the following criteria:

- Broad training, experience and a successful track record at senior policy-making levels in business, government, education, technology, accounting, law, consulting and/or administration;
- The highest personal and professional ethics, integrity and values;
- Commitment to representing the long-term interests of the Company and all of its shareholders;
- An inquisitive and objective perspective, strength of character and the mature judgment essential to effective decision-making;
- Expertise that is useful to the Company and complementary to the background and experience of other Board members; and
- Sufficient time to devote to Board and committee activities and to enhance their knowledge of our business, operations and industry.

The Board believes that our current directors meet these criteria. In addition, as outlined below, the directors bring a strong and unique background and set of skills to the Board, giving the Board as a whole competence and experience in a wide variety of areas, including the legal cannabis industry, related horticulture and concentrate extraction industries, business and management, operations, corporate governance, board service and executive management. We believe that the Board as a whole and our directors possess the necessary qualifications and skills to effectively advise management on strategy, monitor our performance and serve our best interests and the best interests of our shareholders.

## *Biographical Information*

See Executive Officer Section below for biographical information for Mr. Tracey, Mr. Andreae, Mr. Viernes, Mr. Beaulieu, and Mr. Braune.

## Executive Officers

### *Kyle Tracey, 34, Former Chief Executive Officer and Chairman*

Kyle Tracey brings extensive developmental and managerial experience in the public cannabis space to the Vape Holdings executive team.

Mr. Tracey's diversified experience literally from the ground up to top executive positions includes tenures where he helped develop several integral brands in the space, working as an R&D Specialist for companies like BC Northern Lights and Eco Growing Systems, as well as owning and operating a major horticulture light manufacturer.

As Co-Founder and former President of GrowLife Inc., Mr. Tracey helped to grow the company's market cap from 10M to over 100M while establishing a trusted and respected industry brand. Upon his departure from GrowLife in 2013, Kyle recognized the market opportunity for a more sustainable and efficient vaporization medium, and developed the HIVE Ceramics brand under the VAPE umbrella.

23

Strategically appointed as Chairman and CEO of VAPE Holdings Inc. on December 30, 2013 for his industry credentials, work ethic, and capacity to innovate, market, and sell relative industry products, Mr. Tracey delivers the imperative contacts and respect to achieve market penetration for VAPE Holdings brands and products.

Kyle's association and experience with High Times Magazine, various live event promoters and high profile artists, and entertainment industry powerhouses, all have the potential to position VAPE Holdings business units for expansive sponsorship opportunities and global success.

Mr. Tracey holds a B.A. in Business Management from the University of Rhode Island.

### Joseph Andreae, 29, Former President and Board of Directors

Joseph Andreae, a native of the Washington D.C. area, has been an instrumental part of several top brands in the rapidly growing MMJ industry. After working in the hospitality sector, Joe decided to team with a dispensary and concentrates laboratory in Boulder, Colorado on a new initiative.

Joe's leadership and expertise assisted in making those companies successful and earned him useful relationships and pedigree in the emerging vertical. Mr. Andreae has spent the last 5 years moving from state to state, following the industry and laws as they've progressed. His most recent project in Colorado boasted an impressive 15,000 square foot cultivation facility, the city's first licensed indoor concentrate extraction laboratory, and a beautiful store front that saw a 650% increase to $6M in sales following Joe's arrival. Previously, Joe was also a national sales manager of a successful LED lighting company based out of California and remains an active member on several MMJ brand boards, executing a collective vision and strategy for the industry.

### Allan Viernes, 30, Chief Financial Officer and Board of Directors

Mr. Viernes, 30, is an accounting and financial advisor specializing in public and private accounting and finance, SEC matters, bankruptcy reporting and analysis, mergers and acquisitions, and financial modelling/analysis. Mr. Viernes has served in such positions as Chief Financial Officer of an oil and gas company, Corporate Controller of a software company, and consulted with various retail and restaurant franchises and real estate companies through troubled debt restructurings and leveraged buy outs. Mr. Viernes also has past experience as an auditor with McKennon Wilson & Morgan, a PCAOB registered accounting firm, focusing on audits of private and publicly-held companies. Mr. Viernes graduated with a Bachelor of Administration with a concentration in accounting from Devry University, earned a Master of Business Administration from the Keller Graduate School of Management, and is a Certified Public Accountant.

### Benjamin Beaulieu, 29, Chief Operating Officer and Chairman

Mr. Beaulieu delivers valued experience in the implementation and integration of operational and sales systems to the VAPE Holdings executive team. Mr. Beaulieu has owned operated several multi-million-dollar retail garden supply and technology businesses. With a focus on automation and functionality, Mr. Beaulieu has successfully expanded those companies from brick and mortar locations to E-commerce superstores with global sales and partnerships with the industry's top distributors in the United States and Canada. Mr. Beaulieu's experience operating various companies in the ancillary MMJ markets has already improved Hive Ceramics and VAPE Holdings employee management and development. With a focus on streamlining operations Mr. Beaulieu will allow Vape Holdings, Inc. and subsidiaries to rapidly grow while combating the associated costs responsibly.

### Justin Braune, 34, Chief Executive Officer and Board of Directors

On December 10, 2015, the Board appointed Justin Braune to serve as the Company's Chief Executive Officer and as a director, effective immediately.

Prior to joining the Company, Mr. Braune, 33, served as the chief operating officer of Voodoo Science, LLC and Vapor Wild from 2014 to 2015. From 2013 to 2014, Mr. Braune served as the Chief of Operations for Veracity Security, a technology company located in San Diego. From 2013-2014 Mr. Braune was the Director of Sales at Lear Capital. Since

2010 he owned and operated Braune Enterprises a real estate and investment brokerage firm. Mr. Braune graduated from the United States Naval Academy with a B.S. degree in electrical engineering in and was commissioned as an officer in the U.S. Navy. After earning his master's degree in nuclear engineering, Mr. Braune operated the nuclear reactors onboard the USS RONALD REAGAN aircraft carrier. He served in the U.S. Navy until 2009 and subsequently earned his MBA at the University of Southern California, Marshall School of Business. Our Board believes that Mr. Braune's extensive relationships and experience in the industry of vaporization products and e-cigarettes will bring added value to the Company's management team.

24

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires Vape's executive officers and directors, and persons who own more than ten percent of a registered class of Vape's equity securities, to file reports of ownership and changes of ownership on Forms 3, 4 and 5 with the Securities and Exchange Commission. Executive officers, directors and greater than ten percent stockholders are required by Securities and Exchange Commission regulation to furnish Vape with copies of all Forms 3, 4 and 5 they file.

Vape believes that all filings required to be made by its executive officers and directors pursuant to Section 16(a) of the Exchange Act have been filed within the time periods prescribed.

**Committees of the Board of Directors**

On May 11, 2015, the Board authorized the establishment of separate audit and compensation committees consisting of a certain numbers of independent directors. The Company is still in the process of seeking out independent directors for its Board and committees and, as a result, the Company has not yet begun use of these committees. As such, we do not currently have a separately designated audit, compensation, or nominating committee of our Board and the function customarily delegated to these committees are performed by our full Board. We are not a "listed company" under SEC rules and are therefore not required to have separate committees comprised of independent directors.

The Board does not have a nominations committee because the Board does not believe that a defined policy with regard to the consideration of candidates recommended by stockholders is necessary at this time because the functions of such committee are adequately performed by our Board. There are no specific minimum qualifications that the Board believes must be met by a candidate recommended by the Board. Currently, the entire Board decides on nominees, on the recommendation of any member of the Board, followed by the Board's review of the candidates' resumes and interviews of candidates. Based on the information gathered, the Board then makes a decision on whether to recommend the candidates as nominees for director. We do not pay any fee to any third party, or parties, to identify or evaluate or assist in identifying or evaluating potential nominees.

The Board has not yet begun use of an audit committee. However, for certain purposes of the rules and regulations of the SEC and in accordance with the Sarbanes-Oxley Act of 2002, our Board is deemed to be its audit committee and as such functions as an audit committee and performs some of the same functions as an audit committee including: (i) selection and oversight of our independent accountant; (ii) establishing procedures for the receipt, retention, and treatment of complaints regarding accounting, internal controls, and auditing matters; and (iii) engaging outside advisors. Our Board has determined that its members do not include a person who is an "audit committee financial expert" within the meaning of the rules and regulations of the SEC. Our Board has determined that each of its members is able to read and understand fundamental financial statements and has substantial business experience that results in that member's financial sophistication. Accordingly, our Board believes that each of its members has sufficient knowledge and experience to fulfill the duties and obligations of an audit committee.

The Board has not yet begun use of a compensation committee because the Board believes that it is not necessary to have a compensation committee at this time because the functions of such committee are adequately performed by our Board.

**Stockholder Communications**

Our Board has determined not to adopt a formal methodology for communications from stockholders directly to the Board on the belief that any communication sent to the Company's current investor relations firm, Hayden I.R., would be brought to the Board's attention by our Chief Executive Officer, Kyle Tracey.

25

## Meetings of the Board of Directors

The Board of Directors of Vape conducts business through meetings of the Board or by unanimous written consents of the Board. Such actions by written consent of all directors are, according to Delaware corporate law and our bylaws, valid and effective as if they had been passed at a meeting of the directors duly called and held. The Board of Directors for the fiscal year ended September 30, 2015 consisted of: Kyle Tracey, Joe Andreae, Allan Viernes, and Benjamin Beaulieu. None of Mr. Tracey, Mr. Andreae, Mr. Viernes, or Mr. Beaulieu qualifies as an "independent director" pursuant to the rules and regulations of the Securities and Exchange Commission. During the fiscal year ended September 30, 2015, the Board held no formal meetings, and the Board acted by unanimous written consent on multiple occasions.

On May 17, 2013, the Company selected the accounting firm of dbb*mckennon* to act as the then PeopleString's independent public accounting firm for the year ended December 31, 2012. dbb*mckennon* audited the financial statements of Vape for the year ended September 30, 2015 and 2014.

## Board Leadership Structure and Role in Risk Oversight

During the year ended September 30, 2015, we did not separate the roles of Chief Executive Officer and Chairman of the Board because we believe that such roles are adequately performed by Kyle Tracey. The benefits of Mr. Tracey's leadership of the Board stem from his experience in managing small to medium sized businesses and his involvement in the legal cannabis industry, which provide a unique understanding of our culture and business. Also, serving as both the Chief Executive Officer and Chairman of the Board ensures that a constant flow of Company related information is available between the Board and our senior management. This flow of communication enables Mr. Tracey to identify issues, proposals, strategies and other considerations for future Board discussions and to assume the lead in many of the resulting discussions during Board meetings. Our Board has responsibility for the oversight of risk management. A fundamental part of risk management is not only understanding the risks we face and what steps management is taking to manage those risks, but also understanding what level of risk is appropriate for us. The involvement of the Board in setting our business strategy is a key part of its assessment of risk management and the determination of what constitutes our appropriate level of risk. The Board regularly discusses with management our major risk exposures, their potential impact on us, and the steps taken to manage these risks. In addition, the Board may retain, on such terms as determined by the Board, in its sole discretion, independent legal, financial, and other consultants and advisors to advise and assist the Board in fulfilling its oversight responsibilities. Subsequently, upon Kyle Tracey's resignation as Chief Executive Officer and Chairman of the Board and Justin Braune's appointment as Chief Executive Officer, we separated the roles of Chief Executive Officer and Chairman of the Board as Benjamin Beaulieu was appointed as Chairman.

## Code of Ethics

The executive officers of Vape are held to the highest standards of honest and ethical conduct when conducting the affairs of Vape. All such individuals must act ethically at all times in connection with services provided to the Company. We have adopted a formal, written corporate code of ethics that applies to our executive officers as of May 11, 2015.

26

## ITEM 11.   EXECUTIVE COMPENSATION

## EXECUTIVE COMPENSATION

The following table sets forth information concerning the annual and long-term compensation of the Named Executive Officers (as defined below) for services in all capacities to Vape for the year ended September 30, 2015 and 2014. The Named Executive Officers are (1) Kyle Tracey, Chief Executive Officer and Chairman, (2) Joseph Andreae, President, (3) Allan Viernes, Chief Financial Officer, (4) Benjamin Beaulieu, Chief Operating Officer, and (4) Michael Cook, Former Director of Business Development (the "Named Executive Officers").

### 2015 SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) (1) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Kyle Tracey, *Chief Executive Officer and Chairman* (2) | 2015 | $137,173 | $ 2,000 | $104,200 | $437,900 | $ - | $ - | $ - | $681,273 |
| | 2014 | $ 60,000 | $ - | $ - | $315,400 | $ - | $ - | $ - | $375,400 |
| Joseph Andreae, *President* (3) | 2015 | $112,756 | $ 2,000 | $104,200 | $437,900 | $ - | $ - | $ - | $656,856 |
| | 2014 | $ 31,731 | $ - | $ - | $315,400 | $ - | $ - | $ - | $347,131 |
| Allan Viernes, *Chief Financial Officer* (4) | 2015 | $ 96,977 | $ 5,000 | $ 18,300 | $122,500 | $ - | $ - | $ - | $242,777 |
| | 2014 | $ 17,676 | $ - | $ - | $ - | $ - | $ - | $ - | $ 17,676 |
| Benjamin Beaulieu, *Chief Operating Officer* (5) | 2015 | $110,246 | $ 5,000 | $ 18,300 | $437,900 | $ - | $ - | $ - | $571,446 |
| | 2014 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Michael Cook, *Director of Business Development* (6) | 2015 | $ 72,423 | $ 3,000 | $ - | $183,500 | $ - | $ - | $ - | $258,923 |
| | 2014 | $ 40,000 | $ - | $ - | $166,000 | $ - | $ - | $ - | $206,000 |

(1)   The amounts in this column reflect the dollar amount recognized for financial statement reporting purposes for the year ended September 30, 2015 and 2014 in accordance with ASC 718, of stock option awards pursuant to the Equity Incentive Plan (as defined below). The fair value of each option award is estimated on the date of grant using the Black-Scholes model. Assumptions used in the calculation of these amounts are included in the footnotes to VAPE's audited financial statements furnished herewith. All issued and outstanding options were cancelled as of September 30, 2015.

(2)   As of September 30, 2015 and 2014, $50,000 and $53,885 of Mr. Tracey's salary remains unpaid, respectively.

On October 20, 2015, Kyle Tracey surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. On October 20, 2015, Kyle Tracey surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(3)    As of September 30, 2015, $13,333 of Mr. Andreae's salary remains unpaid. On October 20, 2015, Joe Andreae surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. On October 20, 2015, Joe Andreae surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

27

(4) As of September 30, 2015, $1,667 of Mr. Viernes' salary remains unpaid. On December 21, 2015, Allan Viernes surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(5) As of September 30, 2015, $1,667 of Mr. Beaulieu's salary remains unpaid. On December 21, 2015, Benjamin Beaulieu surrendered 30,000 shares of stock valued at $18,300 that were issued on March 12, 2015. All issued and outstanding options were cancelled as of September 30, 2015.

(6) As of September 30, 2015 and 2014, $30,000 and $26,769 of Mr. Cook's salary remains unpaid, respectively. As of May 2015, Mr. Cook was removed as an officer and refocused as a Product Development Manager. All issued and outstanding options were cancelled as of September 30, 2015. As of May 2015, Mr. Cook was removed as an officer and refocused as a Product Development Manager.

**Outstanding Equity Awards at Fiscal Year End**

All issued and outstanding options were cancelled as of September 30, 2015.

**Risk Management**

The Board of Directors does not believe that Vape's executive compensation program gives rise to any risks that are reasonably likely to have a material adverse effect on Vape. Executive officers are compensated on a salary basis and have not been awarded any bonuses or other compensation in 2015 and 2014 that might encourage the taking of unnecessary or excessive risks that threaten the long-term value of Vape.

## DIRECTOR COMPENSATION

The following table sets forth information concerning the compensation of the directors of Vape for the year ended September 30, 2015.

### 2015 DIRECTOR COMPENSATION TABLE

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Kyle Tracey | $ -- | $ 61,000 | $ -- | $ -- | $ -- | $ -- | $ 61,000 |
| Joseph Andreae | $ -- | $ 61,000 | $ -- | $ -- | $ -- | $ -- | $ 61,000 |
| Benjamin Beaulieu | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |
| Allan Viernes | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |

(1) Vape does not currently pay its directors any retainer or other fees for service on the Board or any committee thereof. Vape did not have non-employee directors as of September 30, 2015.

(2) On October 20, 2015, Kyle Tracey and Joe Andreae each surrendered 100,000 shares valued at $61,000 that were issued on March 12, 2015.

28

**ITEM 12.**    **SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Principal Stockholders and Security Ownership of Management**

The following table sets forth information as of January 11, 2016 with respect to the beneficial ownership (as defined in Rule 13d-3 of the Exchange Act) of Vape's Common Stock by (1) each director of Vape, (2) the Named Executive Officers of Vape, (3) each person or group of persons known by Vape to be the beneficial owner of greater than 5% of Vape's outstanding Common Stock, and (4) all directors and officers of Vape as a group:

### BENEFICIAL OWNERSHIP OF COMMON STOCK

| Name and Address of Beneficial Owner(1)(2) | Amount and Nature of Beneficial Ownership | Percent of Class(3) |
|---|---:|---:|
| Kyle Tracey(4) | 33,307,969 | 17.2% |
| Joseph Andreae(5) | 585,555 | * |
| Michael Cook(6) | 1,365,760 | * |
| Benjamin Beaulieu(7) | 630,000 | * |
| Allan Viernes(8) | 600,000 | * |
| All Officers and Directors as a Group | 36,489,284 | 18.9% |
| | | |
| Shares issued and outstanding as of January 11, 2016 | 163,026,935 | |
| Options issued to Officers and Directors | 0 | |
| Shares of Preferred Stock issued to Officers and Directors | 30,500,000 | |
| | 193,526,935 | |

\*     Indicates shareholdings of less than 1%

(1)    In accordance with Rule 13d-3 of the Exchange Act, a person is deemed to be the beneficial owner, for purposes of this table, of any shares of Vape's Common Stock if he or she has voting or investment power with respect to such security. This includes shares (a) subject to options exercisable within sixty (60) days, and (b)(1) owned by a spouse, (2) owned by other immediate family members, or (3) held in trust or held in retirement accounts or funds for the benefit of the named individuals, over which shares the person named in the table may possess voting and/or investment power.

(2)    Except as otherwise noted, the address of each person is c/o the Company at 5304 Derry Avenue, Suite C, CA 91301.

(3)    The percentage of class is calculated pursuant to Rule 13d-3(d) of the Exchange Act.

(4)    Mr. Tracey is the former Chief Executive Officer of the Company. Includes 30,000,000 shares of Series B Convertible Preferred Stock issuable to Hive Ceramics, LLC upon conversion of Secured Series B Preferred Stock Convertible Promissory Notes in the aggregate amount of $300,000. Mr. Kyle Tracey is the sole managing member with sole voting and dispositive power. Each share of Series B Preferred Stock is currently convertible into one share of common stock of the Issuer. Also includes 500,000 shares of Series A Preferred Stock currently convertible on a 1:1 basis into the Company's Common Stock held in the name of HIVE Ceramics, LLC of which Mr. Tracey is the sole managing member (See "NOTE 9 – STOCKHOLDERS' DEFICIT"). As of the time of this filing, Mr. Tracey has not exercised any of his rights to convert preferred stock into common stock.

(5)    Mr. Andreae is the former President of the Company.

(6)    On May 11, 2015, the Board reassigned Michael Cook from his position of Director of Business Development to HIVE Sales and Product Development Manager. In doing so, the Board determined that Mr. Cook's new position does not meet the definition of "Executive Officer" under SEC Rules. Therefore, Mr. Cook has not been considered an executive officer since that time.

(7)     Mr. Beaulieu is the Chief Operating Officer of the Company.

(8)     Mr. Viernes is the Chief Financial Officer of the Company.

---

29

---

**ITEM 13.** **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

**Related Party Transactions**

SUPPLIER

We purchased $60,000 in high-end glass from Kyle Tracey for HIVE Glass, which accounted for 10% of purchases during the year ended September 30, 2015. Kyle Tracey brokered $60,000 of HIVE Glass purchases, which accounted for 10% of total purchases during the year ended September 30, 2015.

RELATED PARTY NOTES PAYABLE, LONG-TERM

The Company had outstanding accounts payable balance to a related party (shareholder of the Company) in the amount of $15,000 as of September 30, 2013. This payable was converted into a note payable on December 7, 2013. The note payable bears interest of 6% per annum with a maturity date of December 1, 2016. As of September 30, 2015, there is $1,645 in accrued interest expense related to this note and the Company recorded $913 in interest expense related to this note during the year ended September 30, 2015.

On December 7, 2013, the Company issued a note payable to a shareholder of the Company in the amount of $23,462 for monies previously borrowed from shareholder. The note is unsecured and bears interest of 6% per annum and matures on December 1, 2016. On January 22, 2015, the Company settled and paid the note and accrued interest of $1,504 for $20,000 and recorded a gain on extinguishment of the note of $3,462.

On February 28, 2014, the Company issued a note payable to HIVE (the "HIVE Note") for the principal amount of $250,000 in connection with the Hive asset acquisition. Per the terms of the HIVE Note, the maturity date is February 27, 2016 and the annual rate of interest is six percent (6%). No prepayment penalty exists. The HIVE Note is unsecured. As of September 30, 2015, there is $22,893 in accrued interest expense related to this note and the Company recorded $15,208 in interest expense related to this note during the year ended September 30, 2015, respectively.

On May 12, 2014, the Company issued a note payable to its President, Joseph Andreae in the amount of $40,000 for monies previously borrowed during the three and six months ended March 31, 2014 (the "Andreae Note"). The note was unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348 in full satisfaction on the Andreae Note.

On August 11, 2014, the Company issued a 6% note payable to its President, Joseph Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note, the original principal balance was $12,828, and was not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240 in full satisfaction of the Andreae Note II.

RELATED PARTY CONVERTIBLE NOTES PAYABLE

On February 18, 2014, the Company issued 8% Convertible Notes to two third parties to cover outstanding accounts payable in the amount of $20,000. Per the terms of the notes, the aggregate principal balance is $20,000, and was not secured by any collateral or any assets pledged to the holders. The maturity date is February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holders can, at their sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the notes was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $8,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,000 and $1,667 of the discount to interest expense during the three and nine months ended June 30, 2014, respectively. On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and

unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,333 to interest expense.

30

On February 18, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $10,612 (the "Tracey Note"). Per the terms of the Tracey Note, the original principal balance is $10,612, and was not secured by any collateral or any assets pledged to the holder. The maturity date was February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,245 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,415 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion the Tracey Note. Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $2,830 to interest expense.

On March 17, 2014, the Company issued an 8% Convertible Note to Jerome Kaiser, former CEO, CFO and Director of the Company for services rendered to the Company in the amount of $50,000 (the "Kaiser Note") which was charged to expense during the three months March 31, 2014. Per the terms of the Kaiser Note, the principal balance is $50,000, and is not secured by any collateral or any assets pledged to the holders. The maturity date is March 17, 2015, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at his sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Kaiser Note is the market closing price of the market day immediately preceding the date of conversion minus twenty percent (20%). We recorded a discount totaling $10,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $4,167 of the discount to interest expense during the year ended September 30, 2015. In March 2015, the Company paid the outstanding principal and accrued interest in satisfaction on the note of $50,000 and $4,000, respectively.

On May 12, 2014, in connection with the 6% Notes, the Company issued a note for $40,000 to Kyle Tracey, which was recorded as a related party convertible note payable. We recorded a discount totaling $16,000 related to the beneficial conversion feature embedded in the 6% note to Mr. Tracey upon issuance. We amortized $6,667 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $13,333 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $11,042 (the "Tracey Note II"). Per the terms of the Tracey Note II, the original principal balance is $11,042, and was not secured by any collateral or any assets pledged to the holder. The maturity date was May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,417 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $920 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note II. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,497 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to its Director of Business Development, Michael Cook, for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $11,825 (the "Cook Note"). Per the terms of the Cook Note, the original principal balance was $11,825, and was not secured by any collateral or any assets pledged to the holder. The maturity date is May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,730 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $985 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the "Cook Note. Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,745 to interest expense.

On August 11, 2014, the Company issued a second 8% Convertible Note to Mr. Cook for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $15,115 (the "Cook Note II"). Per the terms of the Cook Note II, the original principal balance was $15,115, and is was secured by any collateral or any assets pledged to the holder. The maturity date is August 11 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $6,046 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Cook Note II. Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,542 to interest expense.

On August 11, 2014, the Company issued an 8% Convertible Note to Mr. Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $216,001 (the "Tracey Note III"). Per the terms of the Tracey Note III, the original principal balance was $216,001, and is not secured by any collateral or any assets pledged to the holder. The maturity date was August 11, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note III was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $86,401 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note III. Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $79,200 to interest expense.

## ITEM 14.   PRINCIPAL ACCOUNTING FEES AND SERVICES.

*Audit Fees*

Vape incurred audit and review fees of $56,000 and $43,000 for the periods ended September 30, 2015 and 2014 to dbb*mckennon*.

*Audit Related Fees*

During the year ended September 30, 2014, Vape paid $16,000 for audit related services to dbb*mckennon* in connection with the merger.

32

*Tax Fees*

During the year ended September 30, 2015 and 2014, Vape paid $4,500 and $3,000 for tax services to dbb*mckennon*.

*All Other Fees*

As of September 30, 2015 and 2014, Vape has not paid any fees associated with non-audit services to dbb*mckennon*, or any other accounting firm.

**Policy on Pre-Approval of Audit and Permissible Non-Audit Services**

The Board (functioning in the capacity of an audit committee as discussed in Item 10 above) is responsible for appointing and setting compensation and overseeing the work of the independent registered public accounting firm. The Board approves, in advance, all audit and permissible non-audit services to be performed by the independent registered public accounting firm. Such approval process ensures that the independent registered public accounting firm does not provide any non-audit services to Vape that are prohibited by law or regulation.

ITEM 15.    EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

(a)    Exhibits
Reference is made to the Index of Exhibits beginning on page E-1 herein.

(b)    Financial Statements
Reference is made to the Index to Consolidated Financial Statements on page F-1.

33

## SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

VAPE HOLDINGS, INC.

Date: January 13, 2016

By: */s/ Justin Braune*
Justin Braune
Chief Executive Officer

Date: January 13, 2016

By: */s/ Allan Viernes*
Allan Viernes
Chief Financial Officer

In accordance with Section 13 or 15(d) of the Exchange Act, the Registrant has caused this report to be signed by the following persons in the capacities and on the dates stated.

| Signatures | Title | Date |
| --- | --- | --- |
| */s/ Justin Braune*<br>Justin Braune | Chief Executive Officer, Director<br>(Principal Executive Officer) | January 13, 2016 |
| */s/ Allan Viernes*<br>Allan Viernes | Chief Financial Officer, Director<br>(Principal Financial and Accounting Officer) | January 13, 2016 |
| */s/ Benjamin Beaulieu*<br>Benjamin Beaulieu | Chief Operating Officer,<br>Chairman of Board of Directors | January 13, 2016 |

34

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

## VAPE HOLDINGS, INC.

## (FORMERLY PEOPLESTRING CORPORATION)

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets at September 30, 2015 and 2014 | F-3 |
| Consolidated Statements of Operations for the years ended September 30, 2015 and 2014 | F-4 |
| Consolidated Statements of Stockholders' Deficit for the years ended September 30, 2015 and 2014 | F-5 |
| Consolidated Statements of Cash Flows for the years ended September 30, 2015 and 2014 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Vape Holdings, Inc.

We have audited the accompanying consolidated balance sheets of Vape Holdings, Inc. and subsidiaries (collectively, the "Company") as of September 30, 2015 and 2014, and the related consolidated statements of operations, stockholders' deficit and cash flows for the years then ended September 30, 2015 and 2014. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of September 30, 2015 and 2014, and the results of their operations and their cash flows for the periods then ended, in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As more fully explained in Note 2 to the consolidated financial statements, the Company has incurred losses and has a working capital deficit as of September 30, 2015. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans with respect to these factors are also described on Note 2. The Company's consolidated financial statements do not include any adjustments that might result from the outcome of these uncertainties should the Company be unable to continue as a going concern.

 /s/ dbb*mckennon*
dbb*mckennon*
Newport Beach, California
January 13, 2016

---

F-2

# VAPE HOLDINGS, INC.
## CONSOLIDATED BALANCE SHEETS

| | September 30, 2015 | September 30, 2014 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash | $ 273,904 | $ 48,370 |
| Accounts receivable | 72,401 | 16,771 |
| Inventory | 194,937 | 227,530 |
| Prepaid inventory | 64,079 | 246,491 |
| Other current assets | 40,679 | 44,100 |
| Deferred financing costs | 107,908 | - |
| Total current assets | 753,908 | 583,262 |
| | | |
| Fixed assets, net of accumulated depreciation | 118,327 | 106,377 |
| Trademarks | 123,150 | 119,575 |
| Pending patents | - | 14,890 |
| Deferred financing costs, long-term | 12,067 | |
| TOTAL ASSETS | $ 1,007,452 | $ 824,104 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Accounts payable | $ 115,938 | $ 216,388 |
| Accrued expenses | 208,665 | 169,513 |
| Customer deposits | 1,275 | - |
| Convertible notes payable, net of unamortized discount of $369,569 and $32,333, respectively | 305,923 | 187,667 |
| Related party convertible notes payable, net of unamortized discount of $4,168 at September 30, 2014 | - | 45,832 |
| Total current liabilities | 631,801 | 619,400 |
| | | |
| Long term liabilities: | | |
| Convertible notes payable, long-term, net of unamortized discount of $507,360 and $19,800, respectively | 458,404 | 178,200 |
| Related party convertible notes payable, long-term, net of unamortized discount of $125,480 at September 30, 2014 | - | 199,115 |
| Related party notes payable, long-term | 265,000 | 341,290 |
| Other liabilities, long-term | 12,235 | - |
| Warrant liability | 25,025 | 2,464,232 |
| Total liabilities | 1,392,465 | 3,802,237 |
| | | |
| Commitments and contingencies | | |
| | | |
| Stockholders' deficit: | | |
| Preferred stock, $0.00001 par value - 100,000,000 authorized; 500,000 outstanding at September 30, 2015 and September 30, 2014 | - | - |
| Common stock, $0.00001 par value - authorized 1,000,000,000 shares; 19,896,521 issued at September 30, 2015, 19,455,896 outstanding at September 30, 2015, and 10,032,436 issued and outstanding at September 30, 2014 | 192 | 100 |
| Additional paid-in capital | 26,660,868 | 22,402,662 |
| Treasury stock, 690,625 shares at September 30, 2015 | (435,031) | |
| Accumulated deficit | (26,611,042) | (25,380,895) |

| | | | |
|---|---|---:|---:|
| Total stockholders' deficit | | (385,013) | (2,978,133) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ | 1,007,452 | $   824,104 |

See notes to consolidated financial statements.

F-3

# VAPE HOLDINGS, INC.
## CONSOLIATED STATEMENTS OF OPERATIONS

|  | For the Year Ended September 30, | |
|---|---|---|
|  | 2015 | 2014 |
| Revenue | $ 1,277,657 | $ 841,724 |
| Cost of revenue [A] | 1,013,641 | 458,387 |
| Gross profit | 264,016 | 383,337 |
| Operating expenses: | | |
| Sales and marketing [B] | 715,292 | 219,891 |
| Research and development | 212,424 | 45,757 |
| General and administrative [C] | 2,127,594 | 1,315,710 |
| Total operating expenses | 3,055,310 | 1,581,358 |
| Operating loss | (2,791,294) | (1,198,021) |
| Other income (expense): | | |
| Interest expense | (788,038) | (241,065) |
| Interest expense - related party | (148,562) | (219,714) |
| Change in warrant liability | 2,439,207 | (23,404,058) |
| Gain on settlement | 625,461 | - |
| Loss on debt extinguishments, net | (564,712) | - |
| Total other income (expense), net | 1,563,356 | (23,864,837) |
| Loss before provision for income taxes | (1,227,938) | (25,062,858) |
| Provision for income taxes | 2,209 | 800 |
| Net loss | $ (1,230,147) | $(25,063,658) |
| Net loss available to common shareholders: | | |
| Loss per common share - basic | $ (0.11) | $ (3.20) |
| Loss per common share - diluted | $ (0.11) | $ (3.20) |
| Weighted average shares - basic | 11,563,247 | 7,822,212 |
| Weighted average shares - diluted | 11,563,247 | 7,822,212 |

[A] Stock-based compensation was $50,558 and $0 for the years ended September 30, 2015 and 2014, respectively.

[B] Stock-based compensation was $156,086 and $0 for the years ended September 30, 2015 and 2014, respectively.

[C] Stock-based compensation was $799,699 and $450,501 for the years ended September 30, 2015 and 2014, respectively.

See notes to consolidated financial statements.

F-4

# VAPE HOLDINGS, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT

| | Series A Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at September 30, 2013 - Prior to merger | - | $ - | 4,684,537 | $ 46 | $ - | $ (317,237) | $ - | $ (317,191) |
| Shares retained by PeopleString shareholders upon merger on September 30, 2013 | - | - | 1,565,463 | 16 | - | - | - | 16 |
| Conversion of related party notes payable and accrued interest | - | - | 571,630 | 7 | 341,538 | - | - | 341,545 |
| Conversion of note payables and accrued interest | - | - | 28,836 | - | 55,586 | - | - | 55,586 |
| Fair value of officer services | - | - | - | - | 15,000 | - | - | 15,000 |
| Common stock issued for services | - | - | 50,000 | - | 133,200 | - | - | 133,200 |
| Discount on convertible note payable at 10% | - | - | - | - | 4,424 | - | - | 4,424 |
| Discount on convertible notes payable at 8% | - | - | - | - | 158,402 | - | - | 158,402 |
| Discount on convertible note payable at 6% | - | - | - | - | 108,000 | - | - | 108,000 |
| Discount on related party convertible note payable at 8% | - | - | - | - | 193,217 | - | - | 193,217 |
| Discount on related party convertible note payable at 6% | - | - | - | - | 3,000 | - | - | 3,000 |
| Common stock issued in connection with warrant settlement | - | - | 3,542 | - | 98,822 | - | - | 98,822 |
| Cashless exercise of warrants | - | - | 3,128,428 | 31 | 20,840,972 | - | - | 20,841,003 |
| Stock-based compensation - employee options | - | - | - | - | 326,812 | - | - | 326,812 |
| Stock-based compensation - non - employee options | - | - | - | - | 123,689 | - | - | 123,689 |
| Issuance of preferred stock for HIVE asset acquisition | 500,000 | - | - | - | - | - | - | - |
| Net loss | - | - | - | - | - | (25,063,658) | - | (25,063,658) |
| Balance at September 30, 2014 | 500,000 | $ - | 10,032,436 | $ 100 | $22,402,662 | $ (25,380,895) | $ - | $ (2,978,133) |
| Conversion of related party notes payable and accrued interest | - | - | 625,478 | 6 | 341,741 | - | - | 341,747 |
| Conversion of notes payable and accrued interest | - | - | 8,230,155 | 80 | 813,985 | - | - | 814,065 |
| Conversion of unpaid wages | - | - | 158,175 | 2 | 96,485 | - | - | 96,487 |
| Common stock issued for services | - | - | 60,277 | 1 | 36,768 | - | - | 36,769 |
| Common stock issued for bonuses | - | - | 440,000 | 6 | 288,196 | - | - | 288,202 |
| Stock issued for settlement of accounts payable | - | - | 100,000 | 1 | 99,999 | - | - | 100,000 |
| Discount on convertible note payable at 12% | - | - | - | - | 142,800 | - | - | 142,800 |
| Discount on convertible note payable at 10% | - | - | - | - | 252,079 | - | - | 252,079 |
| Discount on convertible notes payable at 8% | - | - | - | - | 220,400 | - | - | 220,400 |
| Discount on related party convertible note payable at 10% | - | - | - | - | 641,666 | - | - | 641,666 |
| Discount on related party convertible note payable at 6% | - | - | - | - | 5,410 | - | - | 5,410 |
| Extinguishment of related party accrued interest | - | - | - | - | 1,625 | - | - | 1,625 |
| Modification of convertible notes payable | - | - | - | - | 568,174 | - | - | 568,174 |
| Stock-based compensation - employee options | - | - | - | - | 606,362 | - | - | 606,362 |
| Stock-based compensation - non-employee options | - | - | - | - | 75,012 | - | - | 75,012 |
| Issuance of common stock for BetterChem Acquisition | - | - | 250,000 | 3 | 67,497 | - | - | 67,500 |
| Unwinding of BetterChem Acquisition | - | - | (250,000) | (3) | 3 | - | (67,500) | (67,500) |
| Surrender of common stock | - | - | (440,625) | (4) | 4 | - | (367,531) | (367,531) |
| Net income | - | - | - | - | - | (1,230,147) | - | (1,230,147) |
| Balance at September 30, 2015 | 500,000 | $ - | 19,205,896 | $ 192 | $26,660,868 | $ (26,611,042) | $ (435,031) | $ (385,013) |

See notes to consolidated financial statements.

# VAPE HOLDINGS, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | For the Year Ended September 30, | |
| --- | --- | --- |
|  | 2015 | 2014 |
| Cash flows from operating activities: |  |  |
| Net loss | $(1,230,147) | $(25,063,658) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |  |
| Depreciation | 71,305 | 16,178 |
| Accretion of debt discounts and deferred financing costs | 695,795 | 366,431 |
| Fair value in excess of stock issued for conversion of notes payable and accrued interest | 15,895 | 1,323 |
| Fair value in excess of stock issued for conversion of related party notes payable and accrued interest | 22,128 | 44,239 |
| Gain on change in warrant liability | (2,439,207) | 23,404,058 |
| Gain on settlement | (625,461) | - |
| Loss on debt extinguishments, net | 564,712 | - |
| Fair value of officer services | - | 15,000 |
| Common stock issued for services | 36,769 | 133,200 |
| Stock-based compensation | 969,577 | 450,501 |
| Changes in operating assets and liabilities: |  |  |
| Accounts receivable | (55,630) | (16,771) |
| Inventory | 215,005 | (474,021) |
| Other assets | 25,554 | (2,433) |
| Accounts payable | 194,549 | 156,042 |
| Accrued expenses | 301,001 | (10,092) |
| Net cash used in operating activities | (1,238,155) | (980,003) |
|  |  |  |
| Cash flows from investing activities: |  |  |
| Capital expenditures | (83,255) | (122,555) |
| Purchase of trademarks | (10,818) | (134,465) |
| Net proceeds from settlement | 62,930 | - |
| Net cash used in investing activities | (31,143) | (257,020) |
|  |  |  |
| Cash flows from financing activities: |  |  |
| Net proceeds from issuance of convertible note payable | 1,657,660 | 438,000 |
| Net proceeds from issuances of related party convertible notes payable | - | 505,535 |
| Net proceeds from issuances of related party notes payable | - | 341,290 |
| Repayments on convertible notes payable | (40,000) | - |
| Repayments on related party convertible notes payable | (50,000) | - |
| Repayments on related party notes payable | (72,828) | - |
| Net cash provided by financing activities | 1,494,832 | 1,284,825 |
|  |  |  |
| Net change in cash | 225,534 | 47,802 |
| Cash, beginning of period | 48,370 | 568 |
| Cash, end of period | $ 273,904 | $ 48,370 |
|  |  |  |
| Supplemental disclosures of cash flow information Cash paid during the period for: |  |  |
| Interest | $ 18,788 | $ - |
| Taxes | $ 2,209 | $ - |

Non-cash investing and financing activities:

| | | | | |
|---|---|---:|---|---:|
| Conversion of notes payable and accrued interest | $ | 814,065 | $ | 55,586 |
| Conversion of related party notes payable and accrued interest | $ | 341,747 | $ | 341,545 |
| Issuance of convertible note payable for services | $ | - | $ | 41,667 |
| Issuance of convertible note payable for former officer services | $ | - | $ | 50,000 |
| Issuance of common stock in connection with warrant settlement | $ | - | $ | 98,822 |
| Beneficial conversion feature recorded with convertible notes payable | $ | 615,279 | $ | - |
| Beneficial conversion feature recorded with related party convertible note payable | $ | 647,076 | $ | - |

See notes to consolidated financial statements.

F-6

## VAPE HOLDINGS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1. DESCRIPTION OF BUSINESS, RECENT ACQUISITIONS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

<u>BUSINESS</u>

Vape Holdings, Inc. ("VAPE," the "Company," "we," "us," "our," "our company") is a holding company with its primary focus in the manufacturing and distribution of healthy and sustainable vaporization products. The Company designs, markets and distributes ceramic vaporization products under a unique brand. The Company has introduced a nonporous, non-corrosive, chemically inert medical-grade ceramic vaporization element as a healthy, sustainable alternative to traditional titanium and quartz vaporization materials, as well as lower-grade ceramic found in traditional electronic cigarettes and vaporizers. This material can be used for a wide range of applications, including stand-alone vaporization products and "E-cigs." Electronic cigarettes come in a variety of designs ranging from those that look vastly like traditional cigarettes, to larger vaporizer units which are capable of vaporizing liquid with varying viscosity. The process of vaporization is believed to eliminate the smoke, tar, ash, and other byproducts of traditional smoking by utilizing lower temperatures in a controlled electronic environment.

**HIVE CERAMICS**

HIVE Ceramics ("HIVE") is the premier brand under the VAPE umbrella. HIVE manufactures and distributes a proprietarily blended ceramic vaporization element for torched, electronic and portable vaporizers with countless design and product crossover capabilities in existing and emerging markets. HIVE is dedicated to bringing the healthiest and cleanest vaporization experience possible to the market. The HIVE product line currently consists of over 15 distinct ceramic elements, including the 2 piece domeless, domeless direct inject, and HIVE's signature domeless elements covering 10mm, 14mm and 18mm applications as well as regular elements, the HIVE Flower Cup, the HIVE Carb Cap, HIVE Stinger Dabber, the 14mm HIVE x Quave - Club Banger, and the HIVE x D-Nail 16mm and 20mm attachments.

The Company has recently launched 'HIVE Glass.' HIVE Glass is VAPE's newest line of products under the HIVE brand name. The HIVE GLASS line is precision made using state of the art manufacturing processes and techniques, and exclusively uses German Schott glass caliber and fittings through all production phases. The aim with HIVE Glass is to create an affordable, high quality glass product that is both aesthetically pleasing and a highly functional vaporization product. VAPE's existing customer base and distribution network will be the catalyst for expansion of this new HIVE product line. Under HIVE Glass, the Company also buys and sells high-end collector pieces. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

VAPE has also recently launched 'HIVE Supply.' HIVE Supply is a packaging and sourcing division of VAPE designed to serve as a competitively priced, comprehensive "one-stop shop" for all medical and recreational marijuana packaging needs. As with all of VAPE's products, HIVE Supply will operate in full compliance with all federal laws and the laws of each individual state in which it does business. HIVE Supply will focus on providing much-needed support to cannabis businesses in regards to sourcing consumer products, brand management and marketing services. HIVE Supply is currently operated out of three (3) locations: HIVE Supply in Southern California, HIVE Supply Washington in Spokane and HIVE Supply Oregon in Portland. Under HIVE Supply, the Company also buys and sells high-end manufacturing machines. Subsequent to year end, the Company curtailed the product line in order to focus on HIVE Ceramics.

In connection with its launch of HIVE Supply and HIVE Glass, the Company opened 'THE HIVE' retail store and gallery in Los Angeles, an end-user experience to showcase the complete line of HIVE Ceramics and HIVE Glass products, while introducing HIVE Supply and all the new products being tested and developed through each vertical. Subsequent to year end, the Company curtailed its retail store in order to reduce overhead costs and focus on HIVE Ceramics.

F-7

The Company intends to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has created or acquired and continues in the process of creating and/or acquiring proprietary vaporizers and e-cigarettes, and various trademarks, patents and copyrights for brands which are developed or in development. The Company is actively engaged in improving and expanding lines of branded products through business alliances and acquisitions, as well as developing its branded retail business expansion. VAPE and its business units are organized and directed to operate strictly in accordance with all applicable state and federal laws.

## REVIVAL PRODUCTS

On December 28, 2015, the Company created a new wholly-owned subsidiary, Revival Products, LLC ("Revival"), which is in the business of portable vaporization devices. Revival will disposable cartridge complement HIVE Ceramic's product lines utilizing its sales and distribution channels and via its own designated e-commerce site at www.revivalvapes.com.

## BETTERCHEM

On July 1, 2015, the Company entered into a Share Exchange Agreement with BetterChem Consulting, Inc. ("BetterChem"), a Pennsylvania corporation, and its sole shareholder and the Company's current Chief Science Officer Dr. Mark Scialdone ("Dr. Scialdone"), whereby the Company acquired a controlling 80% interest in BetterChem from Dr. Scialdone in exchange for up to 400,000 shares of the Company's restricted common stock. In consideration for the issuance of the shares to Dr. Scialdone, the Company acquired 80 shares of the common stock of BetterChem which represents 80% of the issued and outstanding shares of BetterChem. Dr. Scialdone retained a 20% interest in BetterChem. The Share Exchange Agreement transaction closed concurrently with its execution on July 1, 2015 and was approved by Unanimous Written Consent of the Board of Directors (the "Board") of the Company on the same date. At closing, the Company issued 250,000 shares of its common stock valued at $67,500 to BetterChem. The Company acquired an 80% controlling interest of the business in order to expand its science consulting segment and research and development. BetterChem had no assets and liabilities upon closing.

An additional up to 150,000 shares of common stock to be issued to Dr. Scialdone will be subject to the following terms:

1. Due to the uncertain nature of the valuation of BetterChem, a privately held consulting business, the parties have agreed that Dr. Scialdone shall have a nonassignable contingent contractual right to receive additional shares contingent on the future gross revenues of BetterChem as follows:

   a. On the one year anniversary of the closing, Dr. Scialdone shall be entitled to an additional 75,000 shares if BetterChem has generated at least $100,000 in gross revenues beginning on the date of closing and up to the one year anniversary of the closing. The additional stock issuance will be calculated on a pro rata basis (i.e. If BetterChem only generates $50,000 in gross revenues in the first year then Dr. Scialdone will be entitled to only 37,500 shares).

F-8

    b.   On the two year anniversary of the closing, Dr. Scialdone shall be entitled to an additional 75,000 shares if BetterChem has generated at least $100,000 in gross revenues beginning on the one year anniversary of the closing up to the two year anniversary of the closing. The additional stock issuance will be calculated on a pro rata basis (i.e. If BetterChem only generates $50,000 in gross revenues in the second year then Dr. Scialdone will be entitled to only 37,500 shares).

2.   In the event of a change in control of BetterChem or a sale of all or substantially all of the assets of BetterChem during the two year period, the additional 150,000 shares shall automatically vest and be payable in full to Dr. Scialdone and any salary compensation due Dr. Scialdone under the 2 year term of his employment agreement with the Company dated May 1, 2015, or extensions of that Employment Agreement which the parties may thereafter execute, shall be accelerated and shall be due and payable in full within 30 days of the event of change in control of BetterChem.

In connection with the Share Exchange Agreement, on July 1, 2015, Dr. Scialdone and the Company entered into an Intellectual Property Rights Transfer Agreement (the "I.P. Agreement") whereby Dr. Scialdone agreed to transfer and assign to Company the entire right, title and interest in and to any and all intellectual property in which Dr. Scialdone has a right to convey an interest, including intellectual property conceived, developed, reduced to practice, assigned or acquired by Dr. Scialdone prior to the date of the I.P. Agreement as well as intellectual property held, conceived, developed, reduced to practice, assigned or acquired by BetterChem. There were no assets or liabilities assumed by the Company. On January 12, 2016, the Company unwound the transaction and curtailed the subsidiary's operations in order to reduce overhead costs and focus on HIVE Ceramics and reflected such as of September 30, 2015 in the consolidated financial statements. As of September 30, 2015, the 250,000 shares issued to BetterChem were recorded as treasury stock valued at $67,500 as a result of the settlement to receive the shares back as part of the unwind.

VAPE is organized and directed to operate strictly in accordance with all applicable state and federal laws. Subsequent to year end, the Company abandoned such plans in order to reduce overhead costs and focus on HIVE Ceramics.

Subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue.

BASIS OF PRESENTATION

The accompanying unaudited interim consolidated financial statements have been prepared by the Company pursuant to the rules and regulations of the SEC. Certain information and disclosures normally included in the annual financial statements prepared in accordance with the accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. In the opinion of management, all adjustments and disclosures necessary for a fair presentation of these consolidated financial statements have been included. Such adjustments consist of normal recurring adjustments. The current results are not an indication of the full year.

CONSOLIDATION

The consolidated financial statements include the assets, liabilities, and operating results of the Company and its wholly-owned subsidiaries, HIVE Ceramics, Offset, and Nouveau after elimination of all material inter-company accounts and transactions. No segment information is presented as the assets, liabilities, and results of HIVE represent over 90% of the Company's operations.

USE OF ESTIMATES

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make certain estimates and assumptions that affect the reported amounts of assets

and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates and assumptions include losses for warrant contingencies and the valuation of conversion features in notes.

F-9

FAIR VALUE OF FINANCIAL INSTRUMENTS

     Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants as of the measurement date. Applicable accounting guidance provides an established hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in valuing the asset or liability and are developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the factors that market participants would use in valuing the asset or liability. There are three levels of inputs that may be used to measure fair value:

     Level 1 - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.
     Level 2 - Include other inputs that are directly or indirectly observable in the marketplace.
     Level 3 - Unobservable inputs which are supported by little or no market activity.

     The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. Derivative instruments include the warrant liability (Level 2). Derivative instruments are valued using standard calculations/models that are primarily based on observable inputs, including volatilities and interest rates. Therefore, derivative instruments are included in Level 2.

     Fair-value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of September 30, 2015 and 2014. The respective carrying value of certain on-balance-sheet financial instruments approximated their fair values. These financial instruments include cash, prepaid expenses, accounts payable, accrued liabilities, and notes payable. Fair values for these items were assumed to approximate carrying values because of their short-term nature or they are payable on demand.

     The following table presents the Company's fair value hierarchy for assets measured at fair value on a recurring basis at September 30, 2015:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Cash and cash equivalents | $ 273,904 | $ - | $ - | $ 273,904 |
| Total assets measured at fair value | $ 273,904 | $ - | $ - | $ 273,904 |
| | | | | |
| Liabilities | | | | |
| Derivative instruments | $ - | $ 25,025 | $ - | $ 25,025 |
| Total liabilities measured at fair value | $ - | $ 25,025 | $ - | $ 25,025 |

     The following table presents the Company's fair value hierarchy for assets and liabilities measured at fair value on a recurring basis at September 30, 2014:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Cash and cash equivalents | $ 48,370 | $ - | $ - | $ 48,370 |
| Total assets measured at fair value | $ 48,370 | $ - | $ - | $ 48,370 |
| | | | | |
| Liabilities | | | | |
| Derivative instruments | $ - | $ 2,464,232 | $ - | $ 2,464,232 |
| Total liabilities measured at fair value | $ - | $ 2,464,232 | $ - | $ 2,464,232 |

## CONCENTRATION

*Credit Risk*

At times, the Company maintains cash balances at a financial institution in excess of the FDIC insurance limit. In addition, at we extend credit to customers in the normal course of business, after we evaluate the credit worthiness. The Company does not expect to take any unnecessary credit risks causing significant write-offs of potentially uncollectible accounts.

*Customers*

One (1) customer accounted for 37% of our accounts receivable as of September 30, 2015. The loss of this customer would have a significant impact on the Company's financial results.

*Suppliers*

One (1) supplier accounted for 54% of our purchases during the year ended September 30, 2015. We purchased $60,000 in high-end glass from Kyle Tracey for HIVE Glass, which accounted for 10% of purchases during the year ended September 30, 2015. The loss of these suppliers would have a significant impact on the Company's financial results.

## REVENUE RECOGNITION

The Company recognizes revenues from product sales when (a) persuasive evidence that an agreement exists; (b) the products have been delivered; (c) the prices are fixed and determinable and not subject to refund or adjustment; and (d) collection of the amounts due is reasonably assured. Revenue is recorded when sales orders are shipped.

## INVENTORY

Inventory is valued at the lower of cost or market, as determined primarily by the average cost inventory method, and are stated using the first-in, first-out (FIFO) method. Management will record a provision for loss for obsolete or slow moving inventory to reduce carrying amounts to net realizable value.

We purchase product sourced from China which we are required to pay 50% upon placing the order. Amounts paid for products, which have not been received, are recorded as prepaid inventory. There are no amounts paid which are in dispute or considered impaired.

## FIXED ASSETS

Fixed assets are recorded at cost and depreciation is provided over the estimated useful lives of the related assets using the straight-line method for financial statement purposes. The estimated life of tooling related to our ceramic products is three (3) years. The estimated life of our leasehold improvements is the lesser of the term of the related lease and useful life.

F-11

## IMPAIRMENT OF LONG-LIVED AND PURCHASED INTANGIBLE ASSETS

The Company has adopted Accounting Standards Codification ("ASC") 350 "Intangibles - Goodwill and Other." The Statement requires that long-lived assets and certain identifiable intangibles held and used by the Company be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Events relating to recoverability may include significant unfavorable changes in business conditions, recurring losses, or a forecasted inability to achieve break-even operating results over an extended period. The Company evaluates the recoverability of long-lived assets based upon forecasted undercounted cash flows. Should impairment in value be indicated, the carrying value of intangible assets will be adjusted, based on estimates of future discounted cash flows resulting from the use and ultimate disposition of the asset. ASC 350 also requires assets to be disposed of be reported at the lower of the carrying amount or the fair value less costs to sell.

Long-lived assets, such as fixed assets and purchased intangibles subject to amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of the asset is measured by comparison of its carrying amount to undiscounted future net cash flows the asset is expected to generate. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the asset exceeds its fair market value. Estimates of expected future cash flows represent management's best estimate based on currently available information and reasonable and supportable assumptions. Any impairment recognized is permanent and may not be restored. During the year ended September 30, 2015 and 2014, the Company recorded $22,133 and $0 of impairment of its pending patents as its expected cash flows did not exceed its carrying amounts and none towards its trademarks as its expected future cash flows are in excess of their carrying amounts.

## RESEARCH AND DEVELOPMENT

Research and development costs are expensed as incurred. The costs of materials and equipment that will be acquired or constructed for research and development activities, and that have alternative future uses, both in research and development, marketing or sales, will be classified as fixed assets and depreciated over their estimated useful lives. To date, research and development costs include the research and development expenses related to prototypes of the Company's products. During the year ended September 30, 2015 and 2014, research and development costs were $212,424 and $45,757, respectively.

## CONVERTIBLE DEBT

Convertible debt is accounted for under the guidelines established by ASC 470-20 "Debt with Conversion and Other Options." ASC 470-20 governs the calculation of an embedded beneficial conversion, which is treated as an additional discount to the instruments where derivative accounting (explained below) does not apply. The amount of the value of warrants and beneficial conversion feature may reduce the carrying value of the instrument to zero, but no further. The discounts relating to the initial recording of the derivatives or beneficial conversion features are accreted over the term of the debt. Many of the conversion features embedded in the Company's convertible notes are variable and are adjusted based on a discount to market prices which could cause an unlimited number of common stock to be issued. The management and board of directors currently have the ability to authorize additional shares of common stock primarily through their super voting rights under the Series A Preferred stock (See "NOTE 8 - STOCKHOLDERS' DEFICIT").

When applicable, the Company calculates the fair value of warrants and conversion features issued with the convertible instruments using the Black-Scholes valuation method, using the same assumptions used for valuing employee options for purposes of ASC 718 "Compensation - Stock Compensation", except that the contractual life of the warrant or conversion feature is used. Under these guidelines, the Company allocates the value of the proceeds received from a convertible debt transaction between the conversion feature and any other detachable instruments (such as warrants) on a relative fair value basis. The allocated fair value is recorded as a debt discount or premium and is amortized over the expected term of the convertible debt to interest expense. If the fair value exceeds the carrying value of the debt, an immediate charge to operations is recorded by management. Each reporting period, the Company will compute the estimated fair value of derivatives and record changes to operations. Currently no instruments are being recorded as such.

The Company accounts for modifications of its BCF's in accordance with ASC 470-50 "Modifications and Extinguishments." ASC 470-50 requires the modification of a convertible debt instrument that changes the fair value of an embedded conversion feature and the subsequent recognition of interest expense or the associated debt instrument when the modification does not result in a debt extinguishment.

F-12

DERIVATIVE FINANCIAL INSTRUMENTS

Derivative financial instruments, as defined in ASC 815, "Accounting for Derivative Financial Instruments and Hedging Activities", consist of financial instruments or other contracts that contain a notional amount and one or more underlying (e.g. interest rate, security price or other variable), require no initial net investment and permit net settlement. Derivative financial instruments may be free-standing or embedded in other financial instruments. Further, derivative financial instruments are initially, and subsequently, measured at fair value and recorded as liabilities or, in rare instances, assets.

The Company does not use derivative financial instruments to hedge exposures to cash-flow, market or foreign-currency risks. However, the Company has issued financial instruments including senior convertible notes payable and freestanding stock purchase warrants with features that are either (i) not afforded equity classification, (ii) embody risks not clearly and closely related to host contracts, or (iii) may be net-cash settled by the counterparty. As required by ASC 815, in certain instances, these instruments are required to be carried as derivative liabilities, at fair value, in our consolidated financial statements.

The Company estimates the fair values of derivative financial instruments using various techniques (and combinations thereof) that are considered to be consistent with objectively measuring fair values. In selecting the appropriate technique, consideration is given to, among other factors, the nature of the instrument, the market risks that it embodies and the expected means of settlement. For less complex derivative instruments, such as free-standing warrants, the Company generally uses the Black-Scholes option valuation technique because it embodies all of the requisite assumptions (including trading volatility, estimated terms and risk free rates) necessary to fair value these instruments. Estimating fair values of derivative financial instruments requires the development of significant and subjective estimates that may, and are likely to, change over the duration of the instrument with related changes in internal and external market factors. In addition, option-based techniques are highly volatile and sensitive to changes in the trading market price of our common stock, which has a high-historical volatility. Since derivative financial instruments are initially and subsequently carried at fair values, the Company's operating results will reflect the volatility in these estimate and assumption changes.

EARNINGS PER COMMON SHARE

Basic earnings per common share is computed by dividing net income available to common shareholders by the weighted-average number of common shares outstanding during the reporting period. Diluted earnings per common share is computed by dividing net income available to common shareholders by the combination of dilutive common share equivalents, comprised of shares issuable under the Company's share-based compensation plans and the weighted-average number of common shares outstanding during the reporting period. Dilutive common share equivalents include the dilutive effect of in-the-money share equivalents, which are calculated, based on the average share price for each period using the treasury stock method. Under the treasury stock method, the exercise price of an award, if any, the amount of compensation cost, if any, for future service that the Company has not yet recognized, and the estimated tax benefits that would be recorded in paid-in capital, if any, when an award is settled are assumed to be used to repurchase shares in the current period.

The following is a summary of outstanding securities that would have been included in the calculation of diluted shares outstanding since the exercise prices did not exceed the average market value of the Company's common stock if the Company generated net income for the year ended September 30, 2015 and 2014:

|  | For the Year Ended September 30, 2015 | For the Year Ended September 30, 2014 |
|---|---|---|
| Series A Preferred stock | 500,000 | 500,000 |
| Common stock options | - | 303,889 |
| Common stock warrants | 1,184,727 | 1,184,727 |
| Convertible notes | 79,699,946 | 843,213 |
|  | 81,384,673 | 2,831,829 |

F-13

The Company would have excluded 125,000 options from the computation for the year ended September 30, 2014 as their exercise prices were in excess of the average closing market price of the Company's common stock, causing their effects to be anti-dilutive using the treasury stock method.

STOCK-BASED COMPENSATION

ASC 718, "Share-Based Payment" requires that compensation cost related to share-based payment transactions be recognized in the consolidated financial statements. Share-based payment transactions within the scope of ASC 718 include stock options, restricted stock plans, performance-based awards, stock appreciation rights, and employee share purchase plans.

The Company adopted ASC 718, which requires disclosure of the fair value and other characteristics of stock options and more prominent disclosure about the effects of an entity's accounting policy decisions with respect to stock-based compensation on reported net loss. The Company has reflected the expense of such stock based compensation based on the fair value at the grant date for awards consistent with the provisions of ASC 718.

In connection with the adoption of ASC 718, the fair value of our share-based compensation has been determined utilizing the Black-Scholes pricing model. The fair value of the options granted is amortized as compensation expense on a straight line basis over the requisite service period of the award, which is generally the vesting period. The fair value calculations involve significant judgments, assumptions, estimates and complexities that impact the amount of compensation expense to be recorded in current and future periods. Upon option exercise, the Company issues new shares of stock.

The following weighted average variables were used in the Black Scholes model for all option issuances valued during the year ended September 30, 2015 and 2014:

| Year Ended September 30, | Stock Price at Grant Date | Dividend Yield | Exercise Price | Risk Free Interest Rate | Volatility | Average Life |
|---|---|---|---|---|---|---|
| 2015 | $ 0.73 | -% | $ 0.73 | 2.2% | 380% | 10.0 |
| 2014 | $ 1.66 | -% | $ 1.66 | 2.5% | 401% | 10.0 |

The Company's accounting policy for equity instruments issued to consultants and vendors in exchange for goods and services follows the provisions of Emerging Issues Task Force ("EITF") 96-18, "Accounting for Equity Instruments That are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services", codified into ASC 505-50. The measurement date for the fair value of the equity instruments issued is determined at the earlier of (i) the date at which a commitment for performance by the consultant or vendor is reached or (ii) the date at which the consultant or vendor's performance is complete. In the case of equity instruments issued to consultants, the fair value of the equity instrument is recognized over the term of the consulting agreement.

RECENT ACCOUNTING PRONOUNCEMENTS

In May 2014, the FASB issued Accounting Standards Update No. 2014-09, "Revenue from Contracts with Customers", which supersedes most of the current revenue recognition requirements. The core principle of the new guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for these goods or services. New disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers are also required. This guidance is effective for the Company in the first quarter of fiscal year 2018 and early application is not permitted. Entities must adopt the new guidance using one of two retrospective application methods. The Company is currently evaluating the standard but does not expect it to have a material impact on our financial position, results of operations or cash flows.

In August 2014, the FASB issued ASU 2014-15, which provides guidance on determining when and how to disclose going-concern uncertainties in the financial statements. The new standard requires management to perform interim and annual assessments of an entity's ability to continue as a going concern within one year of the date the financial

statements are issued.[2] An entity must provide certain disclosures if "conditions or events raise substantial doubt about the entity's ability to continue as a going concern." The ASU applies to all entities and is effective for annual periods ending after December 15, 2016, and interim periods thereafter, with early adoption permitted.

F-14

The Financial Accounting Standards Board issues Accounting Standard Updates ("ASUs") to amend the authoritative literature in Accounting Standards Codification ("ASC"). There have been a number of ASUs to date that amend the original text of ASC. The Company believes those issued to date either (i) provide supplemental guidance, (ii) are technical corrections, (iii) are not applicable to the Company or (iv) are not expected to have a significant impact on the Company.

RISKS AND UNCERTAINTIES

Although forward-looking statements in this Quarterly Report reflect our good faith judgment, such statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include without limitation those discussed under the heading "Risk Factors" below, as well as those discussed elsewhere in this Quarterly Report. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Quarterly Report. We undertake no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Quarterly Report. Readers are urged to carefully review and consider the various disclosures made in this Quarterly Report, which attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

**NOTE 2. GOING CONCERN**

VAPE's consolidated financial statements reflect a net loss of $1,230,147 during the year ended September 30, 2015. As of September 30, 2015, we had cash of $273,904 and working capital of $122,107. VAPE has suffered an accumulated deficit of $26,411,042 and subsequent to the Company's fiscal year ended September 30, 2015, the Company began taking steps to curtail its Offset, HIVE Glass and HIVE Supply business lines to focus more on consumer vaporization products including the launch of "Revival" discussed above. The Company also curtailed its 'THE HIVE' retail store in order to reduce overhead costs and focus on HIVE Ceramics. Moreover, the Company curtailed its exploration into providing real estate, management and consulting solutions to the legal cannabis industry in states where such cannabis cultivation and extraction is legal. The Company was never able to execute on any of these plans and ultimately determined that the Company's capital reserves for such projects as well as the risks inherent in each project due to the current regulatory environment surrounding the cannabis industry made this line of business too difficult to pursue. All of which have resulted in losses and opportunity costs. In addition, the ongoing need to obtain financing to fund operations also raise substantial doubt about the ability of Vape to continue as a going concern. Management expects to obtain funding for the new operations for the foreseeable future; however, there are no assurances that the Company will obtain such funding. VAPE's financial statements do not include any adjustments to reflect the possible effects on recoverability and classification of assets or the amounts and classification of liabilities that may result from the inability to continue as a going concern. See Note 11 for subsequent events regarding financing activities.

**NOTE 3. FIXED ASSETS**

The following is a summary of fixed assets as of September 30, 2015 and 2014:

|  | September 30, 2015 | September 30, 2014 |
|---|---|---|
| Molds and Tooling | $ 176,015 | $ 122,555 |
| Leasehold improvements | 29,795 | - |
| Accumulated depreciation | (87,483) | (16,178) |
|  | $ 118,327 | $ 106,377 |

During the year ended September 30, 2015 and 2014, depreciation expense included in cost of revenue were $71,305 and $16,178, respectively.

## NOTE 4. ACCRUED EXPENSES

The following is a summary of accrued expenses as of September 30, 2015 and 2014:

|  | September 30, 2015 | September 30, 2014 |
|---|---|---|
| Accrued interest | $ 46,337 | $ 16,300 |
| Accrued interest - related party | 24,538 | 18,325 |
| Accrued wages and taxes | 112,322 | 108,374 |
| Other | 25,468 | 26,514 |
|  | $ 208,665 | $ 169,513 |

As of September 30, 2015 and 2014, the Company recorded accrued wages and taxes for Kyle Tracey of $55,000 and $59,273, Joe Andreae of $14,667 and $0, Allan Viernes of $1,833 and $0, and Benjamin Beaulieu of $1,833 and $0, respectively.

## NOTE 5.  THIRD PARTY DEBT

### CONVERTIBLE NOTES PAYABLE

Beginning on February 11, 2014, the Company issued 6% Convertible Notes (the "6% Notes") pursuant to subscription agreements to ten (10) accredited investors (the "Holders") with the aggregate principal amount of $230,000. The 6% Notes are not secured by any collateral or any assets pledged to the Holders. The maturity dates are from February 28, 2015 to March 31, 2015, and the annual rate of interest is six percent (6%). Subject to certain limitations, the Holders can, at their sole discretion, convert the outstanding and unpaid principal and interest of their notes into fully paid and nonassessable shares of the Company's common stock. The conversion price of these 6% Notes is the average of the fifteen (15) lowest daily VWAP's occurring during the twenty (20) consecutive trading days immediately preceding the date each Holder elects convert all of their 6% Note minus a discount of 40%. In no event will the conversion price be less than $1.00 per share or greater than $3.00 per share. The Company had a preexisting relationship with each of the Holders, and no general solicitation or advertising was used in connection with the issuance of the 6% Notes. We recorded a discount totaling $92,000 related to the beneficial conversion feature embedded in the notes upon issuance and amortized $32,333 and $57,667 of the discount to interest expense during the year ended September 30, 2015 and 2014, respectively.

On March 12, 2015, the Company offered to pay accrued interest and modify the terms of the six (6) Holders' outstanding 6% Notes, decreasing the conversion floor from $1.00 to $0.50 in order to encourage the noteholders to convert their promissory notes. The Company recorded a loss on debt extinguishment of $23,443 as a result of the fair value in excess of the modified conversion floor. In March 2015, the Company paid all accrued interest on the 6% notes of $17,200. Five (5) of the six (6) holders converted in full a total of $80,000 of 6% Notes into 160,000 shares of common stock. The remaining note holder partially converted $20,000 of 6% Notes into 40,000 of common shares and extended the terms on the remaining $30,000 for six (6) months. As of September 30, 2015, there is $1,010 in accrued interest expense related to the one (1) remaining note and the Company recorded $1,010 in interest expense related to the 6% note during the year ended September 30, 2015. On December 14, 2015, the note holder converted $30,000 in principal and $1,351 of accrued interest into 13,063,013 shares of common stock. As a result of the subsequent conversion the principal balance and accrued interest as of September 30, 2015 were classified as long-term.

### Securities Purchase Agreement

On December 3, 2014, the Company entered into a securities purchase agreement (the "Securities Purchase Agreement") with an accredited investor (the "Investor") pursuant to which the Company agreed to sell, and the Investor agreed to purchase, an unsecured convertible promissory note (the "Note") in the principal amount of $560,000 less an original issue discount ("OID") of $50,000 and transaction expenses of $10,000 for a total purchase price of $500,000. The Company also paid a finder's fee in the amount of $25,000 in connection with this transaction, which was recorded as a discount to the note as it was paid from the proceeds. The closing under the Securities Purchase Agreement occurred on December 3, 2014. The Company received $475,000 net proceeds after transactions costs. We amortized $27,778 of the

discount to interest expense during the year ended September 30, 2015. In addition, the Company recorded $45,940 in deferred financing costs and amortized $25,522 to interest expense during the year ended September 30, 2015. As of September 30, 2015, the Company had unamortized costs of $20,418 in current deferred financing costs. The deferred financing costs are amortized through the maturity date.

F-16

The Note bears interest at the rate of 10% per annum and is convertible into common stock of the Company at a conversion price per share of 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions))(the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the Note, together with accrued interest thereon, is due in twelve monthly installments, commencing six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the average of the three (3) lowest Closing Sale Prices in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the Note is seventeen months from the date of issuance. We recorded a discount totaling $168,000 related to the beneficial conversion feature embedded in the note upon issuance. On August 26, 2015, the Company and Investor entered into an Amendment whereby the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the Securities Purchase Agreement. As a result, we expensed the unamortized discount of $168,000 to interest expense, recorded a loss on debt extinguishment of $158,916, and recorded a new discount of $242,916. We amortized $30,365 of the discount to interest expense during the year ended September 30, 2015. On December 10, 2015, the Company and the Investor entered into a forbearance agreement regarding the Investor's convertible note and added $105,000 to the principal. See Note 11 to the consolidated financial statements.

Between June 2015 and September 2015, the Company issued the following conversions for payment towards Investor:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| June 4, 2015 | $ | 46,667 | $ | 28,871 | $ | 75,538 | $ | 0.342 | 220,949 |
| July 3, 2015 | | 46,667 | | 4,295 | | 50,962 | $ | 0.194 | 263,141 |
| August 11, 2015 | | 25,000 | | - | | 25,000 | $ | 0.138 | 181,818 |
| September 3, 2015 | | 25,000 | | - | | 25,000 | $ | 0.056 | 445,196 |
| September 23, 2015 | | 25,000 | | - | | 25,000 | $ | 0.041 | 606,061 |
| September 29, 2015 | | 23,000 | | - | | 23,000 | $ | 0.015 | 1,548,822 |
| | $ | 191,334 | $ | 33,166 | $ | 224,500 | | | 3,265,987 |

Subsequent to year end, the Investor also enacted the following conversions:

| Conversion Date | Principal Converted | | Accrued Interest Converted | | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|---|
| October 8, 2015 | $ | 21,000 | $ | - | $ | 21,000 | $ | 0.012 | 1,818,182 |
| October 16, 2015 | | 18,900 | | - | | 18,900 | $ | 0.012 | 1,636,364 |
| October 22, 2015 | | 25,800 | | - | | 25,800 | $ | 0.011 | 2,333,786 |
| October 29, 2015 | | 22,460 | | - | | 22,460 | $ | 0.011 | 2,031,660 |
| November 11, 2015 | | 33,500 | | - | | 33,500 | $ | 0.007 | 4,649,549 |
| November 18, 2015 | | 24,000 | | - | | 24,000 | $ | 0.006 | 4,195,804 |
| November 30, 2015 | | 30,000 | | - | | 30,000 | $ | 0.005 | 5,741,627 |
| December 11, 2015 | | 22,000 | | - | | 22,000 | $ | 0.002 | 9,090,909 |
| December 28, 2015 | | 22,500 | | - | | 22,500 | $ | 0.002 | 9,297,521 |
| January 7, 2016 | | 20,000 | | - | | 20,000 | $ | 0.002 | 10,101,010 |
| | $ | 240,160 | $ | - | $ | 240,160 | | | 50,896,412 |

As a result, as of September 30, 2015, $46,671 and $87,221, net of total unamortized discounts of $81,835 and

$152,939 are classified as current and long-term on the accompanying consolidated balance sheet. As of September 30, 2015, there is $9,945 in accrued interest expense related to this note and the Company recorded $43,111 in interest expense related to this note during the year ended September 30, 2015.

F-17

$2M Securities Purchase Agreement

On February 10, 2015, the Company entered into a securities purchase agreement (the "February 2015 Securities Purchase Agreement") with an accredited investor pursuant to which the Company agreed to sell, and the investor agreed to purchase, an unsecured convertible promissory note (the "$2M Note") in the principal amount of $2,000,000 less an OID of $182,000 and transaction expenses of $10,000 for a total purchase price of $1,808,000. The closing under the February 2015 Securities Purchase Agreement occurred on February 10, 2015.

The $2M Note bears interest at the rate of 10% per annum and is immediately convertible into common stock of the Company at a conversion price per share of 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable Conversion (subject to adjustment in the event of stock splits, stock dividends, and similar transactions, and in the event of subsequent sales of common stock at a lower purchase price (subject to certain exceptions)) (the "Conversion Price"). In no event will the Conversion Price be less than $0.50 per share. Repayment of principal on the $2M Note, together with accrued interest thereon, is due in twelve bi-monthly installments, commencing approximately six months from issuance. The Company may make such payments in cash (in which event the Company will pay a 25% premium) or, subject to certain conditions, in shares of common stock valued at the lower of the Conversion Price or 70% of the lowest daily VWAP in the ten (10) Trading Days immediately preceding the applicable payment date (the "Amortization Conversion Rate"). The Maturity Date of the $2M Note is twelve months from the date of issuance.

During the year ended September 30, 2015, the Company received $800,000 toward the $2M Note with an original issue discount of $148,600 and transaction costs for net proceeds of $651,395, respectively. We amortized $45,600 of the discount to interest expense during the year ended September 30, 2015. In addition, we recorded a discount totaling $108,641 related to the beneficial conversion feature embedded in the note upon issuance.

On August 13, 2015, the Company entered into an Amendment, Waiver and Modification Agreement (the "Amendment") to its $2M Securities Purchase Agreement and related Transaction Documents with Redwood Management, LLC including any designees and or assignees thereto. Under the terms of the Amendment, the parties agreed to reduce the $2,000,000 outstanding balance of the $2M Note to $800,000 to reflect the total amount funded under the note, to terminate the offsetting investor note securing the additional unfunded balance and to waive any past claims of default or offsetting interest on the $2M Note or investor note. In addition, the conversion rate of the note was amended to 55% of the lowest price of the prior fifteen (15) trading days and conversion floor removed which amendment was triggered by the dilutive issuances of the August 2015 convertible note financing thereby entitling Investor to the lowest conversion rate granted during the year ended September 30, 2015 per the terms of the $2M Securities Purchase Agreement. As a result, we expensed the unamortized discount of $108,641 to interest expense, recorded a loss on debt extinguishment of $385,815, and recorded a new discount of $440,000. We amortized $94,131 of the discount to interest expense during the year ended September 30, 2015.

F-18

The following is summary of conversions by the $2M Note holder during the year ended September 30, 2015:

| Conversion Date | Principal Converted | | Accrued Interest Converted | Total Converted | | Conversion Rate | | Common Shares Issued |
|---|---|---|---|---|---|---|---|---|
| August 13, 2015 | $ | 50,000 | - | $ | 50,000 | $ | 0.127 | 393,701 |
| August 26, 2015 | | 25,000 | - | | 25,000 | $ | 0.056 | 446,428 |
| September 8, 2015 | | 25,000 | - | | 25,000 | $ | 0.056 | 446,428 |
| September 14, 2015 | | 25,000 | $ - | | 25,000 | $ | 0.053 | 469,925 |
| September 16, 2015 | | 10,000 | - | | 10,000 | $ | 0.053 | 188,679 |
| September 17, 2015 | | 25,000 | - | | 25,000 | $ | 0.053 | 469,925 |
| September 22, 2015 | | 10,000 | - | | 10,000 | $ | 0.043 | 232,558 |
| September 24, 2015 | | 10,000 | - | | 10,000 | $ | 0.026 | 390,625 |
| September 25, 2015 | | 10,000 | - | | 10,000 | $ | 0.019 | 518,135 |
| September 29, 2015 | | 13,410 | - | | 13,410 | $ | 0.015 | 900,000 |
| | $ | 203,410 | $ - | $ | 203,410 | | | 4,456,404 |

F-19

Subsequent to year end, the $2M Note holder also enacted the following conversions:

| Conversion Date | Principal Converted | Accrued Interest Converted | Total Converted | Conversion Rate | Common Shares Issued |
|---|---|---|---|---|---|
| October 1, 2015 | $ 10,000 | $ - | $ 10,000 | $ 0.0148 | 675,676 |
| October 5, 2015 | 10,000 | - | 10,000 | $ 0.0148 | 675,676 |
| October 6, 2015 | 13,262 | - | 13,262 | $ 0.0138 | 961,000 |
| October 7, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 9, 2015 | 11,728 | - | 11,728 | $ 0.0116 | 1,011,000 |
| October 9, 2015 | 10,000 | - | 10,000 | $ 0.0115 | 865,801 |
| October 12, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 13, 2015 | 11,601 | - | 11,601 | $ 0.0116 | 1,000,052 |
| October 15, 2015 | 14,680 | - | 14,680 | $ 0.0115 | 1,271,000 |
| October 19, 2015 | 17,400 | - | 17,400 | $ 0.0116 | 1,500,000 |
| October 19, 2015 | 15,000 | - | 15,000 | $ 0.0116 | 1,298,701 |
| October 20, 2015 | 16,650 | - | 16,650 | $ 0.0111 | 1,500,000 |
| October 21, 2015 | 17,500 | - | 17,500 | $ 0.0115 | 1,515,152 |
| October 23, 2015 | 20,000 | - | 20,000 | $ 0.0115 | 1,731,602 |
| October 26, 2015 | 24,420 | - | 24,420 | $ 0.0111 | 2,200,000 |
| October 29, 2015 | 26,640 | - | 26,640 | $ 0.0111 | 2,400,000 |
| November 2, 2015 | 29,970 | - | 29,970 | $ 0.0111 | 2,700,000 |
| November 2, 2015 | 20,000 | - | 20,000 | $ 0.0111 | 1,809,136 |
| November 5, 2015 | 32,190 | - | 32,190 | $ 0.0111 | 2,900,000 |
| November 10, 2015 | 28,800 | - | 28,800 | $ 0.0096 | 3,000,000 |
| November 12, 2015 | 23,930 | - | 23,930 | $ 0.0072 | 3,323,611 |
| November 17, 2015 | 16,500 | - | 16,500 | $ 0.0060 | 2,727,273 |
| November 19, 2015 | 1,640 | 11,225 | 12,865 | $ 0.0056 | 2,316,013 |
| November 23, 2015 | 23,111 | - | 23,111 | $ 0.0056 | 4,127,000 |
| November 27, 2015 | 24,750 | - | 24,750 | $ 0.0055 | 4,500,000 |
| December 2, 2015 | 18,450 | - | 18,450 | $ 0.0041 | 4,500,000 |
| December 8, 2015 | 18,000 | - | 18,000 | $ 0.0036 | 5,000,000 |
| December 11, 2015 | 13,368 | - | 13,368 | $ 0.0024 | 5,570,000 |
| December 16, 2015 | 14,181 | - | 14,181 | $ 0.0024 | 5,860,000 |
| December 22, 2015 | 15,488 | - | 15,488 | $ 0.0024 | 6,400,000 |
| December 29, 2015 | 17,666 | - | 17,666 | $ 0.0024 | 7,300,000 |
| | $ 541,604 | $ 11,225 | $ 552,830 | | 82,775,494 |

As a result, as of September 30, 2015, $25,445 and $246,785, net of total unamortized discounts of $29,541 and $294,819 are classified as current and long-term on the accompanying consolidated balance sheet. As of September 30, 2015, there is $26,861 and $11,225 in current and long-term accrued interest expense related to this note, respectively, and the Company recorded $38,086 in interest expense related to this note during the year ended September 30, 2015.

Convertible Note Financing

On August 5, 2015, the Company entered into a series of convertible note financings with several accredited investors totaling an aggregate of $541,000 in aggregate proceeds raised less certain fees and costs as set forth in the financing documents known as the "August 2015 Notes". The financing was disclosed on the Company's Current Report on Form 8-K filed on August 11, 2015 and is incorporated herein by reference. The Company recorded an original issue discount of $12,500 along with these notes and amortized $1,042 of the discount to interest expense during the year ended September 30, 2015. The Company also recorded a beneficial conversion feature of $253,617 towards the notes and amortized $48,683 of the discount to interest expense during the year ended September 30, 2015. As of September 30, 2015, there is $8,388 of accrued interest related to these notes and the Company recorded $8,388 in interest expense related to these notes during the year ended September 30, 2015.

F-20

On August 12, 2015, the Company entered into an additional convertible note financing transaction with an accredited investor in the principal amount of $105,000 less fees and costs. The closing under the financing occurred concurrently with the execution of the financing documents on August 12, 2015. The convertible note bears interest at the rate of 8% per annum and is convertible into common stock of the Company at any time after 180 days from issuance of the note at a conversion price per share equal to 58% of the average of the lowest trading price of the common stock in the thirteen (13) trading days immediately preceding the applicable conversion date. The Company has the option to prepay the convertible note in the first 180 days from closing subject to a prepayment penalty of 150% of principal plus interest. The maturity date of the convertible note is June 12, 2016 subject to the noteholder's right to extend maturity an additional nine (9) month period. The Company recorded an original issue discount of $5,000 along with these notes and amortized $1,000 of the discount to interest expense during the year ended September 30, 2015. The Company also recorded a beneficial conversion feature of $60,900 towards the notes and amortized $12,180 of the discount to interest expense during the year ended September 30, 2015. As of September 30, 2015, there is f $1,143 of accrued interest related to these notes and the Company recorded $1,143 in interest expense related to the notes during the year ended September 30, 2015.

The foregoing descriptions of the August 12, 2015 note financing and related documentation do not purport to be complete and are qualified in their entirety by reference to the full text of the documents, which are filed as exhibits to this Quarterly Report on Form 10-K and are incorporated herein by reference.

As of September 30, 2015, future minimum principal payments for the years ending September 30, 2016 and 2017 are $1,487,256 and $154,000, respectively. As of September 30, 2015, expected amortization of debt discounts for the years ending September 30, 2016 and 2017 are $333,013 and $543,916, respectively. As of September 30, 2015, expected amortization of deferred financing costs for the years ending September 30, 2016 and 2017 are $107,909 and $12,067, respectively. The Company has the ability to increase the authorized common stock of the Company in the event that the convertible notes require more shares than available.

## NOTE 6.   RELATED PARTY DEBT

### RELATED PARTY NOTES PAYABLE, LONG-TERM

The Company had outstanding accounts payable balance to a related party (shareholder of the Company) in the amount of $15,000 as of September 30, 2013. This payable was converted into a note payable on December 7, 2013. The note payable bears interest of 6% per annum with a maturity date of December 1, 2016. As of September 30, 2015, there is $1,645 in accrued interest expense related to this note and the Company recorded $913 in interest expense related to this note during the year ended September 30, 2015.

On December 7, 2013, the Company issued a note payable to a shareholder of the Company in the amount of $23,462 for monies previously borrowed from shareholder. The note is unsecured and bears interest of 6% per annum and matures on December 1, 2016. On January 22, 2015, the Company settled and paid the note and accrued interest of $1,504 for $20,000 and recorded a gain on extinguishment of the note of $3,462.

On February 28, 2014, the Company issued a note payable to HIVE (the "HIVE Note") for the principal amount of $250,000 in connection with the Hive asset acquisition. Per the terms of the HIVE Note, the maturity date is February 27, 2016 and the annual rate of interest is six percent (6%). No prepayment penalty exists. The HIVE Note is unsecured. As of September 30, 2015, there is $22,893 in accrued interest expense related to this note and the Company recorded $15,208 in interest expense related to this note during the year ended September 30, 2015, respectively. On December 10, 2015, the HIVE Note was converted into a Series B Convertible Preferred Note payable and the maturity date was extended to December 10, 2016. See Note 11 to the consolidated financial statements.

On May 12, 2014, the Company issued a note payable to its President, Joseph Andreae in the amount of $40,000 for monies previously borrowed during the three and six months ended March 31, 2014 (the "Andreae Note"). The note was unsecured and bears interest of 6% per annum and matures on May 1, 2016. On December 4, 2014, the Company repaid the principal balance of $40,000 and accrued interest of $1,348 in full satisfaction on the Andreae Note.

On August 11, 2014, the Company issued a 6% note payable to its President, Joseph Andreae, for monies borrowed from Mr. Andreae to cover outstanding accounts payable in the amount of $12,828 (the "Andreae Note II"). Per the terms of the Andreae Note, the original principal balance  was $12,828, and was not secured by any collateral or any assets pledged to the holder. The maturity date is November 30, 2014, and the annual rate of interest is six percent (6%). The monies were funded during the three and nine months ended June 30, 2014. On December 4, 2014, the Company repaid principal balance of $12,828 and accrued interest of $240 in full satisfaction of the Andreae Note II.

## RELATED PARTY CONVERTIBLE NOTES PAYABLE

On February 18, 2014, the Company issued 8% Convertible Notes to two third parties to cover outstanding accounts payable in the amount of $20,000.  Per the terms of the notes, the aggregate principal balance is $20,000, and was not secured by any collateral or any assets pledged to the holders. The maturity date is February 18, 2016, and the annual rate of interest is eight percent (8%).  Subject to certain limitations, the holders can, at their sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the notes was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $8,000 related to the beneficial conversion feature embedded in the notes upon issuance.  We amortized $1,000 and $1,667 of the discount to interest expense during the three and nine months ended June 30, 2014, respectively. On October 28, 2014, the Company received a Notice of Conversion on two (2) 8% Convertible Notes issued to third parties on February 18, 2014 to cover expenses of the Company. The noteholders converted aggregate principal of $20,000 and aggregate outstanding accrued and unpaid interest of $1,100 into an aggregate of 42,370 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of their convertible notes payable. The conversion of these notes was in full satisfaction of the notes payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,333 to interest expense.

On February 18, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $10,612 (the "Tracey Note"). Per the terms of the Tracey Note, the original principal balance is $10,612, and was not secured by any collateral or any assets pledged to the holder. The maturity date was February 18, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,245 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $1,415 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion the Tracey Note. Mr. Tracey converted principal of $10,612 and outstanding accrued and unpaid interest of $584 into 22,481 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $2,830 to interest expense.

On March 17, 2014, the Company issued an 8% Convertible Note to Jerome Kaiser, former CEO, CFO and Director of the Company for services rendered to the Company in the amount of $50,000 (the "Kaiser Note") which was charged to expense during the three months March 31, 2014. Per the terms of the Kaiser Note, the principal balance is $50,000, and is not secured by any collateral or any assets pledged to the holders. The maturity date is March 17, 2015, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at his sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Kaiser Note is the market closing price of the market day immediately preceding the date of conversion minus twenty percent (20%). We recorded a discount totaling $10,000 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $4,167 of the discount to interest expense during the year ended September 30, 2015. In March 2015, the Company paid the outstanding principal and accrued interest in satisfaction on the note of $50,000 and $4,000, respectively.

F-22

On May 12, 2014, in connection with the 6% Notes, the Company issued a note for $40,000 to Kyle Tracey, which was recorded as a related party convertible note payable. We recorded a discount totaling $16,000 related to the beneficial conversion feature embedded in the 6% note to Mr. Tracey upon issuance. We amortized $6,667 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the 6% Convertible Note issued on May 13, 2014 to Mr. Tracey (the "Tracey PPM Note") as part of a private placement transaction in exchange for capital of $40,000. Mr. Tracey converted principal of $40,000 and outstanding accrued and unpaid interest of $1,098 into 41,098 shares of restricted common stock of the Company at a per share conversion price of $1.00 in accordance with the terms of the convertible note. The conversion of the Tracey PPM Note was in full satisfaction of the note. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $13,333 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to Kyle Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $11,042 (the "Tracey Note II"). Per the terms of the Tracey Note II, the original principal balance is $11,042, and was not secured by any collateral or any assets pledged to the holder. The maturity date was May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,417 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $920 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note II. Tracey converted principal of $11,042 and outstanding accrued and unpaid interest of $407 into 22,989 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Tracey Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,497 to interest expense.

On May 12, 2014, the Company issued an 8% Convertible Note to its Director of Business Development, Michael Cook, for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $11,825 (the "Cook Note"). Per the terms of the Cook Note, the original principal balance was $11,825, and was not secured by any collateral or any assets pledged to the holder. The maturity date is May 12, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $4,730 related to the beneficial conversion feature embedded in the notes upon issuance. We amortized $985 of the discount to interest expense during the year ended September 30, 2014. On October 28, 2014, the Company received a Notice of Conversion on the "Cook Note. Mr. Cook converted principal of $11,825 and outstanding accrued and unpaid interest of $435 into 24,619 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $3,745 to interest expense.

On August 11, 2014, the Company issued a second 8% Convertible Note to Mr. Cook for monies borrowed from Mr. Cook to cover outstanding accounts payable in the amount of $15,115 (the "Cook Note II"). Per the terms of the Cook Note II, the original principal balance was $15,115, and is was secured by any collateral or any assets pledged to the holder. The maturity date is August 11 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Cook Note II was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $6,046 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Cook Note II. Mr. Cook converted principal of $15,115 and outstanding accrued and unpaid interest of $255 into 30,864 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The conversion of the Cook Note II was in full satisfaction of the note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $5,542 to interest expense.

F-23

On August 11, 2014, the Company issued an 8% Convertible Note to Mr. Tracey for monies borrowed from Mr. Tracey to cover outstanding accounts payable in the amount of $216,001 (the "Tracey Note III"). Per the terms of the Tracey Note III, the original principal balance was $216,001, and is not secured by any collateral or any assets pledged to the holder. The maturity date was August 11, 2016, and the annual rate of interest is eight percent (8%). Subject to certain limitations, the holder can, at its sole discretion, convert the outstanding and unpaid principal and interest into fully paid and nonassessable shares of the Company's common stock. The conversion price for the Tracey Note III was the lowest market closing price per share within the previous twenty (20) market days of the date of conversion minus a discount of forty percent (40%). We recorded a discount totaling $86,401 related to the beneficial conversion feature embedded in the notes upon issuance. On October 28, 2014, the Company received a Notice of Conversion on the Tracey Note III. Mr. Tracey converted principal of $216,001 and outstanding accrued and unpaid interest of $3,645 into 441,057 shares of restricted common stock of the Company at a per share conversion price of $0.498 in accordance with the terms of the convertible note payable. The shares of common stock under the conversion were issued by the Company on November 7, 2014. Upon conversion, we expensed the unamortized discount of $79,200 to interest expense.

## NOTE 7.  COMMITMENTS AND CONTINGENCIES

### Office Lease

As of September 30, 2015, the Company leases a 5,000 square foot office in Chatsworth, California for $4,947 per month which expires in November 2015.

### Warrant Liability

The Company recorded the estimated settlement liability as of March 31, 2014 for the Warrant Shares issued and the Warrants that remain outstanding and unexercised that would be entitled to the same settlement based on the number of shares expected to be issued and the market price of the Company's common stock on the dates of the actual settlements from $4.72 per share to $7.25 per share, and market price of the first settlement of $7.25 for the unsettled claims. We believe the issuance of convertible notes in the three months ended March 31, 2014 triggered the full ratchet anti-dilution adjustment; before the provision was triggered, the fair value of the warrant liability was not significant as the exercise was so far out of the money. As a result of the above settlements with warrant holders, the Company recorded a loss on settlement of warrants of $29,528,844 during the six months ended March 31, 2014 and a long-term warrant liability of $29,430,022 as of March 31, 2014 based on 4,407,200 shares of common stock under the settlement at the Company's closing stock prices discussed above. As of September 30, 2015, the estimated settlement liability is $25,025 based on the fair market value of 1,184,727 remaining warrants and using the Black-Scholes model and therefore the Company recorded a gain on the change in warrant liability of $2,439,207 during the year ended September 30, 2015.

### Settlement of Company Legal Claims

On December 15, 2014, the Company recorded a gain on settlement of $257,930 for a confidential settlement by and between the Company and certain shareholders and related parties as settlement for certain potential legal claims held by the Company. As a result of the settlement, the Company received net proceeds of $62,930 and vendor credits of $200,000 during the year ended September 30, 2015. A total of $325,000 in vendor credits has been received in connection with the settlement and no further credits will be given. In January 2015, the Company received 440,625 shares from the settlement that was assigned to officers of the Company. The officers decided it was in the best interest of the Company to return these shares to the Company to be used for future strategic issuances. Accordingly, the 440,625 shares valued at $367,531 were recorded as treasury stock as of September 30, 2015, and the Company recorded a gain on settlement of $625,461 during the year ended September 30, 2015.

### Chief Science Officer

On May 1, 2015, the Company appointed Dr. Mark A. Scialdone to the newly-created executive officer position of Chief Science Officer.

Dr. Scialdone's Executive Employment Agreement was for a period of two (2) years. Dr. Scialdone shall receive an

annual salary of $102,000, he shall be eligible for any benefits made generally available by the Company, he shall be eligible to receive any bonuses made generally available by the Company, and he shall be reimbursed for any reasonable expenses incurred while performing his duties as the Company's Chief Science Officer. Additionally, Dr. Scialdone is entitled to receive severance equal to six (6) months base salary if terminated without cause by the Company.

F-24

The Chief Science Officer was also receive bonus compensation associated with revenue generated from consulting services revenues generated over the term of this Agreement such bonus compensation to be calculated in accordance with the schedule below.

On January 12, 2016, the Company unwound the transaction and curtailed the subsidiary's operations in order to reduce overhead costs and focus on HIVE Ceramics and reflected such as of September 30, 2015 in the consolidated financial statements. As of September 30, 2015, the 250,000 shares issued to BetterChem were recorded as treasury stock valued at $67,500 as a result of the settlement to receive the shares back as part of the unwind.

<u>Officer & Director Appointments and Related Matters</u>

Pursuant to Board consent on May 11, 2015, the Company made several changes to its management structure.

The Company confirmed the appointment of Dr. Mark Scialdone to the newly-created officer position of Chief Science Officer which was announced by Current Report on Form 8-K dated May 5, 2015 which is incorporated by reference herein. See above in this section for more information about Dr. Scialdone.

## NOTE 8. INCOME TAXES

The following table presents the current and deferred income tax provision for federal and state income taxes for the year ended September 30, 2015 and 2014:

| | 2015 | 2014 |
|---|---|---|
| Current tax provision (benefit): | | |
| Federal | $ - | $ - |
| State | 2,209 | 800 |
| Total | 2,209 | 800 |
| Deferred tax provision (benefit) | | |
| Federal | (418,000) | (262,000) |
| State | - | - |
| Valuation allowance | 418,000 | 262,000 |
| Total | - | - |
| Total provision (benefit) for income taxes | $ 2,209 | $ 800 |

Reconciliations of the U.S. federal statutory rate to the actual tax rate for the year ended September 30, 2015 and 2014:

| | 2015 | 2014 |
|---|---|---|
| US federal statutory income tax rate | (34.0%) | (34.0%) |
| State tax – net of benefit | (6.0%) | (6.0%) |
| | (40.0%) | (40.0%) |
| Permanent differences: | -% | 38.7% |
| Stock-based compensation | 2.8% | 0.2% |
| Changes in warrant liability | -% | 1.0% |
| Increase in valuation allowance | 37.2% | 0.1% |
| Effective tax rate | -% | -% |

The Company incurred certain non-cash transactions which are not includable or deductible for income tax reporting purposes, such the change in fair value of warrant liability, certain stock-based compensation and accretion of debt discounts.

The components of the Company's deferred tax assets and (liabilities) for federal and state income taxes as of September 30, 2015 and 2014:

|  | As of September, | |
|  | 2015 | 2014 |
| --- | --- | --- |
| Current deferred tax assets (liabilities): | | |
|    Accrued expenses and other | $     - | $     - |
| Total current deferred tax assets | - | - |
| Non-current deferred tax assets and liabilities: | | |
|    Property, plant and equipment | 29,000 | 29,000 |
|    Net operating losses | 680,000 | 262,000 |
|    Total non-current deferred tax assets | 709,000 | 291,000 |
|    Valuation allowance | (709,000) | (291,000) |
| Total non-current deferred tax assets | - | - |
| Net deferred tax assets | $     - | $     - |

During the year ended September 30, 2015 and 2014 the valuation allowance increased by $418,000 and $233,000, respectively. At September 30, 2015, the Company had approximately $680,000 of federal and state gross net operating losses allocated to continuing operations available. The net operating loss carry forwards, if not utilized, will begin to expire in 2033 for federal purposes and 2031 for state purposes.

Based on the available objective evidence, including the Company's limited operating history and current liabilities in excess of assets, management believes it is more likely than not that some of the net deferred tax assets, specifically certain net operating losses, at September 30, 2014 will not be fully realizable. In addition, subsequent to year end significant shares were issued to shareholders in connection with the conversion of notes payable and a subscription for the purchase of common stock. In connection, with these issuances the Company determined that the historical NOLs have probably been impaired due to IRS Section 382 limitations. Due to the uncertainty surrounding realization of the remaining deferred tax assets, specifically the NOLs, the Company has provided a valuation allowance of $709,000 and $291,000 against its net deferred tax assets at September 30, 2015 and 2014, respectively. We will continue to monitor the recoverability of our net deferred tax assets.

As of September 30, 2015 and 2014, the Company has a State tax liability of $0 and $0, respectively. As of September 30, 2015 and 2014, the Company recorded no estimated taxes payable for Federal and State.

The Company has filed all United States Federal and State tax returns. The Company has identified the United States Federal tax returns as its "major" tax jurisdiction. The United States Federal return years 2014 through 2015 are still subject to tax examination by the United States Internal Revenue Service; however, we do not currently have any ongoing tax examinations. The Company is subject to examination by the California Franchise Tax Board for the year ended 2014 through 2015 and currently does not have any ongoing tax examinations.

## NOTE 9. STOCKHOLDERS' DEFICIT

### COMMON STOCK

On November 27, 2013, the Board and shareholders approved an increase in the authorized number of shares of common and preferred stock which may be issued by the Company to 1,000,000,000 shares and 100,000,000 shares, respectively. On December 3, 2013, the certificate of amendment was filed with the Secretary of State of Delaware to reflect the increase in authorized.

F-26

## PREFERRED STOCK

On April 1, 2014, the Board formally approved the filing of a Preferred Stock Designation in connection with the commitment of 500,000 Series A Shares to HIVE on March 27, 2014 pursuant to its authority to issue blank check preferred stock as provided in the Company's Certificate of Incorporation. Per the Certificate of Designation (the "Designation"), there are 100,000,000 shares of preferred stock authorized by the Company's Certificate of Incorporation. The Company is authorized to issue 500,000 shares of Series A Shares pursuant to the Designation. As provided in the Designation (and as set forth in the HIVE Asset Purchase Agreement), Series A Shares are entitled to vote at a 15-1 ratio to Common Stock. Each share of preferred stock shall initially be convertible into one share of common stock (500,000 shares of common stock in the aggregate). On the two year anniversary of the transaction of HIVE, the preferred stock conversion ratio shall be adjusted as follows: a one-time pro rata adjustment of up to ten-for-one (10-1) based upon the Company generating aggregate gross revenues over the two years of at least $8,000,000 (e.g. If the Company generates only $4,000,000 in aggregate gross revenues over the two year period then the convertible ratio will adjust to 5-1). In no event will the issuance convert into more than 5,000,000 shares of common stock of the Company.

On June 19, 2014, the Company formally issued the 500,000 Series A Shares to HIVE.

The value ascribed to the Series A Shares was based on the historical costs of the assets acquired on March 27, 2014 from HIVE since the transfer of assets was made among entities under common control.

## COMMON STOCK ISSUED FOR BONUSES

On October 20, 2014, the Company's Board of Directors issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Benjamin Beaulieu. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $24,900, $24,900, and $24,900 being charged to general and administrative expense during the year ended September 30, 2015.

On March 12, 2015, the Company's Board of Directors issued bonus stock grants of 30,000 shares of restricted common stock each to Kyle Tracey, Joseph Andreae, and Allan Viernes. In addition, a total of 60,000 shares were granted to three (3) employees. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $9,150, $9,150, and $195,200 being charged to cost of revenue, sales and marketing, and general and administrative expense during the year ended September 30, 2015.

## COMMON STOCK ISSUED FOR SERVICES

On March 12, 2015, the Company's Board of Directors issued a bonus stock grant of 60,277 shares of restricted common stock to an outside sales consultant for services performed. This issuance based on the fair market value on the date of issuance immediately vested resulting in $36,769 being charged to sales and marketing expense during the year ended September 30, 2015.

## COMMON STOCK ISSUED FOR ACCRUED WAGES

On March 12, 2015, Kyle Tracey converted $59,718 of accrued wages into 97,898 shares of immediately vested restricted common stock based on the fair market value on the date of issuance.

On March 12, 2015, Michael Cook converted $36,769 of accrued wages into 60,277 shares of immediately vested restricted common stock based on the fair market value on the date of issuance.

## COMMON STOCK ISSUED AS DIRECTOR COMPENSATION

On March 12, 2015, the Company's Board of Directors issued 100,000 shares of restricted common stock each were granted to Kyle Tracey and Joseph Andreae for serving on the Board of Directors.

## COMMON STOCK ISSUED FOR ACCOUNTS PAYABLE

On June 1, 2015, the Board issued 100,000 shares of restricted common stock at $1.00 per share for payment of accrued legal services. This $100,000 issuance was based on the fair market value of $50,000 and additional consideration of $50,000 given on the date of issuance.

F-27

## COMMON STOCK ISSUED FOR ACQUISITION OF BETTERCHEM

See Note 1 for common stock issued for the acquisition of BetterChem.

## WARRANTS

The table below summarizes the Company's warrant activity during the year ended September 30, 2015:

|  | Shares | | Weighted Average Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Warrants outstanding at September 30, 2014 | 1,184,726 | $ | 0.114 | 1.6 | $ | 7,217,234 |
| Warrants issued | - | | - | | | |
| Warrants exercised | - | | - | | | |
| Cancelled/forfeited/expired | - | | - | | | |
| Warrants outstanding at September 30, 2015 | 1,184,726 | $ | 0.021 | 0.6 | $ | 694,008 |

As a result of the anti-dilution provision of the warrants, the exercise price as of September 30, 2015 was reduced to $0.021 per share using the following weighted average variables in the Black Scholes model during the year ended September 30, 2015:

| Year Ended September 30, | Stock Price at Grant Date | | Dividend Yield | Exercise Price | | Risk Free Interest Rate | Volatility | Average Life |
|---|---|---|---|---|---|---|---|---|
| 2015 | $ | 0.04 | -% | $ | 0.023 | 0.08% | 351% | 0.7 |

The Company's warrants above are accounted for as derivative liabilities in the accompanying consolidated balance sheets.

## OPTIONS

On June 27, 2014, the Company authorized the "2014 Incentive and Nonstatutory Stock Option Plan" (the "Plan") whereby a maximum of 2,000,000 shares of the Company's common stock could be granted in the form of incentive and nonstatutory stock options. If any shares of common stock subject to an award under the Plan are forfeited, expire, are settled for cash or are tendered by the participant or withheld by us to satisfy any tax withholding obligation, then, in each case, the shares subject to the award may be used again for awards under the Plan to the extent of the forfeiture, expiration, cash settlement or withholding. The stock option awards issuable under the Plan can be made up of any combination of incentive and nonstatutory stock options. The stock options will be granted at fair market value on the date of grant and will vest as directed by the Board. Incentive stock options are available to employees only whereas nonstatutory stock options are available to independent contractors and consultants of the Company.

On June 27, 2014, concurrent with the formal adoption of the Plan, the Company's Board granted a total of 1,000,000 stock options to certain employees, consultants and/or independent contractors of the Company (the "Option Grant"). The Option Grant includes options to purchase 520,000 shares granted to employees, consultants and/or independent contractors of the Company that are not executive officers. In addition, the Board determined that executive officer Michael Cook, Director of Business Development, should receive options to purchase 100,000 shares and that Kyle Tracey, Chief Executive Officer and Chairman, and Joseph Andreae, President and member of the Board, should receive options to purchase 190,000 shares each. The options were granted at the market price of the Company's common stock at close of business ($1.66 per share) on June 27, 2014, pursuant to the Company's standard form stock option agreements under the Plan. The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 1,000,000 options on the grant date was $1,660,000 and the amount expensed upon the grant date was $415,000 as result of 250,000 options immediately vested. On September 30, 2014 an additional $22,312 was expensed due to the

revaluing 212,500 non-employee options.

The description of the incentive and nonstatutory stock options herein is qualified in its entirety by reference to the full text of the Form of Incentive Stock Option Agreement and Nonstatutory Stock Option Agreement, which are attached as Exhibits 10.2 and 10.3, respectively, to the Current Report on Form 8-K filed with the SEC on July 3, 2014.

F-28

*Additional Option Grants Under 2014 Stock Option Plan*

On October 20, 2014, the Board granted a total of 20,000 stock options to certain employees and canceled 20,000 options previously allocated (but not issued) to employees. The options were granted at the market price of the Company's common stock at close of business ($0.83 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 20,000 options on the grant date was $16,600 and the amount expensed upon the grant date was $4,150 as result of 5,000 options immediately vested.

On December 22, 2014, the Company's Board granted a total of 775,000 stock options to certain employees. The option grant includes options to purchase 225,000 shares granted to employees that are not executive officers. In addition, the Board determined that executive officer Michael Cook, Director of Business Development, should receive options to purchase 25,000 shares and that Kyle Tracey, Chief Executive Officer and Chairman, and Joseph Andreae, President and member of the Board, and Allan Viernes, Chief Financial Officer should receive options to purchase 175,000 shares each. The options were granted at the market price of the Company's common stock at close of business ($0.70 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 775,000 options on the grant date was $542,500 and the amount expensed upon the grant date was $135,625 as result of 193,750 options immediately vested.

*Consulting Agreements*

On October 20, 2014, the Company entered into consulting agreements with two consultants to provide business development and acquisition services to the Company. The consultants were each issued 100,000 options to purchase common stock of the Company by the Board as consideration for consulting services. The options were granted at the market price of the Company's common stock at close of business ($0.83 per share). The options vest 25% at grant and 25% each subsequent six (6) months from the date of grant. The aggregate value of the 200,000 options on the grant date was $166,000 and the amount expensed upon the grant date was $41,500 as result of 50,000 options immediately vested. On December 31, 2014 an additional $3,000 was expensed due to the revaluing the 200,000 non-employee options.

*Cancellation of Option Plans*

Collectively, officers, employees, and consultants of the Company decided to surrender and cancel all options outstanding.

Option activity during the year ended September 30, 2015, was as follows:

|  | Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Options outstanding at September 30, 2014 | 1,150,000 | $ | 2.92 | 8.7 | $ | 4,648,294 |
| Options granted | 995,000 | $ | 0.73 | 10.0 | | |
| Options exercised | - | $ | - | - | | |
| Options cancelled/forfeited/expired | (2,145,000) | $ | 1.91 | 9.0 | | |
| Options outstanding at September 30, 2015 | - | $ | - | - | $ | - |
| Options exercisable at September 30, 2015 | - | $ | - | - | $ | - |

The aggregate intrinsic value in the table above represents the total pre-tax intrinsic value (the aggregate difference between the closing stock prices of VAPE's common stock at the specified dates and the exercise prices for in-the-money options) that would have been received by the option holders if all in-the-money options had been exercised on the specified dates.

The fair value of each option award is estimated on the date of grant using the Black-Scholes valuation model,

consistent with the provisions of ASC 718. Because option-pricing models require the use of subjective assumptions, changes in these assumptions can materially affect the fair value of the options. VAPE has limited relevant historical information to support the expected exercise behavior because no exercises have taken place.

During the year ended September 30, 2015 and 2014, $1,006,343 and $681,375 were recorded as stock-based compensation related to options, respectively. As of September 30, 2015, there is no future stock compensation expense related to options.

F-29

**NOTE 10. INTELLECTUAL PROPERTY**

The Company plans to rely on a combination of trademark, copyright, trade secret and patent laws in the United States as well as confidentiality procedures and contractual provisions to protect future proprietary technology and its brands, as they are developed. The Company has begun to execute on this plan with the acquisition of the patent pending HIVE Ceramic vaporization product and the HIVE trademark as well as several pending trademark applications. The Company intends to continue to create or acquire proprietary vaporizers and e-cigarettes, and various trademarks, patents and/or copyrights for brands which are developed.

<u>TRADEMARKS</u>

On March 27, 2014, the Company and Stone Arch Studio, LLC entered into a Trademark Assignment Agreement whereby the Company acquired all right, title, priority and interest to the HIVE trademark U.S. Registration No. 44513069 as registered with the U.S. Patent and Trade Office ("USPTO"). This acquisition further protects the Company's HIVE Ceramics brand vaporization line. As of September 30, 2015, the Company has capitalized $123,150 in costs paid related to the trademarks.

<u>PATENTS</u>

On March 27, 2014, the Company formally closed its acquisition of the patent pending HIVE Ceramics vaporization technology. The Company has already begun exploiting this technology and intends to prosecute the patent application to completion. As of September 30, 2015, the Company has capitalized had no costs of patents capitalized and recorded impairment to pending patents of $22,133 based on its expected cash flow not exceeding its carrying amount.

The Company also has been in discussions to acquire additional patented technology from third parties to further grow and develop its branded product lines in the vaporization market.

**NOTE 11. SUBSEQUENT EVENTS**

**Common Stock Issued for Accrued Wages**

On October 22, 2015, the Company's Board of Directors issued 2,083,333 shares of restricted common stock each to Kyle Tracey at $0.024 per share for payment of $50,000 in accrued wages. On October 22, 2015, the Company's Board of Directors issued 555,555 shares of restricted common stock each to Kyle Tracey at $0.024 per share for payment of $13,333 in accrued wages. On October 22, 2015, the Company's Board of Directors issued 1,250,000 shares of restricted common stock each to Michael Cook at $0.024 per share for payment of $3,000 in accrued wages.

**Common Stock Issued for Bonuses**

On October 22, 2015, the Company's Board of Directors issued bonus stock grants of 600,000 shares of restricted common stock each to Allan Viernes and Benjamin Beaulieu at $0.024 per share. In addition, the Company issued 300,000 shares of restricted common stock to employees at $0.024 per share. These issuances were based on the fair market value on the date of issuance immediately vested and resulted in $36,000 being charged to general and administrative expense during the three months ended December 31, 2015.

On October 22, 2015, the Company's Board of Directors issued bonus stock grants of 1,250,000 shares of restricted common stock an outside sales consultant at $0.024 per share. The issuance was based on the fair market value on the date of issuance immediately vested and resulted in $30,000 being charged to sales and marketing expense during the three months ended December 31, 2015.

**Common Stock Surrenders**

On October 22, 2015, the Kyle Tracey and Joe Andreae each surrendered 130,000 shares of restricted common stock, with 60,000 shares valued at $49,800 and 200,000 shares valued at $122,000. As result, 260,000 shares of common

stock were recorded as treasury stock valued at $171,800. In addition, on October 22, 2015, an employee also surrendered 30,000 shares valued at $9,150 which was recorded as treasury stock.

On December 21, 2015, the Allan Viernes and Benjamin Beaulieu each surrendered 30,000 shares of restricted common stock valued at $36,600. As result, 60,000 shares of common stock were recorded as treasury stock valued at $36,600.

## Appointment of Justin Braune as Chief Executive Officer

On December 10, 2015, the Board appointed Justin Braune to serve as the Company's Chief Executive Officer and as a director, effective immediately.

Prior to joining the Company, Mr. Braune, 33, served as the chief operating officer of Voodoo Science, LLC and Vapor Wild from 2014 to 2015. From 2013 to 2014, Mr. Braune served as the Chief of Operations for Veracity Security, a technology company located in San Diego. From 2013-2014 Mr. Braune was the Director of Sales at Lear Capital. Since 2010 he owned and operated Braune Enterprises a real estate and investment brokerage firm. Mr. Braune graduated from the United States Naval Academy with a B.S. degree in electrical engineering in and was commissioned as an officer in the U.S. Navy. After earning his master's degree in nuclear engineering, Mr. Braune operated the nuclear reactors onboard the USS RONALD REAGAN aircraft carrier. He served in the U.S. Navy until 2009 and subsequently earned his MBA at the University of Southern California, Marshall School of Business. Our Board believes that Mr. Braune's extensive relationships and experience in the industry of vaporization products and e-cigarettes will bring added value to the Company's management team.

F-30

In connection with his appointment as Chief Executive Officer and a member of our Board, Mr. Braune entered into an employment agreement dated as of December 10, 2015 (the "Employment Agreement") with the Company pursuant to which he will receive an annual salary of $150,000, subject to adjustment, and bi-monthly sales-based compensation of $1.00 USD per unit of wholesale sales of Mr. Braune's new vaporizer pen product line and $3.00 USD per unit on retail sales. The sales-based compensation and salary is payable in cash or stock as further described in the Employment Agreement.

In addition, the Company will issue to Mr. Braune 20,000,000 shares of the Company's common stock, to be held in escrow and released by the Company to Mr. Braune in accordance with the following vesting schedule: (i) 5,000,000 shares shall vest on June 10, 2015, (ii) 5,000,000 shares shall vest on December 10, 2016, (iii) 5,000,000 shares shall vest on June 10, 2016, and (iv) 5,000,000 shares shall vest on December 10, 2016. Mr. Braune also is eligible to participate in any stock option plan maintained by the Company and available to other employees and standard benefit programs for similarly situated employees. The Employment Agreement continues until terminated by either party upon 30 days' prior written notice.

**Resignations of Kyle Tracey and Joe Andreae; Appointment of Benjamin Beaulieu as Chairman**

On December 10, 2015, the Board accepted the resignation of Kyle Tracey as Chief Executive Officer, Chairman of the Board and all other officer positions held by him with the Company. Mr. Tracey will remain in a consultant role with the Company focusing on sales and business development of HIVE Ceramics for a period of two (2) years. Mr. Tracey also retains a large block of voting control of the Company due to the above issuance of the Series B Notes issued to HIVE Ceramics, LLC an entity he co-owns. The Board also accepted the resignation of Joe Andreae as President and a director as of December 10, 2015. The President seat will remain vacant until a qualified candidate is located.

Benjamin Beaulieu was elevated from his position as a member of the Board to Chairman of the Board on December 10, 2015 to replace Mr. Tracey. Mr. Beaulieu also currently serves as the Company's COO and will remain in that role.

**Series B Preferred Stock Convertible Notes**

On December 10, 2015, the Company entered into two Secured Series B Preferred Stock Convertible Notes (the "Series B Notes") for an aggregate principal of $300,000 including 1) $50,000 from Hive Ceramics, LLC in new capital to the Company and 2) an amended and restated note for Hive Ceramics LLC in the amount of $250,000 for capital previously contributed which is soon to be due and payable.

The Series B Notes accrue interest at eight percent (8%) per annum, mature one (1) year from issuance and are secured by all of the assets and property of the Company. Upon the election of the noteholder, the Series B Notes are convertible into newly created Series B Preferred Stock on a one-for-one (1:1) basis into shares of common stock of the Company at a fixed price per share of $0.01.

Concurrently, the Company filed a Certificate of Designation with the Delaware Secretary of State on the Series B Preferred Stock which provides, in pertinent part, for the following rights and privileges:

Authorized Amount of Series B Preferred Stock: There are authorized 30,000,000 shares of Series B Preferred Stock, subject to the Certificate of Designation. There shall be no additional Series B Shares authorized or issued.

Voting Rights: Each share of Series B shall be entitled to five (5) votes for every one (1) vote entitled to each share of Common Stock.

Rank: All shares of Series B shall rank (i) senior to the Company's Common Stock, (ii) *pari passu* with all other series of preferred stock whether currently outstanding or hereafter created, including the Series A Preferred Stock, and specifically ranking, by its terms, on par with Series B, and (iii) junior to any class or series of capital stock of the Company hereafter created specifically ranking, by its terms, senior to the Series B, in each case as to the distribution of assets upon liquidation, dissolution or winding up of the Company, whether voluntary or involuntary.

The Board of Directors authorized the designation of the Series B Preferred Stock pursuant to the authority of the Certificate of Incorporation, which confers said authority on the Board, and the issuance of the Series B Notes pursuant to a unanimous written consent of the Board dated December 10, 2015.

F-31

**Equity Investment by the Investor**

On December 10, 2015, the Investor purchased $90,000 in common stock at a purchase price equal to 90% of the average of the closing prices of the common stock for the three (3) trading days immediately preceding the date that is 6 months from the date of the agreement.

**Forbearance Agreement**

On December 10, 2015, the Company and the Investor entered into a forbearance agreement regarding the Investor's convertible note. The Investor alleged certain breaches by the Company of its obligations under the note. The Company denied any breaches or defaults occurred under the note. However, in an effort to avoid protracted litigation about the dispute, the parties agreed to enter into the forbearance agreement which provided that the outstanding balance of the note increased by $105,000 as provided for in the original note.

**Additional Funding Under August 2015 Note**

On December 15, 2015, an accredited investor provided the Company with $50,000 in additional proceeds under the same terms of their original convertible note.

*Third Party Debt Conversions*

See Note 5 for subsequent conversions related to third party debt.

*Unwinding of BetterChem Acquisition*

See Note 1 for the unwinding of BetterChem.

F-32

## INDEX OF EXHIBITS

| Exhibit No. | Description of Exhibit |
|---|---|
| 3.1 | Certificate of Incorporation of Vape Holdings, Inc., as amended, placed into effect on January 2, 2009, incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-1 (Registration No. 333-163290) filed with the SEC on November 23, 2009. |
| 3.2 | Amended and Restated By-laws of Vape Holdings, Inc., incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1 (Registration No. 333-163290) filed with the SEC on November 23, 2009. |
| 3.3 | Certificate of Designation for Series A Preferred Stock, incorporated by reference to Exhibit 2.1(E) to the Company's Current Report on Form 8-K filed with the SEC on February 28, 2014. |
| 3.4 | Certificate of Designation for Series B Preferred Stock, incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.1 | Securities Purchase Agreement entered into by and between Vape Holdings, Inc. and Redwood Management, LLC dated February 10, 2015, incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on February 17, 2015. |
| 10.2 | Unsecured Convertible Promissory Note entered into by and between Vape Holdings, Inc. and Redwood Management, LLC dated February 10, 2015, incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed with the SEC on February 17, 2015. |
| 10.3 | Executive Employment Agreement by and between Vape Holdings, Inc. and Dr. Mark Scialdone, dated May 1, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on May 5, 2015. |
| 10.4 | Form of Stock Surrender Agreement Stock, incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 10.5 | Form of Option Surrender Agreement, incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 10.6 | Share Exchange Agreement by and between Vape Holdings, Inc. and BetterChem Consulting, Inc., dated July 1, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on July 1, 2015. |
| 10.7 | Intellectual Property Rights Transfer Agreement by and between Vape Holdings, Inc. and BetterChem Consulting, Inc., dated July 1, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on July 1, 2015. |
| 10.8 | Form of Securities Purchase Agreement, dated August 5, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.9 | Form of 8% Note, dated August 5, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.10 | Form of Back End Note, dated August 5, 2015, incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.11 | Form of Collateralized Note, dated August 5, 2015, incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.12 | 12% Note I, dated August 5, 2015, incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.13 | 12% Note II, dated August 5, 2015, incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed with the SEC on August 11, 2015. |
| 10.14 | Securities Purchase Agreement, dated August 12, 2015, by and between Darling Capital LLC and the Company, incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.15 | 8% Convertible Promissory Note, dated August 12, 2015, by and between Darling Capital LLC and the Company, incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.16 | Amendment, Waiver and Modification Agreement, dated August 13, 2015, by and among the Company and Redwood Management, LLC including any designees or assignees thereto, incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q filed with the SEC on August 14, 2015. |
| 10.17 | Amendment to Unsecured Convertible Promissory Note, dated August 26, 2015, by and between Vape Holdings, Inc. and Typenex Co-Investment, LLC. * |

| | |
|---|---|
| 10.18 | Form of Option Surrender Agreement, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on October 22, 2015. |
| 10.19 | Form of Stock Surrender Agreement Stock, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on October 22, 2015. |
| 10.20 | Secured Series B Preferred Stock Convertible Promissory Note by and between the Company and Hive Ceramics LLC, dated December 10, 2015, incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.21 | Amended and Restated Secured Series B Preferred Stock Convertible Promissory Note by and between the Company and Hive Ceramics LLC, dated December 10, 2015, incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.22 | Executive Employment Agreement, dated December 10, 2015, by and between the Company and Justin Braune, incorporated by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.23 | Consulting Agreement, dated December 10, 2015, by and between the Company and Kyle Tracey, incorporated by reference to Exhibit 99.2 to the Company's Current Report on Form 8-K filed with the SEC on December 11, 2015. |
| 10.24 | Common Stock Purchase Agreement, dated December 10, 2015, by and between Vape Holdings, Inc. and Odyssey Research and Trading, LLC. * |
| 10.25 | Forbearance Agreement, dated December 10, 2015, by and between Vape Holdings, Inc. and Typenex Co-Investment, LLC. * |
| 10.26 | Share Exchange Unwind Agreement, dated January 12, 2015, by and among Vape Holdings, Inc., BetterChem Consulting, Inc. and Mark Scialdone. * |

E-1

| Exhibit No. | Description of Exhibit |
|---|---|
| 14.1 | Code of Ethics, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 21.1 | List of Subsidiaries of Vape Holdings, Inc. * |
| 23.1 | Consent of DBBMcKennon, Independent Registered Public Accountants, as to the report relating to the consolidated financial statements of Vape Holdings, Inc. * |
| 31.1 | Section 302 Certification of Chief Executive Officer * |
| 31.2 | Section 302 Certification of Chief Financial Officer * |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 * |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 * |
| 99.1 | Audit Committee Charter, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 99.2 | Compensation Committee Charter, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 99.3 | Insider Trading Policy, dated May 11, 2015, incorporated by reference to our Quarterly Report on Form 10-Q filed with the SEC on May 15, 2015. |
| 101.INS ** | XBRL Instance Document |
| 101.SCH ** | XBRL Taxonomy Schema |
| 101.CAL ** | XBRL Taxonomy Calculation Linkbase |
| 101.DEF ** | XBRL Taxonomy Definition Linkbase |
| 101.LAB ** | XBRL Taxonomy Label Linkbase |
| 101.PRE ** | XBRL Taxonomy Presentation Linkbase |

*Filed herewith

**Furnished herewith. XBRL (Extensible Business Reporting Language) information is furnished and not filed or a part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, as amended, is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise is not subject to liability under these sections.

E-2

# EXHIBIT "D"

